# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INDEPENDENCE FEDERAL SAVINGS BANK** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:04CV00736** |
| ) | **(RMC)** |
| **MORTON A. BENDER, <u>et</u> <u>al.</u>,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## THE BENDERS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

Defendants Morton A. Bender and Grace M. Bender (the "Benders"), by and through their undersigned counsel, pursuant to Local Rule 65.1(c) of the Rules of Civil Procedure for the United States District Court for the District of Columbia, hereby apply to this Court for Preliminary Injunctive Relief, pursuant to the terms of the proposed Order submitted herewith, and for such other and further relief as may be appropriate.  Pursuant to Local Rule of Civil Procedure 65.1(d), the Benders are also requesting, by separate filing concurrently herewith, an expedited oral hearing on their Application.  In support hereof, the Benders respectfully refer to and incorporate herein their Answer to the Complaint, their Counterclaim for equitable, preliminary and permanent injunctive relief, and their Memorandum in support of their Application for Preliminary Injunctive Relief.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & WAYSON, L.L.P.


_____/s/_____
Dale A. Cooter, Bar #277454
Donna S. Mangold, Bar #358851
James E. Tompert, Bar #358952
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com
*Attorneys for Defendants*
 *Morton A. Bender and Grace M. Bende* r

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK )

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Case No. 1:04CV00736</td></tr>
<tr><td></td><td>)</td><td>(RMC)</td></tr>
<tr><td>MORTON A. BENDER, <u>et</u> <u>al.</u>,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## THE BENDERS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

Defendants Morton A. Bender and Grace M. Bender, by and through their undersigned counsel, submit this Memorandum of Points and Authorities in support of their Application for Preliminary Injunctive Relief and state as follows:

## INTRODUCTION

Defendants, Morton and Grace Bender (the "Benders"), as joint tenants, are the beneficial owners of 326,000 shares of common stock of Plaintiff Independence Federal Savings Bank ("Independence" or "Bank"), and thereby jointly own approximately 21% of the outstanding stock of the Bank. Independence is a federally-chartered savings bank, with its principal place of business in the District of Columbia. Its stock is publicly traded on the NASDAQ Stock Exchange. Despite the fact that the Benders have received approval from the Office of Thrift Supervision to obtain up to one hundred percent of the stock of Independence, the Bank, through its Board of Directors, is determined to ensure that the Benders' rights as shareholders are effectively extinguished. The instant litigation filed by Independence against the Benders (and against Nelson Deckelbaum and Elliott Hall, the only two

independent directors of the Bank), together with the Poison Pill Shareholders Rights Plan adopted by the board in May 2004, constitute their latest salvo.[1]

By their Application, the Benders seek a preliminary injunction compelling Independence: to promptly hold an annual meeting of its shareholders pursuant to its bylaws and federal regulations, including the election of the members of the Board of Directors, before the Merger Agreement with Carver Bancorp, Inc. is put to a vote; to hold a special meeting of shareholders for the purpose of taking a shareholder vote on the Merger Agreement, such special meeting to commence no earlier than thirty (30) days after adjournment of the annual meeting; and to rescind the Shareholder Rights Plan which it approved on or about May 5, 2004.  The Benders also seek additional injunctive relief in the form of an order enjoining the Bank, until after the time that the annual meeting for the election of directors and the special meeting to vote on the Carver Merger Agreement have been held, from calling for a vote on the Bank's proposed creation of a holding company for the purpose of reorganizing the Bank.[2]

## **FACTS**

In or about March 2003, the Benders, together with Columbo Bancshares, Inc., filed an application with the Office of Thrift Supervision ("OTS") for approval of an acquisition of up to 100% of the shares of Independence ("the change of control Application").  On or about October 14, 2003,

---

[1] In addition, the Bank recently filed with the OTS a draft press release announcing its intention to reorganize and form a holding company, the effect of which will be to reduce from two-thirds approval to majority approval, for the approval of the merger with Carver.

[2] The Benders are filing, concurrently herewith, a request for an expedited oral hearing on their Application for Preliminary Injunctive Relief.

the change of control Application was approved by OTS (a copy of the OTS approval is attached

hereto as Exhibit A).  Consistent with their regulatory filings and approvals, the Benders had been

steadily increasing their stock ownership in Independence.  In addition to increasing their stock

ownership, the Benders sought, pursuant to OTS regulations and the Bank's own bylaws, to remove

for cause most of the members of the Bank's Board of Directors (excluding Deckelbaum and Hall), a

goal they made public through regulatory filings.  To accomplish the removal of directors, the Benders

began requesting, in October 2003, a special meeting of shareholders.  The Bank's Board, however,

refused to call such a meeting.  In the face of the Board's refusal, and knowing that the annual meeting

of the Bank's shareholders would not take place until April 2004, the Benders, on November 24,

2003, filed an action entitled <u>Bender, et al. v. Parks, et al.</u>,("<u>Parks</u> case"),[3] in which they sought

temporary and preliminary injunctive relief in the form of an order requiring the directors of

Independence to hold a special meeting of the shareholders of Independence. During the course of the

hearings in this Court on the Benders' request for injunctive relief in the <u>Parks</u> case, counsel for

Independence represented to this Court that Independence would have its annual meeting of

shareholders in the Spring of 2004, thus, they argued, obviating the need for a special meeting (such

representations are discussed in greater detail below).

On January 15, 2004, this Court, in a Memorandum Opinion (pertinent portions of which are

attached as Exhibit B), denied the Benders' request in the <u>Parks</u> case for a preliminary injunction

---

[3] The Parks case was originally filed in the District of Columbia Superior Court but was
removed to this Court by the defendants in that case.

ordering a special shareholders meeting.[4]  In its Memorandum Opinion, the Court stated, in pertinent part, that "[s]hould an injunction be withheld, Mr. Bender can either bid for the Bank, acquire its stock in the methods forecast by the Application, or proffer new Board members for the Annual Meeting in the Spring."  1/15/04 Mem. Op. at 11.

Since this Court's January 15, 2004 Memorandum Opinion in the Parks case, and notwithstanding the Court's expectation - based on representations of the Bank, its Board members, and their counsel - that the Benders would be afforded the full range of corporate and regulatory procedures through which to exercise their rights to increase their share ownership, there have been significant roadblocks thrown in their way by Independence, not the least of which is this litigation. First, on or about March 15, 2004, Independence entered into an Agreement and Plan of Merger ("Merger Agreement") with Carver Bancorp, Inc. ("Carver") (pertinent portions of the Merger Agreement are attached hereto as Exhibit C).  Pursuant to Section 8.01(c) of the Merger Agreement,

---

[4] Notwithstanding their disappointment in it, the Benders certainly acknowledge this Court's decision in the Parks case denying their request for temporary and preliminary injunctive relief.  The Bank's counsel in the current litigation is obviously enamored of this Court's findings in the Parks case (that the Benders seek to "gain indirect control of [IFSB] without spending a sou for it").  See Compl. at ¶¶9, 89 (quoting the foregoing language from the Court's January 15, 2004 Memorandum Opinion). The Bank's counsel, however, seems unwilling to follow the logic of the Court's January 2004 decision. When the parties were before this Court in December 2003 and January 2004 in the Parks case, and the Benders were seeking a special meeting to vote on the removal of directors for cause, the Bank and its directors took the position that the Benders should be treated like all the other shareholders of the Bank.  While the Benders were disappointed with the Court's conclusions in the Parks case, they accepted its logic and did what the Court suggested they should - purchase shares "in the methods forecast by" by their change of control application and await the annual meeting in the spring to proffer new board members.  Now that the Benders have done what the Court stated they could do, the Bank is unhappy and now seeks – with a vengeance - to treat the Benders differently than all other shareholders are treated.

the merger transaction is to be completed by December 31, 2004.  Second, notwithstanding the obligation of the Bank to have held its annual meeting by April, 2004 (and notwithstanding the representations made in the <u>Parks</u> case by the Bank, its directors and their counsel that it would do so), the Bank has failed and refused to notice the annual meeting and to date there has been no annual meeting since April 2003.  Third, on May 4 and 5, 2004, the Bank's Board of Directors convened a special meeting of the Board and approved a Shareholder Rights Plan (although directors Deckelbaum and Hall were not present), commonly known as a Poison Pill ("Poison Pill").  Fourth, on May 6, 2004, Independence filed this action against the Benders, seeking preliminary and permanent injunctive relief as well as monetary damages.[5]  Fifth, on or about May 26, 2004, Independence filed with the with the OTS a draft press release (a copy of which is attached hereto as Exhibit D) announcing its intention to reorganize and form a holding company, the effect of which will be to reduce from two-thirds approval to majority approval, for the votes necessary to approve the merger with Carver.  The Benders now seek preliminary injunctive relief nullifying these roadblocks and ordering annual and special shareholders meetings to put the removal of the directors and the approval of the merger to a vote of the shareholders; prohibiting, temporarily, a vote on the proposed reorganization; and rescinding the Poison Pill.[6]

---

[5]  The Bank's only two independent directors, Nelson Deckelbaum and Elliott Hall, are also named as Defendants in this action.

[6]  The timetable in the relief requested is critical.  The Benders request that: (1) the invalidation of the Poison Pill Shareholder Rights Plan be made immediately effective upon the entry of the Court's order; (2) that Bank be ordered to call the now long overdue annual meeting so that the election of directors can be voted upon; (3) that the Bank be ordered to call the special meeting for the shareholder vote on the Carver Merger Agreement on a date not sooner than 30 days after the date the annual meeting takes place; and (4) that the Bank be enjoined from calling for a vote for the creation of

a holding company until all the above actions have been accomplished.

# ARGUMENT

## I.      SUBSTANTIVE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF

"In considering a request for preliminary injunctive relief, a district court must examine whether '(1) there is a substantial likelihood [movant] will succeed on the merits; (2) [movant] will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the [non-movant]; and (4) the public interest will be furthered by an injunction.'" Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc., 295 F. Supp. 2d 75, 81 (D.D.C. 2003)(Collyer, J.) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360 (D.C. Cir. 1999)).  See Mova Pharmaceutical corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  As this Court explained in its decision in Atlantic Coast, the four factors "'interrelate on a sliding scale' and a particularly strong showing on one may compensate for a weak showing on another."  Atlantic Coast, 295 F. Supp.2d at 81 (citations omitted).  Injunctive relief is appropriate in matters of corporate governance.  See Woodward & Lothrop, Inc. v. Schnabel, 593 F. Supp. 1385 (D.D.C. 1984) (shareholders entitled to temporary restraining order directing that a scheduled shareholder vote on a proposed merger be enjoined until such time as amended and accurate information regarding the proposed merger could be disseminated).

## II.    THERE IS SUBSTANTIAL LIKELIHOOD THAT THE BENDERS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS[7]

### A.    INDEPENDENCE SHOULD BE ORDERED TO SCHEDULE THE ANNUAL MEETING TO ELECT DIRECTORS

There is a substantial likelihood that the Defendants will succeed on the merits of their request for an annual meeting. The Bank and the directors have no basis in law on which they can base a refusal to hold an annual meeting. Neither the regulations nor the Bylaws requiring an annual meeting are discretionary. Moreover, the Bank and its directors expressly represented to this Court in the Parks case that an annual meeting would be convened in April, 2004.

As noted above, in the fall of 2003, the Benders sought a special shareholders' meeting pursuant to 12 C.F.R. §552.6(a) and Article II, Section 3 of the Bank's Bylaws for the express purpose of holding a vote on whether the Bank's board of directors (other than directors Nelson Deckelbaum and Elliott Hall, Defendants herein) should be removed for cause. When the Bank's directors failed to honor their obligation to hold the meeting, the Benders filed the Parks case in this Court, seeking an injunction to force the directors to hold the meeting. The Parks case was filed in November 2003, and the final hearing on the Benders' motion for preliminary injunctive relief in that

---

[7] Not only are the Benders likely to succeed on their claims (as alleged in their Counterclaim), they are also likely to succeed in their defense of the Bank's claims against them as alleged in the Bank's Complaint. The Benders have amended their 13D to avoid any further confusion regarding the presence or absence of profit sharing agreements; the Benders are not controlling shareholders and owe no fiduciary duty to the Bank nor did they conspire with Deckelbaum or Hall to breach their fiduciary duties owed as directors; and the Benders have not tortiously interfered with the Carver Merger Agreement. In fact, the Bank's allegations in its Complaint are so far afield that the Benders have served the Bank's counsel with a Rule 11 motion which the Benders intend to file with the Court if the Bank does not voluntary dismiss its Complaint within twenty-one days.

case was held on January 8, 2004, approximately three months before the time that the Benders anticipated the Bank's annual meeting would be held.

The principal defense raised by the Bank and the Directors in opposition to the Benders' request in the <u>Parks</u> case for an order mandating the call of a special meeting was the fact (according to them) that the annual meeting would be taking place in a matter of months and, therefore, there was no reason to hold a special meeting. Counsel for the Bank and the directors made this representation over and over again in the <u>Parks</u> case. During the December 3, 2003 hearing on the Benders' Motion for a Temporary Restraining Order, this Court inquired as to whether a refusal to hold a special meeting would "undercut the entire concept [of] shareholder democracy," and counsel for Independence and its directors responded: "I don't think that your question can be viewed in a vacuum. After all, the, an actual meeting of the shareholders is scheduled to take place in April so what's the rush here. I mean, all of the issues that Mr. Bender wants to present at the special shareholder meeting could presumable be presented at the annual meeting in April." <u>See</u> Transcript of 12/3/03 TRO Hearing (pertinent portions of which are attached hereto as Exhibit E) at 45, 46. Later in the same hearing, counsel for Independence and the board of directors, addressing the issue of balance of hardships, stated: "As we clearly demonstrate in our papers . . . compliance with this request [for a special shareholders' meeting] would result in a further waste of precious assets of the bank. At a minimum it would involve the bank paying for two shareholders meeting in a span of only three months. . . . We have estimated that it would cost over $800,000 to comply with an injunction and have this special meeting when in fact an annual meeting is scheduled for [sic]." 12/3/03 TRO Tr. at 51, 52. On the second day of the TRO hearing, counsel for the Bank and its directors represented to the Court that the Board was prepared to

move up the date of the annual meeting to April 12, 2004 and have a combined annual and special meeting on that date.  12/8/03 TRO Tr. (pertinent portions of which are attached hereto as Exhibit F) at 4-5, 6, 9.  Later in the same hearing, counsel for the Bank and its Board stated: "But the kind of confusion that that's going to create [having a special meeting in March], the kind of chaos that is going to create, the man hours, the overlapping where you are preparing for the special meeting and preparing for the annual meeting, along with this cost 400,000 plus dollars more to accommodate a meeting in March versus a meeting three weeks later in April."  12/8/03 TRO Tr. at 29.

Counsel for the Bank and its Board made similar representations in the papers they filed in the Parks case.  In their Supplemental Response in Opposition to Bender Motion for Preliminary Injunctive Relief filed January 8, 2004  in the Parks case (pertinent portions of which are attached hereto as Exhibit G), the Bank's directors, in arguing that the timing considerations militated in favor of a denial of the Bender's request for a special meeting, stated:

> A special meeting could be scheduled, in a best-case scenario, little more than a month before the date on which the Bank would schedule its annual meeting of shareholders, *at which Bender may advance any appropriate proposal he may wish to present for shareholder consideration.*    Given the fact that, at best, Bender can obtain a special meeting only a month in advance of the regular annual meeting, the balance of equities strongly tilt against inflicting comparatively large expense on the Bank for comparatively little benefit to Bender.

Supp. Resp. at 20-21 (footnote omitted; emphasis added).  Later in the same response, the directors stated: "[t]he fact that Bender's removal proposal stands virtually no chance of ultimate success is another equitable factor which strongly militates against requiring the expenditure of corporate resources for a special meeting that can, at best, occur only approximately one month before the regular annual meeting."  Id. at 21.  In Paragraph 8 of the December 8, 2003 Affidavit of Thomas L. Batties,

Esq. (the acting President of Independence) offered in support of the Bank's and the directors'

Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Temporary Restraining

Order, Preliminary and Permanent Injunction, Mr. Batties declared that his Affidavit would "describe,

in more specific terms, the process involved and the disruption that would be caused by calling a special

shareholder's meeting on an expedited schedule - *particularly with regard to the overlap in*

*preparations that is inevitable in terms of the fast approaching     April 2004  IFSB annual*

*shareholders' meeting.* " 12/8/03 Batties Aff. at ¶8 (emphasis added) (pertinent portions of the Batties

Affidavit are attached hereto as Exhibit H).  In Paragraph 20 of the same affidavit, Mr. Batties

represented to the Court that "the results of election [of the special meeting requested by the Benders]

would not become available until approximately April 5, 2004, which would be within a few days of the

expected date of the annual meeting." 12/8/03 Batties Affid. at ¶20.  In Paragraph 21, Mr. Batties

stated that "inclusion of the annual report with the proxy material would require the [special] meeting to

be scheduled approximately on the same date as the scheduled date of the annual meeting, April 21,

2004." Id. at ¶21.  Mr. Batties then asserted that "if a separate special meeting of shareholders were

scheduled prior to the annual meeting of shareholders, the preparation process for the two meetings

would substantially overlap" resulting in an unacceptable burden to the Bank's staff and in confusion to

the shareholders.  Id. at ¶23.  Finally, in Paragraph 26, Mr. Batties states that "holding two

stockholders' meeting within a matter of weeks from one another would be a costly burden." Id. at

¶26.[8] In their Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order,

_____

[8]  The time line attached to Mr. Batties' Affidavit states that preparations for the April 2004
annual meeting would begin January 1, 2004, that proxy materials would be mailed the week of March

11

Preliminary Injunction, and Permanent Injunction, filed December 3, 2003 in the <u>Parks</u> case ("12/3/03

Oppos.") (pertinent portions of which are attached hereto as Exhibit T), the Bank and the directors

stated that the Board, in its consideration and rejection of the Bender's request in the fall of 2003 for a

special meeting, "placed great weight on the fact that the shareholder's annual meeting is scheduled to

be held in April 2004 and that the matters raised by Mr. Bender could reasonably be considered then,

without any prejudice to Mr. Bender's rights." 12/3/03 Oppos. at 8 (citing 12/3/03 Affidavit of

Thomas Batties (pertinent portions of which are attached hereto as Exhibit I), at ¶30).  In arguing in that

same Opposition that the Benders could not demonstrate a likelihood of success on the merits, the

Bank and the directors state that "[i]t is clear from the totality of the evidence that IFSB properly and

reasonably denied Mr. Bender's request to call a special shareholders' meeting *less than three*

*months before IFSB's annual shareholder meeting is scheduled to commence.*   " 12/3/03 Oppos. at

13 (emphasis added).

　　　This Court was obviously persuaded by the foregoing representations made both in court

hearings and in the briefs of the Bank and the directors that the Bank's annual meeting would be held in

April, 2004.  One of the reasons given by this Court for denying the Benders' preliminary injunctive

relief in the <u>Parks</u> case was the Court's finding that "[s]hould an injunction be withheld, Mr. Bender can

either bid for the Bank, acquire its stock in the methods forecast by the Application, ***or proffer new***

***Board members for the Annual Meeting in the Spring***   ." 1/15/04 Mem. Op. at 11 (emphasis

_____

7, 2004, and that the annual meeting would be held April 21, 2004.  Therefore, presumably, consistent
with the representations made by the Bank's President to this Court in the <u>Parks</u> case, all of the
preparation for the 2004 annual meeting has already been undertaken and no further preparations are
required and there is no reason for further delay.

added).

April 2004 has now come and gone and no annual meeting has been set.  Not only is the
Bank's refusal to hold the meeting a violation of representations made in this Court in the <u>Parks</u> case by
counsel for the Bank and its directors, but it also violates the Bank's own bylaws and OTS regulations.
The Bank's Amended and Restated Bylaws effective April 21, 1999 (a copy of which are attached
hereto as Exhibit J) provide in Article VIII that the Bank's fiscal year ends on the 31st day of December
of each year.  Article II section 2 of the same Bylaws provides that the annual meeting shall take place
"annually within 120 days after the end of the savings bank's fiscal year on the third Wednesday of
January . . . or at such other date and time within such 120 day period as the board of directors may
determine."  Thus, the annual meeting should have been held January 21, 2004, but in no event later
than April 29, 2004.  On April 6, 2004, however, the Bank's Board of Directors voted to amend
Article II, Section 2 to set the date of the annual meeting "within 150 days after the end of the savings
bank's fiscal year on the third Wednesday of April . . . or at such other date and time within such 150-
day period as the board of directors may determine."  A copy of the 4/9/04 amendment is attached
hereto as Exhibit K. Thus, even under the Bank's amended bylaws, the annual meeting should have
been held April 21, 2004, but in no event later than June 1, 2004.  The regulations of the OTS also
require that a Bank's annual meeting be held within 150 days of the end of its fiscal year – by June 1,
2004.  12 C.F.R. §552.6(a).

Notwithstanding the fact that the Bank and its Board members represented to this Court in
December and January that the annual meeting would be held this Spring, and that the bylaws then in
effect required the meeting to take place no later than April 29, 2004, the Bank has failed to call the

13

annual meeting and instead continues to delay the meeting. Even though the Board technically had until June 1, 2004 at the latest to hold the annual meeting, it has not held it – nor has it engaged in any pre-meeting preparations, nor has it issued any notice as to when or where the meeting will take place, and it is clear by the Board's inaction that it has no intention to voluntarily schedule the meeting at any time in the near future.

It is clear that this Court cannot rely on the representations of the Bank, its Board, or their counsel, that an annual meeting will take place. Only an order, by way of mandatory injunction, directing the meeting to take place by a date certain, can ensure that the annual meeting will in fact occur. As the Bank and its directors continue to stymie the efforts of the Benders to increase their acquisition of stock, the urgency for the meeting has escalated.

The propriety of granting an injunction in these circumstances is well-established. In Aprahamian v. HBO & Co., 531 A.2d 1204 (Del. Ch. 1987), the court granted plaintiff's motion for preliminary injunction prohibiting any further postponement of the annual meeting of shareholders. As noted by the court in Aprahamian, "[t]he corporate election process, if it is to have any validity, must be conducted with scrupulous fairness and without any advantage being conferred or denied to any candidate or slate of candidates. In the interest of corporate democracy, those in charge of the election machinery of a corporation must be held to the highest standards in providing for and conducting corporate elections." 531 A.2d at 1206-07.

Under Delaware statutory corporate law,[9] a board of directors is required to convene an annual

_____

[9] It is not entirely clear which law applies in this case. Independence is a federally chartered thrift. Although OTS regulations permit a thrift in its charter to elect that certain portions of the laws

14

meeting and if it fails to do so, the board of directors may be summarily compelled by the Chancery

Court to convene the meeting.  See Speiser v. Baker, 525 A.2d 1001, 1005-06 (citing 8 Delaware

Code §211 and noting that no cases were cited by the parties in which a court actually declined to

compel a meeting once the statutory elements[10] were proven); see also Hoschett v. TSI Intern.

Software, Ltd., 683 A.2d 43, 44 (Del. Ch. 1996) ("obligation to hold an annual meeting . . . is one of

the very few mandatory features of Delaware corporation law.  Delaware courts have long recognized

the central role of annual meetings in the scheme of corporate governance").  The District of Columbia

also requires corporations to hold annual meetings "at such time as may be provided in the bylaws."

D.C. Code §29-101.25. Whether to hold an annual meeting simply is not discretionary - no matter

what interest the board may have in ***not*** having the meeting.  "Whether [the annual meeting] is welcome

or resented by management, however, is in the end, irrelevant under Section 211(b) and (c) of the

DGCL and similar statutes in other jurisdictions."  Hoschett, 683 A.2d at 45.

The importance of the shareholder right to vote was expressed by the Delaware Chancery

Court as follows:

_____

(except for antitakeover provisions) of the place where the thrift operates (here, primarily the District of
Columbia, but also Maryland), the laws of Delaware, the Model Business Corporation Act, or some
other state's laws will apply, Independence made no such selection in its charter.  Because the OTS
would permit a thrift such as Independence to select portions of Delaware law, and because both the
District of Columbia and Maryland look to Delaware law when their laws are silent, Delaware law is
sometimes relied on herein.

[10] To establish the statutory elements under Delaware law, a plaintiff must demonstrate that (1)
he is a shareholder and (2) that no annual meeting has been held within 30 days of the date designated
therefor or, if no date had been set, for 13 months since the last annual meeting.  Speiser, 525 A.2d at
1005 (citing 8 Del. Code §211(c).  "Proof of these two statutory elements has been said to constitute a
*prima facie* case for relief." 525 A.2d at 1005.

The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests. Generally, shareholders have only two protections against perceived inadequate business performance. They may sell their stock . . or they may vote to replace incumbent board members.

It has, for a long time, been conventional to dismiss the stockholder vote as a vestige or ritual of little practical importance. [Footnote omitted]. It may be that we are now witnessing the emergence of new institutional voices and arrangements that will make the stockholder vote a less predictable affair than it has been. Be that as it may, however, whether the vote is seen functionally as an unimportant formalism, or as an important tool of discipline, it is clear that it is critical to the theory that legitimates the exercise of power by some (directors and officers) over vast aggregations of property that they do not own. Thus, when viewed from a broad, institutional perspective, it can be seen that matters involving the integrity of the shareholder voting process involve consideration not present in any other context in which directors exercise delegated power.

Blasius Industries, Inc. v. Atlas Corp., 564 A.2d 651 , 659 (Del. Ch. 1988).

Thus, the Benders are likely to succeed on the merits of their claim that a meeting should be held by a date certain - the holding of an annual meeting is expressly required by the Bank's bylaws and is expressly required by the OTS regulations.

### B.     Independence Should Be Ordered to Schedule a Special Meeting to Vote on the Carver Merger

The Benders also seek an order requiring a special meeting approximately 30 days following the annual meeting. The purpose of the special meeting would be to vote on the Carver merger. The notices for the special meeting can be sent at the same time the notices for the annual meeting are sent, thereby reducing the cost to the Bank. There is a substantial likelihood that the Defendants will succeed on the merits of their request for a special meeting. The Bank and the directors have no basis in law on which they can base a refusal to hold such a meeting.

Section 6.02 of the Carver Merger Agreement obligates Independence to "take, in accordance

16

with applicable law and the Company Charter and Company Bylaws, all action necessary to convene as promptly as practicable following the date of this Agreement [March 15, 2004], a meeting of its shareholders to consider and vote upon the approval of this Agreement and any other matters required to be approved by the company's shareholders in order to permit consummation of the Merger . . . ." Section 3 of the Bank's bylaws provides that a special meeting of the shareholders shall be called upon the written request of the holders of not less than one-tenth of all the outstanding shares.[11]  <u>See also</u> 12 C.F.R. §552.6(a). Finally, 12 C.F.R. §552.13(h)(1) requires that a merger with a stock savings association such as Independence be approved by two-thirds of the bank's stockholders.  The Carver Merger agreement also expressly provides that the vote of the holders of two-thirds of the stockholders of Independence is necessary to approve the merger.  Carver Merger Agreement §5.02(y); §7.01(a). Clearly, the merger with Carver must be put to a vote of the bank's shareholders, and the Benders are likely to succeed on the merits of this claim.

In addition to delaying a vote on the Carver Merger Agreement merely by failing to schedule a special shareholders meeting, the Bank has now announced its intention to reorganize the Bank by the creation of a holding company so that the Carver merger will be subject to just a majority approval, rather than approval by two-thirds of the shareholders.  <u>See</u> draft May 2004 Press Release (Exhibit D hereto).  This latest action is further evidence of the over-the-top attitude of the Bank that it can change any and all rules with impunity solely to stop the Benders.  The purpose of the reorganization is to frustrate the Benders in their rights to evaluate the best course of action for the Bank, to frustrate their

---

[11]  On the same day as this Brief is being filed, the Benders have requested a special meeting of shareholders for the purpose of voting on the Carver Merger Agreement.

evaluation of the Merger Agreement, and to frustrate their participation in corporate democracy. The press release states that the purpose of the reorganization through the creation of a holding company is to help ensure the completion of the Carver transaction by reducing the number of votes necessary for its approval. If the reorganization were approved, the value of the voting rights attendant to the shares held by the Benders would be significantly reduced by virtue of the fact that the merger would be subject to approval by a mere majority. In addition, this latest action can only mean that the Bank intends to delay indefinitely the shareholder vote on the Carver Merger Agreement until such time as the Bank winds its way through the OTS regulatory approval process for the reorganization; then renegotiates and re-executes a revised merger agreement reflecting the reorganization (if it gains OTS approval); and then submits the new merger agreement to a shareholder vote. In the meantime, of course, the Benders will be excluded from the marketplace during that indefinite period of delay by virtue of the Poison Pill Rights Plan.

**C.    The Poison Pill Should Be Rescinded**

As stated above, the Benders received approval from the OTS on their change of control Application on October 14, 2003. Since that time, the Bank and its directors have sought at every turn to prevent the Benders from increasing their stock ownership. In addition to the filing of this lawsuit, their failure to call an annual shareholders' meeting, and their failure to call a special meeting to vote on the Carver Merger Agreement, the Bank, on May 5, 2004 adopted the Poison Pill Rights Plan (pertinent provisions of which are attached hereto as Exhibit L). It is referred to as a poison pill because if its provisions are triggered there is a dilution of stock owned by shareholders who do not have rights or fail to exercise rights to purchase stock under the Plan. The Plan provides for the

18

distribution of one common stock purchase right for each share of Independence common stock. The right represents the right to purchase one-tenth of a share of Independence common stock. The Plan states that "[t]he Purchase Price for each full share of Common stock pursuant to the exercise of a Right shall initially be $60." Shareholder Rights Plan at 13. A right to purchase stock cannot be exercised until a triggering event occurs, as set forth in the Plan. A triggering event occurs if a shareholder acquires twenty percent (20%) or more of the Bank's common stock. Since the Benders have already acquired more than twenty percent (20%) of the Bank's common stock, they are considered a "Grandfathered Shareholder" under the Plan, but only so long as they do not purchase any more shares than they owned as of May 5, 2004. The Merger Agreement with Carver is expressly deemed not to be a triggering event. After a triggering event occurs, each non-triggering shareholder has the right to purchase a number of common shares having a market value of twice the exercise price (which is set at $60 per share in the Plan). As such, under the terms of the Plan, if the Benders purchase one additional share of Independence common stock, a triggering event occurs, and the stock ownership interest of the Benders is subject to massive dilution. The Benders request this Court to declare the Poison Pill Rights Plan invalid and to order its rescission.

There is a substantial likelihood that the Defendants will succeed on the merits of their request that the Poison Pill Rights Plan is invalid and should be rescinded. The Poison Pill was adopted at a meeting at which two of the directors were wrongfully induced not to attend; there are not sufficient authorized but unissued shares of stock to implement the plan, the result of which will be to deprive the Benders of their right to vote their common stock; the adoption of the Poison Pill without prior OTS approval violates the anti-takeover regulations; and adoption of the Poison Pill is not a reasonable

response by the Board to any perceived threat from the Benders.

1.      **The Poison Pill Rights Plan was adopted**
        **without the knowledge or approval of either**
        **the full board or the OTS.**

The Board's adoption of the Poison Pill Rights Plan was accomplished clandestinely. In Paragraph 74 of their Complaint, the Plaintiffs allege that "the independent members of IFSB's board met on May 4 and 5, 2004 and approved a shareholders rights plan . . . ." What the Plaintiffs do not disclose to the Court is that not only were Deckelbaum and Hall not present at either of those meetings for discussion and voting on the Poison Pill, they were affirmatively misled by the Bank's other directors as to the purpose of those meetings so that they would not be present.

The purpose of adopting the Poison Pill is clear - it was to frustrate the Benders in their OTS approved quest to acquire additional shares of the Bank's stock. On May 6, 2004, the day after Independence adopted the Plan, it issued a Press Release in which it stated that the purpose of the Plan was to deter the Benders' acquisition of additional shares which would in turn prevent the Benders from voting down the proposed Carver merger. See 5/6/04 Press Release (attached hereto as Exhibit M). As of May 5, 2004, the Benders were the only shareholders to own more than 20% of the outstanding common stock issued by Independence. Because of the Plan the Benders have been prevented from purchasing any additional shares of Independence notwithstanding the express authorization of the OTS that they are permitted to do so.

Not only does the adoption of the Plan deprive the Benders of the benefit of acquiring shares as sanctioned by the approval of their Change of Control Application, the adoption of the Plan was undertaken in a manner which violates the OTS regulations. The OTS regulations and handbook manifest OTS policy that any maneuver by the board of a federally chartered bank to implement an

21

anti-takeover policy must first be submitted to, *and approved by* , the OTS.  12 C.F.R.

§552.5(b)(1)(i)(A); 12 C.F.R. §552.4(a)(2).[12]  Here, the Board did not seek such approval from the

OTS and the Benders seek an order from this Court preliminarily enjoining the Plan from being

effective, and a ruling that any further stock acquisitions pending any such approval of the Plan by the

Bank's shareholders and the OTS, are not a "triggering event" under the Plan.

Section 410 of the OTS Applications Handbook (pertinent portions of the Handbook are

attached hereto as Exhibit N) defines "anti-takeover provision" as:

> any amendment to the institution's bylaws, or in some cases to the charter, that renders
> more difficult or discourages a merger, tender offer, or proxy contest, the assumption of
> control by a holder of a large block of the institution's stock, or the removal of
> incumbent management.  The Director of OTS, or her designee, will act on all anti-
> takeover amendments, except those preapproved in the regulations for newly converted
> institutions.  Anti-takeover provisions that have been found acceptable by the OTS are
> listed in an exhibit to this section.

Applications Handbook §410 at p. 410.2. The Poison Pill adopted by Independence fits squarely

within the OTS definition of anti-takeover provision.[13]

_____

[12] Although the OTS regulations speak in terms of charter and bylaw amendments, the fact that
the Poison Pill Rights Plan was adopted in this case by board resolution (rather than by law or charter
amendment) does not make it valid.  The Bank's board, by using resolution rather bylaw or charter
amendment, was obviously attempting to end-run these regulations.  If such action were countenanced,
no board of directors would ever adopt an anti-takeover charter measure in any way other than by
board resolution and the OTS regulations on this matter would be rendered inoperative and
meaningless.  Such a construction violates basic tenants of regulatory construction.  In re Surface Min.
Reg. Litig., 627 F.2d 1346, 1362 (D.C. Cir. 1980); Asiana Airlines v. F.A.A., 134 F.3d 393, 398
(D.C. Cir. 1998); Public Citizen Health Research Group v. F.D.A., 704 F.2d 1280 (D.C. Cir. 1983);
Princess Cruises, Inc. v. U.S., 201 F.3d 1352, 1361-1362 (Fed. Cir. 2000), cert. denied, 530
U.S.1274 (2000).

[13] The Poison Pill is not included in the Handbook Exhibit listing the types of anti-takeover
provisions that the OTS has found acceptable.  See Handbook Exhibit at p. 410.3.

Consistent with the requirement that anti-takeover amendments must be submitted for pre-approval to the OTS, the OTS also carves out anti-takeover laws from those laws the OTS will permit stock institutions to follow.  The OTS Handbook provides:

> Stock institutions may also elect to follow the corporate governance procedures of the laws of the state where the main office of the institution is located; the laws of the state where the institution's holding company, if any, is incorporated or chartered; Delaware General Corporation law; or The Model business Corporation Act, provided that such procedures may be elected only to the extent not inconsistent with applicable federal statutes, regulations, and safety and soundness, ***and such procedures do not include anti-takeover provisions***, or include provisions that involve significant issues of law or policy.

Applications Handbook §410, p. 410.8; 12 C.F.R. §552.5(b)(3).

If a bank such as Independence seeks to put an anti-takeover measure such as a Poison Pill in place, it must file an application to do so.  In support of such an application, Independence would have to file the proposed amendment and a discussion of the basis for the amendment.  See Applications Handbook §410, p.410.3-410.4; 410.6. In evaluating the application, the OTS considers whether similar provisions have also received OTS approval and whether an opinion of legal counsel has been submitted.  Id. With regard in particular to applications for bylaw amendments, the OTS handbook states: "A legal opinion may be required since many of the nonconforming amendments tend to restrict member/stockholder rights in favor of the existing board of directors and/or management." Applications Handbook §410, p. 410.6.  The OTS expressly considers applications "for charter and bylaw amendments with nonroutine anti-takeover provisions, or nonstandard indemnification provisions" to "contain an issue of law or policy that require concurrent processing by the OTS Regional Office and OTS-Washington." Applications Handbook §040 at p. 040.1-040.2. Thus, not

24

only was an application required, the application process would have required concurrent review by the regional office in Atlanta, Georgia and by OTS headquarters in Washington.     Besides having been adopted surreptitiously by excluding both directors Deckelbaum and Hall, and the OTS itself, from the adoption process, the Plan as written will violate the Bank's charter and the Benders' common stock voting rights.  Pursuant to its charter (a copy of which is attached hereto as Exhibit O), Independence is authorized to issue 2,500,000 shares of capital stock, of which 2,000,000 shares are common stock and 500,000 shares are preferred stock.  Charter at §5. If the Bank wishes to increase the number of authorized shares, it must amend its charter and the amendment requires the approval of not only the Bank's board of directors, but also by a majority of votes of the shareholders.  Charter §10.  Such an amendment, if duly approved by the Board and the shareholders, would be deemed approved at the time adopted if filed within 30 days after adoption.  552.4(b).  There has been no charter amendment to increase the number of authorized shares.  Accordingly, there are insufficient authorized shares to implement the Plan in any case.  In Section 9 of the Poison Pill, Independence "covenants and agrees that it will cause to be reserved and kept available out of its authorized and unissued shares of Common Stock, or any authorized and issued shares of Common Stock held in its treasury, the number of shares of Common Stock that will be sufficient to permit the exercise in full of all outstanding Rights and, after the occurrence of an event specified in Section 11, shall so reserve and keep available a sufficient number of shares of Common Stock (and/or other securities) which may be required to permit the exercise in full of the Rights pursuant to this Agreement."  Under Section 11 of the Poison Pill, the Board (notwithstanding the absence of any such authority in the Charter) is authorized to issue blank check preferred stock and to assign it common stock voting rights.  However, the Carver Merger

Agreement provides that it can only be approved by an affirmative vote of the holders of two-thirds of Independence's *common stock* .  Merger Agreement §5.02(y); §7.01(a).

### 2.  The failure to submit the Poison Pill Rights Plan to OTS contravened express OTS directive.

Another reason why the Poison Pill Rights Plan is invalid is that OTS ordered Independence in November 2003 to submit to it for review all third-party contracts.  In November, 2003, the OTS determined that Independence was both a "problem association" and in "troubled condition."  <u>See</u> 11/4/03 letter from John E. Ryan to Board of Directors (a copy of which is attached hereto as Exhibit P).  Because of this finding, the OTS imposed a condition on the Bank's board of directors requiring "[p]rior OTS review of third party contracts."  <u>Id</u>. at p. 3, item 4 (citing Thrift Activities Handbook ("TAH") at §310)(pertinent portions of which are attached hereto as Exhibit Q).  Section 310 of the Thrift Activities Handbook provides that banks subject to the condition "may enter into third-party contracts for services outside the normal course of business only with the regional director's pre-approval. . . . Third-party contracts must not contain provisions detrimental to the savings association or contrary to the public interest.  They should receive close regulatory scrutiny since the costs may ultimately increase the cost of an association's failure to the deposit insurance fund."  TAH §310, at p. 310.11.

Notwithstanding the OTS requirement that Independence submit all third-party contracts to OTS for prior review, the Board ignored its obligation to do so, entering into the Poison Pill – which is an agreement between Independence and American Stock Transfer & Trust Company, as Rights Agent – without prior OTS review.  The Poison Pill potentially subjects Independence to significant financial

liability, which underscores the reason it should have been submitted for prior review.  Section 19 of the

Poison Pill provides, in pertinent part: "[Independence] agrees to pay to the Rights Agent reasonable

compensation for all services rendered by it hereunder and, from time to time, on demand of the Rights

Agent, its reasonable expenses and counsel fees and disbursements and other disbursements incurred in

the administration and execution of this Agreement and the exercise and performance of its duties

hereunder. [Independence] shall indemnify the Rights Agent for, and hold it harmless against, any loss,

liability, claim or expense ("Loss") arising out of or in connection with its duties under this Agreement,

including the costs and expenses of defending itself against any Loss, unless such Loss shall have been

determined by a court of competent jurisdiction to be a result of the rights Agent's gross negligence or

intentional misconduct.  The obligations of the Company under this section shall survive the termination

of this Agreement."  Poison Pill at §19 (Exhibit L hereto).

The Bank also failed to submit the Carver Merger Agreement (Exhibit C hereto) to OTS for its

prior review.  The Merger Agreement, like the Poison Pill, has potentially significant financial

consequences for Independence.  Pursuant to Section 8.02(d), if the Merger Agreement is terminated

for certain reasons, the Bank must pay Carver either $1,600,000 or $325,000 (depending on the

reason for termination).  In accordance with the November 4, 2003 letter from the OTS, Independence

should have submitted the Merger Agreement to the OTS for its review prior to the date that it was

signed by the Bank and by Carver.

     **3.**       **There is no legal authorization allowing the Bank to adopt
a poison pill by board resolution.**

The Benders are likely to succeed in having the Poison Pill Rights Plan rescinded for the

additional reasons that: (1) there is no applicable statute by which it is authorized, *ab initio* , and (2) it cannot survive the heightened judicial scrutiny against which it must be evaluated even assuming that it is an authorized exercise of this Board's power in the first instance.

Poison Pills were first judicially sanctioned by the Delaware Supreme Court in Moran v. Household International, Inc., 500 A.2d 1346 (Del. Supr. 1985). The appellants in that case argued that the poison pill rights plan was invalid because there was no Delaware statute which authorized the poison pill. Id. at 1351. The court held that the board of directors' adoption of the poison pill was authorized by 8 Del. C. §151(g), §157. Section 151 of the Delaware Code authorizes the corporation to adopt a resolution assigning rights to classes of stock *where the certificate of incorporation expressly authorizes it to do so* . Section 157 authorizes a corporation to create and issue rights entitling the holders thereof to purchase shares of stock, the rights being evidenced by such instrument as may be approved by the corporation's board of directors. Having found statutory authority within the Delaware Code for poison pills generally, the Moran court went on to analyze whether the adoption of the pill in that case was sustainable under the two-pronged test of Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946 (Del. Supr. 1985) (discussed below).

In the unique circumstances present in this case, unlike in Moran, there is no applicable statute authorizing the adoption of the Poison Pill. Independence is a federally chartered stock savings association. Although it is common for such associations to be wholly-owned by bank holding companies which are themselves incorporated pursuant to state laws, Independence is not so owned - there is no holding company of Independence. The result is that there is no state corporate law which governs Independence - there is only the federal charter itself. Basically, Independence needs a

statutory source to authorize the adoption of the poison pill in the first instance, but there is no federal statute and no OTS regulation comparable to Sections 151 and 157 of the Delaware Code authorizing a poison pill for a federally chartered thrift.[14]  The fact that OTS regulations do permit a thrift such as Independence to elect to be governed by state law (the laws of Delaware or of the place where it sits - here, the District of Columbia), does not provide assistance to the Bank in attempting to validate its Poison Pill.  First, Independence made no such election in its charter.  Second, even if Independence had made an express election in its charter to be subject to the laws of Delaware, it could not choose to incorporate Sections 151 and 157 of the Delaware Corporations Code to the extent those sections authorize anti-takeover provisions such as a poison pill without prior OTS review and approval.  See Applications Handbook §410, p. 410.8; 12 C.F.R. §552.5(b)(3).

Besides the fact that Independence has not made an election in its charter to be governed by the laws of Delaware, and that even if it had it could not choose to incorporate that part of Delaware law which permits anti-takeover measures without prior OTS approval, there is another obstacle to Independence simply adopting a resolution and entering into a Poison Pill Rights Plan.  In Moran, the reason the Court found statutory authorization for the poison pill it was examining was that Section 151 of the Delaware Code permits a corporation to adopt a resolution issuing preferred stock underlying the Rights contemplated by a poison pill rights plan *so long as the corporate charter expressly vests such authority in the board* .  500 A.2d at 1351 n.8.  The charter of Independence does not give such authority to its board.  In fact, the charter of Independence expressly provides that the terms of any

---

[14] It is only through the bylaw or charter amendment application process, described, *supra* , by which a bank can seek to adopt a poison pill.

preferred stock (the relative rights and preferences thereof) "shall be set forth in a supplementary section to the charter."  Charter §5.B.  Independence cannot establish by resolution or fiat the relative rights and preferences of any preferred shares necessary to implement to the Poison Pill - it would have do so by a charter amendment approved by the shareholders.  Such a charter amendment would not only have to be approved by the shareholders - it would have to be approved by the OTS.  12 C.F.R. §552.4 (a)(2)(I).  For all these reasons, the Board of Independence had no authority, by statute or charter, to adopt the Poison Pill Rights Plan by board resolution and it is void *ab initio* .  It is clear that shareholder approval and OTS approval is the only way in which a federal thrift such as Independence can adopt a poison pill.  The Bank did not obtain the required approval and the Poison Pill Rights Plan is invalid.

In addition to the fact that the resolution adopting the Poison Pill simply was not authorized, the Poison Pill cannot withstand the heightened judicial scrutiny to which it is subject.[15]  In Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946 (Del. Supr. 1985), the Delaware Supreme Court set out a two-pronged test for the evaluation of defensive measures taken by a corporation.  Under that test, the directors must demonstrate (1) that they had "reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership" and (2) that the particular defensive mechanism is "reasonable in relation to the threat posed." 493 A.2d at 955.  Here, the Independence board will not be able to sustain this burden.  As to the first prong, the OTS

---

[15]  The Benders submit that because the Poison Pill Rights Plan is clearly invalid, having been adopted without OTS or shareholder approval, this court need not even undertake a Unocal analysis.  Out of an abundance of caution, however, the Benders have included a Unocal discussion.

has already approved the Benders' application to acquire up to one hundred percent of the stock and, in fact, found that proposed acquisition to be in the best interest of the Bank. There is no evidence that any contrary conclusion by the Bank's board was based on a more thorough investigation or a more reasonable analysis than that undertaken by the OTS during the seven month period in which it considered the Benders' change of control application. As to the second prong, the Poison Pill was not reasonable in response to any threat posed by the Benders. Where, as here, the defensive measure adopted "purposefully disenfranchise[s] shareholders," the board must satisfy the more exacting standard set out in Blasius Industries, Inc. v. Atlas Corp., 564 A.2d 651 , 659 (Del. Ch. 1988); Carmody v. Toll Bros., 723 A.2d 1180, 1193 (Del. Ch. 1998). The Blasius standard provides: "A board's unilateral decision to adopt a defensive measure touching 'upon issues of control' that purposefully disenfranchises its shareholders is strongly suspect under *Unocal* , and cannot be sustained without a 'compelling justification.'" Carmody, 723 A.2d at 1193 (quoting Stroud v. Grace, 606 A.2d 75, 92 n.3 (1972)).

The Poison Pill is part and parcel of the Bank's attempt to preclude the Benders from maximizing their right as shareholders to participate in corporate democracy. The Bank has failed to call an annual meeting; has enacted the Poison Pill in violation of OTS regulations and the bank's own charter; and has impeded the Benders' ability to continue to acquire shares, notwithstanding the OTS approval to do so.

### D.   The Bank Should Be Enjoined From Calling for a Vote on the Proposed Reorganization

As stated above, after this litigation was filed, the Bank filed a draft press release with the OTS

in which it announced its plans to create a bank holding company, resulting in a reorganization of the Bank, the purpose of which is to substantively alter the approval process necessary for the Carver Merger Agreement.  Currently, both by regulation and by the express provision of the Carver Merger Agreement, the proposed Carver merger must be approved by two-thirds of the Bank's common stock.  The reason is that Independence is a federally chartered thrift without a bank holding company. Where there is a bank holding company, however, mergers need be approved by a mere majority vote - not a two-thirds vote.  This proposed reorganization is just another part of the Bank's scheme to freeze out the Benders.  It takes only a majority of shareholders to approve such a reorganization and only a majority of shareholders of a bank holding company to approve a merger.  If the Bank is allowed to put the reorganization to a shareholder vote before such time as the annual meeting and the special meeting on approval of the Carver Merger Agreement, the Bank will have completely changed the voting landscape and will have diminished the Benders' voting power.  This is just the latest in the Bank's trampling on the Benders' rights as shareholders and the latest attempted circumvention of the regulatory scheme.

## III.    BECAUSE OF THE BANK'S ACTIONS, THE BENDERS ARE SUFFERING, AND WILL CONTINUE TO SUFFER, IRREPARABLE HARM

Each of the actions which the Bank has taken - the failure to convene the annual meeting, the failure to put the Carver Merger Agreement to a shareholder vote at a special meeting, the adoption of the Poison Pill, and the announced intention to reorganize into a bank holding company - would have caused the Benders irreparable harm even if they had been taken in isolation of each other.  The cumulative effective, however, of the actions taken in concert, has aggravated the irreparable harm to

32

the Benders.

The Bank's failure to hold both the annual meeting and a special meeting for voting on the Carver Merger Agreement has caused the Benders to suffer irreparable harm in that they are being denied the opportunity to participate in corporate governance.  In the Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc., 295 F. Supp. 2d 75, 81 (D.D.C. 2003)(Collyer, J.) case, this Court, in denying the first ground for injunctive relief (the injunction was granted based on a second ground), found that, on Atlantic's Coast's securities claims, "Mesa would suffer harm as a shareholder who *desires a timely change in the ACA Board* if, because of this single omission, the Court ordered a correction and cooling off period" by granting the injunction. 295 F. Supp.2d at 87.[16]  Here, the denial of the injunctive relief sought by the Benders will cause them to suffer irreparable harm as shareholders who desire a timely change in the board of Independence.[17]  See International Banknote Co., Inc. v. Muller, 713 F. Supp. 612, 623 (S.D.N.Y. 1989) ("[c]ourts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors"); ER Holdings, Inc. v. Norton Co., 735 F. Supp. 1094, 1100, 1101 (D. Mass. 1990) (noting that "one of the most sacred rights of any shareholder is to participate in corporate democracy," and that "[c]ourts

---

[16] In granting the injunction on different grounds, this Court found that the harm to Mesa as a shareholder unable to obtain a vote on the consent solicitation could be ameliorated by "setting this matter for early resolution on the merits." 295 F. Supp. 2d at 96.  In this case, of course, the Court made a similar presumption in January - assuming there would be a shareholders' meeting in April, 2004.  There was no meeting, the consequence of which as been an exacerbation – not an amelioration – of the irreparable harm to the Benders as shareholders.

[17] The terms of two directors, Carolyn Jordan and Michael Cobb, end in 2004.  Thus, once the annual meeting the Benders seek takes place, these two director seats will be up for election.

have consistently recognized the irreparable harm associated with delay[ing]" annual meetings, court ordered corporation to restore annual meeting to its original date).

Similarly, the Benders are suffering irreparable harm from the failure of the Bank to call a special meeting to vote on the Carver Merger Agreement. As noted above, the Carver Merger Agreement requires that the submission of the Merger Agreement be submitted for a shareholder vote "promptly" after the date of the Merger Agreement. Since the Merger Agreement was entered into on March 15, 2004, nearly three months have elapsed and no special meeting has been noticed. The Benders as shareholders have an interest in having the Merger Agreement submitted to a vote and in not having the Board delay a vote. The Bank's failure to schedule the special meeting for purposes of voting on the merger agreement has caused the Benders to suffer irreparable harm in that they are being denied the opportunity to participate in corporate governance, in the same way that they are suffering irreparable harm by the Bank's failure to schedule the annual meeting.[18] In Treco, Inc. v. Land of Lincoln Sav. and Loan, 572 F. Supp. 1447 (N.D. Ill. 1983), a shareholder sought a preliminary injunction ordering the bank to convene a special shareholders meeting pursuant to the bank's bylaw. The bylaw was virtually identical to the Article II, Section 3 of Independence's bylaws, providing that the president of the bank was "required to convene a special meeting of shareholders if he receives a written request for a special meeting from shareholders holding not less than 20 percent of all the outstanding common stock of Lincoln entitled to vote at the meeting. The written request must state the

---

[18] Moreover, as already discussed, if the Bank does seek to reorganize into a holding company structure as reflected in its recent draft press release, there will be further delay before the proposed merger is submitted for a shareholder vote.

34

purpose of the meeting . . . ."  The court granted the injunction and ordered the special meeting.  572

F. Supp. at 1450.  The plaintiff shareholders had demonstrated that in refusing to call the meeting there

was a substantial likelihood the defendants had violated the bylaws and the Illinois Savings and Loan

Act; plaintiffs would be irreparably harmed in the absence of an injunction because they would be

"unnecessarily frustrated in their attempt to obtain representation" on the bank's board; defendants

would suffer no irreparable harm, only the cost of the meeting; and plaintiffs' attempt to obtain board

representation furthered the public interest of corporate democracy and shareholder participation in the

management of corporations.  572 F. Supp. at 1450.

The Benders will also suffer irreparable harm if the Bank is permitted to reorganize the Bank

into a holding company, in conformance with its intention as expressed in the May 2004 press release.

Currently, the Benders are shareholders of a federally chartered thrift and as such they have the right to

avoid a merger unless it is approved by two-thirds of the outstanding common stock.  They also have

an interest, in that same capacity, of having the particular merger proposal which is currently on the

table put to an up or down vote prior to the time that a reorganization proposal is voted on.  If the Bank

is allowed to put the reorganization measure to a vote prior to the annual meeting, prior to the vote on

the Carver Merger Agreement, and prior to the time that this Court invalidates the Poison Pill, the

voting corporate governance landscape will be irretrievably altered, resulting in uncompensable harm to

the Benders.

The adoption of the Poison Pill has also caused the Benders irreparable harm in that they are

essentially prevented from acquiring additional stock even though the OTS already authorized them to

do so.[19] As long as they are prevented from acquiring more stock, they are prevented from maximizing their participation in the corporate governance of Independence. Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc., 295 F. Supp. 2d 75, 81 (D.D.C. 2003)(Collyer, J.); International Banknote Co., Inc. v. Muller, 713 F. Supp. 612, 623 (S.D.N.Y. 1989); ER Holdings, Inc. v. Norton Co., 735 F. Supp. 1094, 1100, 1101 (D. Mass. 1990). They will also be irreparably harmed in suffering the loss of the benefit of the OTS approval of their acquisition of stock. In Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998), the District Court, in granting Mova's motion for preliminary injunction, found that Mova "would be harmed by the loss of its 'officially sanctioned head start,' and that Mova's small size put it at a particular disadvantage." 140 F.3d at 1066 n.6. The Circuit Court agreed that this was sufficient to demonstrate severe economic impact to Mova constituting irreparable harm. Id. Here, the Benders are suffering a loss of their "officially sanctioned" right to increase their stock holdings.

Thus, each of the acts taken by the Bank is causing the Benders irreparable harm. The cumulative effect of the actions, however, has exacerbated that harm. By contrast, the Bank will not

---

[19] The harm to the Benders from not being able to buy stock is exacerbated by the fact that there is no such restriction on the others in the marketplace. In fact, on June 1, 2004, 11,200 shares were traded. See Yahoo market report (attached hereto as Exhibit R). As a practical matter, absent some economic explanation for this elevated trading volume and given the current exclusion of the Benders from the market, it is logical to assume that Carver (directly or through persons or entities acting on its behalf), is buying these shares. Carver itself recently acknowledged that it had purchased shares without prior approval from the OTS to exceed its then holdings of 5% of the outstanding shares of Independence stock, resulting in the placement of the balance of the shares (constituting 4.7% of the total outstanding shares of Independence) in a trust. See 5/11/04 Amendment 1 to Carver's Schedule 13D (attached hereto as Exhibit S). Pursuant to the trust agreement establishing that trust, the shares may not be voted by Carver until it receives OTS permission to retain more than 5% of Independence's outstanding voting stock. Id. at Item 6, p. 4.

suffer substantial injury if the preliminary injunction is granted.  The Bank is already obligated by its own

bylaws and by OTS regulations to have held an annual meeting within 150 days of December 31, 2003

(i.e., by June 1, 2004).  At no time during the hearings in the <u>Parks</u> case did the Bank or its directors

ever suggest to the Court that it would be harmed by having the annual meeting.  Indeed, they

repeatedly represented that an annual meeting would be held in the Spring of 2004.  Nor will the Bank

suffer substantial injury if the preliminary injunction ordering the special meeting to vote on the Merger

Agreement is granted.  The Bank is already obligated by its own bylaws and by OTS regulations to

hold a special meeting at the request of holders of at least ten percent of the shares, as well as being

obligated by the OTS regulations and the express terms of the Merger Agreement to submit the merger

to a vote of shareholders at a special meeting.  Granting the injunctive relief temporarily barring a

shareholder vote on the proposed bank reorganization and creation of the holding company, until after

the annual meeting, after the special shareholder meeting to vote on the Carver Merger Agreement, and

after the invalidation of the Poison Pill Rights Plan will not substantially injure the Bank because the

Bank is obligated to first hold its annual meeting and then a special meeting to vote on the Carver

Merger Agreement as it currently exists.   Finally, the Bank will not suffer substantial injury if the

Poison Pill is invalidated and the Benders are permitted to increase their stock holdings.  In fact, the

OTS letter approving the Benders' change of control application expressly found that "based on

supervisory considerations, OTS concluded that the [Benders' proposed] acquisition of

[Independence] is in its best interest."  10/14/03 Approval letter at 5.

      The Benders are asking for no more than that to which they  are already entitled by law, by

contract (via the Bylaws), and by the OTS approval of their change of control application - the annual

meeting, a special meeting to vote on the Carver Merger Agreement (before a vote on the proposed reorganization), and the ability to buy stock. The Bank cannot establish any injury by complying with these obligations. Thus, the Benders are not asking this Court to order any more than what the Bank and Board are already obligated to do.

IV.     **THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING THE RELIEF REQUESTED**

The public clearly has an interest in the enforcement of corporate bylaws and the enforcement of federal regulations governing banks. The public has "no legitimate interest in the abrogation of contract rights conferred upon" shareholders. ER Holdings, Inc. v. Norton Co., 735 F. Supp. 1094, 1103 (D. Mass. 1990). An injunction furthers the public interest where it ensures that "corporate democracy and shareholder participation in the management" of the corporation is served. AHI Metnall v. J.C. Nichols Co., 891 F. Supp. 1352, 1360 (W.D. Mo. 1995). See Treco, Inc. v. Land of Lincoln Sav. and Loan, 572 F. Supp. 1447 (N.D. Ill. 1983). The public has an interest in the disallowance of corporate machinations which interfere with the regulatory approval process. The public also has an interest the invalidation and rescission of a poison pill rights plan adopted in the manner which is not sanctioned by law or corporate charter and which violates federal banking regulations. The granting of the requested injunctive relief - that the Bank call the annual meeting for the election of directors, that the Bank call a special meeting to vote on the Carver Merger Agreement, that the poison pill be rescinded, and that the Bank be enjoined form holding a vote on the proposed reorganization until after these other events have occurred – will advance the public interest.

38

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court schedule an expedited oral hearing on this matter and to enter the Preliminary Injunction as requested.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & WAYSON, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #277454
Donna S. Mangold, Bar #358851
James E. Tompert, Bar #358952
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Defendants*
 *Morton A. Bender and Grace M. Bende*  r

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Benders' Application for Preliminary

Injunctive Relief, Memorandum of Points and Authorities in support thereof, and proposed Order was

sent electronically on the 8th day of June 2004, to:

> Vann Canada, Esquire
> Miles & Stockbridge
> 11 North Washington Street
> Suite 700
> Rockville MD 20850
> vcanada@milesstockbridge.com
>
> James H. Schropp, Esquire
> Fried, Frank, Harris, Shriver
>  & Jacobsen, LLP
> 1001 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004-2505
> schroja@ffhsj.com


_____/s/_____
Dale A. Cooter