UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
INDEPENDENCE FEDERAL SAVINGS BANK,            )
                                              )
                            Plaintiff,        )
                                              )
        v.                                    )
                                              )   Civil Action No. 1:04CV 00736 (RMC)
MORTON A. BENDER, et al.              )
                                              )
                            Defendants.       )
_____)

PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 65, Fed. R. Civ. P., and Rule 65.1 of the United States District Court for the District of Columbia, Plaintiff Independence Federal Savings Bank ("IFSB"), applies to this Court for a preliminary injunction

(1) requiring Defendants Morton A. Bender ("Bender") and Grace M. Bender (collectively, "the Benders") to comply with Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), by filing a complete and accurate Schedule 13D amendment fully disclosing all material information in Bender's possession regarding, *inter alia*, (i) Bender's plans and intentions concerning IFSB; (ii) the reason(s) why they oppose IFSB's planned merger with Carver Bancorp, Inc. ("Carver"), including any economic analyses in Bender's possession; and (iii) the results of Bender's prior litigation involving IFSB, which cast serious doubt on the legality of Bender's plan and thus his ability to implement it;

(2) enjoining Bender from taking any steps to implement his plan to nominate additional IFSB directors to effect a change of control in a manner not approved by the Office of Thrift Supervision ("OTS"); and

(3) neutralizing all IFSB shares acquired by the Benders during the period the Benders were in violation of the federal securities laws ("Tainted Shares") by (i) directing that the Tainted Shares be deemed present at any meeting of shareholders called in regard to the Carver merger transaction, and any postponement or adjournment thereof, for all purposes; and (ii) directing that the Tainted Shares be voted proportionately to the votes actually cast by shares that are not Tainted Shares on all matters considered at that meeting.

As set forth in the supporting Memorandum of Points and Authorities, all of the factors required for injunctive relief are satisfied:  IFSB is likely to succeed on the merits; IFSB is threatened with immediate and irreparable injury, while the only requirement imposed upon Mr. Bender will be to obey the federal securities laws; and the requested injunctive relief is in the public interest.  The issuance of injunctive relief is necessary and appropriate to avoid irreparable injury to IFSB and its shareholders, because IFSB shareholders would otherwise be required to make investment and voting decisions in the absence of material information regarding Bender's intentions.

Accordingly, IFSB respectfully requests that the Court enter an Order granting its application for preliminary injunctive relief.

Respectfully submitted,

_____

James H. Schropp (D.C. Bar No. 185538)
Thomas P. Vartanian (D.C. Bar No. 952671)
Robert H. Ledig (D.C. Bar No. 370987)
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
1001 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C.  20004
Telephone:   (202) 639-7000
Facsimile:    (202) 639-7008

Counsel to Plaintiff
Independence Federal Savings Bank

DATED:  June 30, 2004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
INDEPENDENCE FEDERAL SAVINGS BANK        )
                                                          )
                            Plaintiff,              )
                                                          )
            v.                                          )
                                                          )   Civil Action No. 1:04CV 00736 (RMC)
MORTON A. BENDER, et al.                      )
                                                          )
                            Defendants.          )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

James H. Schropp (D.C. Bar No. 185538)
Thomas P. Vartanian (D.C. Bar No. 952671)
Robert H. Ledig (D.C. Bar No. 370989)
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
1001 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C.  20004
(202) 639-7000  Telephone
(202) 639-7003  Facsimile

DATED:  June 30, 2004

## Table of Contents

NATURE AND SUMMARY OF ACTION ..........................................................................2

FACTS .......................................................................................................................7

    I.       BENDER ACQUIRES A POSITION IN IFSB STOCK...............................7

    II.      BENDER PURPORTS TO ADD TWO IFSB BOARD MEMBERS
           TO HIS "GROUP"........................................................................................8

    III.     IFSB INITIATES A PROCESS TO SELL THE BANK AND
           INVITES BENDER TO PARTICIPATE IN THE BIDDING.........................11

    IV.     THE IFSB BOARD UNANIMOUSLY ACCEPTS THE CARVER
           BID............................................................................................................13

    V.       BENDER FALSELY PROCLAIMS THE PURPORTED
           OPPOSITION OF HIS NOMINEES TO THE CARVER MERGER.............14

    VI.     THE BENDER NOMINEES WITHDRAW FROM THE BENDER
           GROUP ......................................................................................................16

    VII.    BENDER REVEALS IN HIS DEPOSITION, HIS UNDISCLOSED
           TRUE PLANS AND INTENTIONS REGARDING IFSB ............................17

ARGUMENT..............................................................................................................19

    I.       PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY AND
           APPROPRIATE ..........................................................................................19

    II.      BENDER HAS INTENTIONALLY VIOLATED SECTION 13(D)
           BY OMITTING FROM HIS SCHEDULE 13D MATERIAL
           INFORMATION ABOUT HIS PLANS AND INTENTIONS.....................22

           A.      Bender's Schedule 13D Is Incomplete and Misleading Due to
                  Its Material Omissions and Misleading Portrayal of Bender's
                  Plans and Intentions with Respect to IFSB.............................................25

           B.      Bender Has Not Disclosed in His Schedule 13D the Results of
                  the Prior Litigation with IFSB ................................................................31

i

C. The Economic Logic and Rationale of Bender's Actions Prove That He Has Plans Other Than Those Stated in His Schedule 13D.................................................................................................32

D. Bender's Pattern of Evolving Interest in IFSB Demonstrates That He Has Plans Other Than Those Stated in His Schedule 13D.................................................................................................33

III. BENDER SHOULD BE ENJOINED FROM SEEKING TO ACQUIRE CONTROL OF IFSB THROUGH THE ELECTION OF DIRECTORS OR APPOINTMENT OF DIRECTORS IN VIOLATION OF OTS REGULATIONS .......................................................34

IV. IFSB WILL SUFFER IRREPARABLE INJURY IF THE REQUESTED RELIEF IS NOT GRANTED BY THE COURT.....................36

V. OTHER PERSONS WILL NOT SUFFER SUBSTANTIAL HARM IF THE REQUESTED INJUNCTIVE RELIEF IS GRANTED .......................38

VI. INJUNCTIVE RELIEF WOULD SERVE THE PUBLIC INTEREST ............38

CONCLUSION .................................................................................................41

Pursuant to Rule 65, Fed. R. Civ. P., and Rule 65.1 of the local rules of this Court, Plaintiff Independence Federal Savings Bank ("IFSB" or the "Bank") applies to this Court to grant a preliminary injunction:

(1) requiring defendants Morton A. Bender ("Bender") and Grace M. Bender to comply with Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m(d) (hereinafter "Section 13(d)") by filing a complete and accurate Schedule 13D amendment disclosing all material information in Bender's possession regarding, *inter alia*, (i) Bender's plans and intentions concerning IFSB; (ii) his explanation of the reasons why he opposes IFSB's planned merger with Carver Bancorp, Inc. ("Carver"), including any economic analyses in Bender's possession; and (iii) the results of Bender's prior litigation involving IFSB, which cast serious doubt on the legality of Bender's plan and thus his ability to implement it;

(2) enjoining Mr. Bender from taking any steps to implement his plan to nominate additional IFSB directors to effect a change of control in a manner not approved by the Office of Thrift Supervision ("OTS"); and

(3) neutralizing all IFSB shares acquired by Bender during the period Bender was in violation of the federal securities laws ("Tainted Shares") by (i) directing that the Tainted Shares be deemed present at any meeting of shareholders called in regard to the Carver merger transaction, and any postponement or adjournment thereof, for all purposes; and (ii) directing that the Tainted Shares be voted proportionately to the votes actually cast by shares that are not Tainted Shares on all matters considered at that meeting.

1

## NATURE AND SUMMARY OF ACTION

The subject matter of this action principally concerns Defendant Bender's (the Defendants are generally referred to herein simply as "Bender" because Mr. Bender indicated that, although he owns his IFSB shares  jointly with his wife, his wife never read or had any input into the contents of the Bender Group's Schedule 13D filings)[1] calculated efforts to conceal his true plans and intentions regarding IFSB while furtively pursuing  a takeover of the Bank in order to pursue his own personal goal of engineering a "turnaround" of IFSB's business.   While Bender has filed Schedule 13D Amendments disclosing his opposition to the Carver transaction, he has not come close to satisfying the disclosure requirements of Exchange Act Section 13(d).   Contrary to the requirements of that Section, he has concealed the very specific plans he has for IFSB – plans that will clearly affect the vital interests of all IFSB shareholders and the investing public generally – if he is successful in blocking the Carver transaction.  In Bender's Schedule 13D ("Bender Schedule 13D"), Bender hides the truth and discloses only an intention to "oppose" the Carver transaction and a vaguely expressed belief that a change in IFSB's management and directors "is necessary."[2]   The federal securities laws require much more.

The full scope and nature of Bender's plans came to light only when he was recently deposed in this action.   Only then did Bender reveal that, rather than a vague sense that changes are "necessary," Bender has actual plans and intentions, undisclosed to shareholders and the investing public generally, that are concrete, detailed and multifaceted:

> *First*, Bender plans to obtain control of the IFSB board of directors (the "Board") in a three-step process:

---

[1]     *See Morton Bender Dep*., June 4, 2004 (attached at Exhibit 31), at 11:20-12:11 ("Q: I take it you've never discussed IFSB with [Mrs. Bender]?   A:  I don't discuss anything with her.").

[2]     *See Bender Schedule 13D Amendment No. 10* (attached at Exhibit 32), at 5.

(a)      at IFSB's next annual shareholders' meeting, he will run a slate of nominees, specifically, Messrs. Mark Brodsky, Terry Hart Lee and John Silvanus Wilson, Jr., for the three seats up for election at that time;[3]

(b)      soon after IFSB's annual meeting, Bender will call for a special shareholders' meeting for the purpose of removing any person on the IFSB Board who is not a Bender nominee;[4] and

(c)      finally, Bender will seek to replace any removed directors with additional Bender nominees, calling on his nominees already on the Board to do his bidding and approve additional Bender-selected directors.[5]

**Second**, after Bender achieves control of the Board, he (or his Board) will dismiss certain specific IFSB management personnel, including both the current acting Chief Executive Officer and the Chief Financial Officer, although Bender purports to have no specific candidates in mind to replace these key personnel after he causes them to be dismissed.[6]   In addition, Bender plans to replace IFSB's current independent auditor with an auditor hand-picked by Bender and rubberstamped by his Board.[7]

---

[3]      *See Morton Bender Dep.* (*Plaintiff Independence Federal Savings Bank's Opposition to the Benders' Application For Preliminary Injunctive Relief*, filed June 28, 2004 (hereinafter "*Plaintiff Opp.*" Exhibit 1), June 4, 2004, at 50:1-50:12.

[4]      *See id.*, at 84:17-84:21.

[5]      *See, e.g., Bender Schedule 13D Amendment No. 4* (*Plaintiff Opp. Exhibit 10*), at 9.  ("If these five individuals are removed, the remaining three directors would be authorized to fill the resulting vacancies. Two of those remaining directors would be Messrs. Deckelbaum and Hall, who are members of the Group.").

[6]      *See Morton Bender Dep.* (*Plaintiff Opp. Exhibit 1*), at 85:14-85:17.  Bender does acknowledge having spoken with the CEO at Colombo, Hugh Rial, about assuming these duties at IFSB. *Id.*, at 85:9-85:13.

[7]      *See id.*, at 85:14-86:13.

**Third**, Bender's new management team will put into place a whole series of changes in IFSB's management policies and practices that have been developed by Bender.[8]  Specific management changes planned by Bender include:

(i)      sharply increasing the number of loans made by IFSB, by replacing a "lot" of IFSB's current loan officers with more "aggressive" loan officers that would "go out and get the business" that IFSB is currently, in Bender's view, not seeking;[9]

(ii)      altering significantly IFSB's program of earning fees by servicing loans made by the District of Columbia government to disadvantaged citizens of the District;[10]

(iii)      changing IFSB's information technology systems, by out-sourcing these functions, rather than by doing the work in-house, as is currently the case;[11]

(iv)      taking greater "advantage" of IFSB's status as a "minority institution," by seeking business from government agencies which are required by law to use minority banks as depositaries;[12]

(v)      making changes intended to improve the profitability of IFSB's business of collecting revenues from traffic tickets for a fee;[13] and

---

[8]      *See id.*, at 87:9-94:8.  Indeed, although no disclosure of this fact has ever been made by Bender to IFSB shareholders, by bringing pressure to bear on IFSB Board members, Bender has already been responsible for one significant change made in the operations of IFSB, namely, lowering the rate it pays on passbook savings accounts, because he considered the rate that was being paid to be too high. *See id.*, at 88:2-88:11; 92:8-92:13.

[9]      *See id.*, at 92:1-92:7.

[10]      *See id.*, at 92:14-92:22.

[11]      *See id.*, at 89:3-89:16.

[12]      *See id.*, at 89:17-89:21.

[13]      *See id.*, at 94:3-94:8.

(vi)     eliminating completely the fees paid to IFSB Directors for attendance at board meetings.[14]

*Fourth*, Bender, after making all of the above changes, would attempt to effect a "turnaround" at IFSB in an effort to turn IFSB into a company he hopes will be worth even more than $21 per share, although Bender has no idea how much more it might be worth after his program has run its course – and more importantly – how much less it will be worth if he is unsuccessful.[15]   He does, however, have a specific, but undisclosed, timetable in mind:  he believes it will take up to "a year and a half" *after* he acquires operational control of IFSB to produce such a "turnaround."[16]

None of these specific plans and proposals, or the timetable on which Bender intends to implement them, have been disclosed to IFSB shareholders and the investing public generally.  Nor has Bender disclosed that this Court denied his prior preliminary injunction motion in *Bender v. Parks*, and the reasoning of the Court in taking that action:  that Bender's ability to call a special meeting to take control was problematic because (1) Bender's "admitted personal interest" in controlling IFSB was in substantial conflict with the interests of other shareholders; (2) Bender intended to gain indirect control of the Bank without paying a control premium to other shareholders, and (3) the OTS had not approved a change of control via the "removal and replacement of directors."[17]   Bender's latest Schedule 13D Amendments indicate that Bender intends to continue to pursue the same options as he was pursuing when he was before the Court in the prior litigation, with no indication as to how he has addressed the problems and issues identified by the Court.  Indeed, it appears that he has simply decided *not* to address them.

---

[14]     *See id.*, at 94:3-94:8.

[15]     *See id.*, at 80:12-81:4.

[16]     *See id.*, at 81:5-81:9.

[17]     *See Bender v. Parks, 1/15/04 Mem. Op.* (*Plaintiff Opp. Exhibit 2* ), at 7, 9.  *See also OTS Approval Order No. 2003-51*, Oct. 14, 2003 (attached at Exhibit 33).

Finally, Bender has failed to disclose in his Schedule 13D, even as amended, his due diligence consultants' valuation of IFSB, at a range of between $14 and $19 a share, and his own bank's President's advice that $20 per share was too "rich" a price to pay for IFSB, crucial facts in Bender's possession that clearly support the conclusions that (i) Carver's $21 offer is fair, fully-priced and in the best interests of the majority of IFSB shareholders, and (ii) Bender's true goal is to appropriate the value evidenced by Carver's offer to his own personal benefit.

Shareholders and the investing public generally are entitled, as a matter of law, to know why, despite the fair and open bidding process conducted by IFSB, Bender deliberately failed to bid for IFSB, and to know the details of Bender's specific, yet undisclosed, plans and intentions for IFSB. In the absence of such disclosure, these purposeful omissions will materially assist Bender's efforts to achieve his long-held personal goal of obtaining control of IFSB on the cheap by misleading the shareholders as to the consequences of voting against the Carver transaction, despite his unwillingness to match or beat the $21 per share Carver is willing to pay IFSB shareholders. Following the defeat of the Carver offer, Bender will be able to accomplish his bargain-basement grab for control through any of the following methods, or combination thereof: (1) purchasing IFSB shares at a price significantly less than the $21 per share Carver has agreed to pay, after the market price of IFSB stock collapses in the wake of the failure of the Carver deal; (2) acquiring a sufficient number of shares to merge IFSB into the bank already controlled by Bender, Colombo, at a depressed price and on terms that disfavor other IFSB shareholders; and/or (3) gaining control of a majority of IFSB's board, thus acquiring indirect control of IFSB without paying anything for it.

# FACTS

## I.   BENDER ACQUIRES A POSITION IN IFSB STOCK

On October 16, 2002, Defendant Morton Bender filed a Schedule 13D with the OTS, disclosing ownership of 5.8% of the outstanding shares of IFSB's common stock.[18]   The Schedule 13D stated that the purpose in acquiring the stock was to "profit from the appreciation in the market price of the Common Stock through the assertion of shareholder rights."[19]   The Bender's Schedule 13D also stated Bender's view that shareholder value could be increased by a sale of IFSB – **exactly** what IFSB is now attempting to accomplish through the Carver transaction.

On December 3, 2002, Bender filed Amendment No. 2 to the Schedule 13D, disclosing that he had acquired additional shares of IFSB, increasing his ownership of IFSB to 9.8%.[20]   Indicative of Bender's growing interest in taking control of IFSB (as opposed to a mere investment interest, i.e., profiting "from the appreciation of the market price" of the stock), Bender stated that he had requested a special meeting of shareholders for the purpose of removing, purportedly "for cause,"[21] four of the members then comprising IFSB's board.   Without disclosing in his Schedule 13D that he intended to or had done so, Bender also began to suggest specific actions with respect to IFSB's business directly to IFSB's board that he felt should be made.[22]

On January 8, 2003, IFSB issued a press release announcing that it had retained the investment banking firm of Keefe, Bruyette & Woods, Inc. ("KBW") to help IFSB explore ways to enhance

---

[18]   *See Benders' Original Schedule 13D* (*Plaintiff Opp. Exhibit 3*), at 5.

[19]   *See id.*, at 4.

[20]   *See Bender Schedule 13D Amendment No. 2* (attached at Exhibit 34), at 5.

[21]   No "cause," of course, was ever articulated by Bender.

[22]   *See Morton Bender Dep*. (*Plaintiff Opp. Exhibit 1*), at 88:1-88:11.  For example, Bender forcefully contended that IFSB management was "out of [its] mind" for paying more than 2% interest on passbook savings accounts and suggested that lowering the rate would "put $800,000 on the bottom line real quick."  IFSB eventually acted on his suggestion to lower passbook interest rates, after a five-month campaign by Bender for this result. *See id*.

shareholder value.[23]   Immediately following this announcement, the market price of IFSB stock increased approximately 42% over the prior day's closing price, from $10.62 to $15.20 per share.[24] IFSB's stock price continued to climb in the ensuing months, due to speculation regarding the price at which a transaction might occur, reaching a high of $25.49 on January 9, 2004.[25]

## II.   BENDER PURPORTS TO ADD TWO IFSB BOARD MEMBERS TO HIS "GROUP"

Seeking to increase his influence and control over IFSB, in March 2003, Bender initiated a proxy contest and proposed two nominees as candidates for election to the IFSB board, in opposition to IFSB's proposed slate of nominees at the 2003 annual shareholder meeting.  Bender spent, by his own calculation, more than $400,000 to run a proxy contest and put his two nominees, Elliott Hall and Nelson Deckelbaum (the "Bender Nominees") on IFSB's Board.[26]

On March 21, 2003, Bender and affiliated parties, including Colombo Bancshares, Inc. ("Colombo"), a savings and loan holding company controlled by Bender, filed an application with the OTS, "to acquire, either individually or together, up to 100% of the outstanding common stock of [IFSB]," either directly by Bender or indirectly through Colombo, including through a merger of IFSB with Colombo.[27]   Significantly, Bender's application did not state that Bender might seek effective control of IFSB by attempting to gain control of its Board.

On April 15, 2003, the Bender filed Amendment No. 3 to his Schedule 13D, which reported that they had formed a Section 13(d) "Group"[28] with the Bender Nominees with respect to the

---

23    *See Jan. 8, 2003 Press Release* (*Plaintiff Opp. Exhibit 13*).

24    *See IFSB Price Chart for Jan. 7, 2003-Jan. 9, 2004* (attached at Exhibit 35).

25    *See id*.

26    *See 2003 IFSB Annual Report* (attached at Exhibit 36), at 7 (describing accrual of possible reimbursement of expenses claimed by Bender for proxy and related expenses).

27    *See OTS Application* (excerpts attached at Exhibit 37), at 1.

28    *See Clarostat Mfg. Co., Inc. v. Ostrau*, No. C82-299-L, 1983 U.S. Dist. LEXIS 16675 (D.N.H. May 26, 1983) ("Section 13(d)(3) indicates that a group of shareholders acting together for the purpose of acquiring,

**Footnote continued**

ownership of IFSB shares.[29]   Bender also disclosed that he had nominated the Bender Nominees for election to the IFSB Board and intended to solicit proxies in support of their candidacy and that Bender and Colombo had filed a change in control application with the OTS.[30]   Amendment No. 3 also stated that Mr. Bender had given Messrs. Deckelbaum and Hall 100 ISFB shares each, and that the Bender Group's ownership of IFSB had increased to 9.9% of the total outstanding IFSB shares.[31]   Over the course of the next year, until May 2004, Messrs. Bender, Deckelbaum and Hall, purportedly acting together as a Section 13(d) "Group," filed six more amendments to the Bender Schedule 13D, announcing further developments, including:

> (i)     the receipt of approval from OTS to acquire up to 100% of the outstanding IFSB shares;[32]

> (ii)    the initiation of a request for a special shareholders meeting to remove every member of the IFSB Board except the Bender Nominees;[33] and

> (iii)   the initiation of derivative litigation against IFSB's directors, *Bender v. Parks*, seeking (a) damages for "mismanaging" the Bank, and (b) an

---

Footnote continued from previous page

holding, or disposing of securities of an issuer is a 'person' for purposes of the subsection.  Section 13(d)(1)(A) requires disclosure of the identity of such person." (citing *General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir. 1977) and *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149 (D.C. Cir. 1978)).

[29]    *See Bender Schedule 13D Amendment No. 3* (attached at Exhibit 38), at 6.

[30]    *See id*., at 8.

[31]    *See id*., at 9-10.

[32]    *See Bender Schedule 13D Amendment No. 4* (*Plaintiff's Opp. Exhibit 10*), at 8.

[33]    *See id.*  Amendment No. 4  also noted that the Bender Nominees would fill the vacancies.  ("If these five individuals are removed, the remaining three directors would be authorized to fill the remaining vacancies. Two of these remaining directors would be Messrs. Deckelbaum and Hall, who are members of the Group.").

order requiring them to hold the Bender-requested special shareholders meeting.[34]

During the *Bender v. Parks* litigation, the Court specifically directed Bender to disclose the identities of his nominees in his renewed request for a special meeting.[35]  On December 9, 2003, Bender sent a letter to Mr. Jeanus B. Parks, Jr., Chairman of IFSB's Board, naming three individuals Bender planned to have his nominees on the Board appoint:  Mark Brodsky, Terry Hart Lee and John Silvanus Wilson, Jr.[36]  Each of these individuals advised Bender that he was willing to serve on the IFSB Board.[37]  However, the names and qualifications of Bender's three nominees were never set forth in Bender's Schedule 13D, as required by Section 13(d).

Bender lost his suit against IFSB.  In a Memorandum Opinion issued January 15, 2004, this Court, after an evidentiary hearing, rejected Bender's request for an injunction, and the case was dismissed soon thereafter.  In its Opinion, the Court stated that, based on Bender's own testimony, the purpose of his request for a special meeting was to "gain indirect control of the Bank" without having to pay a control premium to shareholders.[38]

The Court also recognized that Bender could not "fairly and adequately" bring a derivative suit because "there exists a conflict between Bender's fiduciary duty to act for the benefit of other shareholders and his admitted personal interest in achieving control of the Bank."[39]  In addition, the Court found that Mr. Bender had not obtained the necessary approvals from the OTS for a change of

---

[34]     *See Bender Schedule 13D Amendment No. 6* (attached at Exhibit 39), at 7.  Immediately prior to the initiation of litigation by Bender, one of the Bender Nominees, Mr. Hall, made a motion at an IFSB Board meeting to have all IFSB Board members except Michael Cobb and the two Bender Nominees resign.  The motion was not taken up.  Despite the curious timing of Mr. Hall's motion, Mr. Hall and Mr. Bender both denied coordinating this action. *See Elliott Hall Dep.*, June 3, 2004 (attached at Exhibit 40), at 57:7-57:15;  *Morton Bender Dep.* (attached at Exhibit 31), at 26:15-27:19.

[35]     *See Dec. 9, 2003 Letter* (attached at Exhibit 41).

[36]     *See id*.

[37]     *See Morton Bender Dep*. (attached at Exhibit 31), at 50:18-51:17; 52:17-53:5; 71:16-72:8.

[38]     *See Bender v. Parks*, *1/15/04 Mem. Op.* (*Plaintiff Opp. at Exhibit 4*), at 5, 7.

[39]     *See id.*, at 7.

control to be effected by replacing the Board, concluding that: "[t]he evidence of record also supports the conclusion that Mr. Bender has not obtained OTS approval for a change in control effected by the removal and replacement of directors, which is necessary for the special meeting to proceed."[40]

Equally important, although Bender announced the initiation of and described the nature of his derivative litigation in his earlier 13D filings, he completely failed to apprise investors and the public of any of the results of the litigation he had filed against IFSB, other than the barebones statement that Bender had been "unsuccessful" in his attempt.[41] Indeed, Bender inexplicably failed to disclose other material information that was only discovered as a result of the discovery in litigation he had initiated.[42] He did not inform IFSB shareholders and the investing public generally that this Court found that Bender's personal interests were so divergent from those of other IFSB shareholders that Bender was not a suitable shareholder representative to seek a special meeting of shareholders. He did not inform shareholders and the investing public generally that this Court found that Bender's focus, and ultimate goal, is to enable him to acquire IFSB without paying a control premium. And he failed to inform shareholders and investors that the Court stated that "the record indicates that Mr. Bender did not obtain the necessary approvals from the OTS for a change in control to be effected" through the removal and replacement of members of IFSB's Board.

## III.   IFSB INITIATES A PROCESS TO SELL THE BANK AND INVITES BENDER TO PARTICIPATE IN THE BIDDING

In June 2003, a transaction committee, comprised of two directors and IFSB's Acting President, was formed by IFSB's Board to manage the bidding process. The transaction committee, together with KBW, developed a process to solicit preliminary offers,[43] and met several times from

---

[40]     *See id.*, at 11.

[41]     *See Bender Schedule 13D Amendment No. 7* (*Plaintiff Opp. Exhibit 7*), at 7.

[42]     For example, Bender had also failed to disclose his plan to acquire the Bank without paying for it or the identity of his proposed nominees to the Board.

[43]     *See Bender v. Parks*, *1/15/04 Mem. Op.* (*Plaintiff Opp. Exhibit 2*), at 3.

August to December 2003, providing updates on the process to IFSB's board.  The bidding process included confidentiality and "standstill" provisions to ensure that bidders agreed not to misuse IFSB's business information or buy IFSB stock for a period of time.  During this timeframe, IFSB received several indications of interest from parties interested in acquiring IFSB, including one from Bender on December 17, 2003.[44]  In his letter, Bender proposed to acquire IFSB for a price between $22.00 and $24.00 per share, subject to satisfactory completion of his due diligence.  Bender eventually agreed to execute a confidentiality agreement in a form satisfactory to IFSB, although less restrictive than the confidentiality agreements executed by other potential bidders.  Bender hired a consultant, Mr. Savas Karas, of the financial consulting firm Enterprise Solutions Group, Inc., who completed a due diligence review at IFSB's offices in January 2004,[45] allowing Bender ample time to submit a bid.

Nevertheless, on February 23, 2004, Bender's counsel advised KBW in writing that Bender would not submit a bid for IFSB.[46]  According to Hugh Rial, President of Colombo Bank, Bender's due diligence consultant arrived at a "range of value for Mr. Bender to consider as part of his possible bid" of "approximately $14 to $19 a share."[47]  Mr. Rial also advised Mr. Bender of Mr. Rial's own opinion of IFSB's value, namely, that a $20 per share offer would be "rich."[48]

Bender stated that he knew that a bid IFSB had been made of $21 per share for a figure he claimed to have learned from Mr. Karas.[49]  Thus, Bender knew that in order to acquire IFSB, he would at least have to match the $21 bid.  One reason Bender has offered for not submitting a bid was that he concluded that IFSB "was in worse shape than I thought."[50]  However, Faustine Fitzgerald, a

---

[44]   *See Dec. 15, 2003 Letter* (attached at Exhibit 42), at 1.

[45]   *See Morton Bender Dep*. (attached at Exhibit 31), at 77:11-77:14.

[46]   *See Feb. 23, 2004 Letter from Silver, Freedman & Taft* (attached at Exhibit 43) ("My clients, Morton A. Bender and Colombo Bancshares, Inc., have completed their due diligence of Independence Federal Savings Bank.  This is to advise you that they have chosen not to make an offer at this time for the Bank.").

[47]   *See Hugh Rial Dep*., June 3, 2004 (*Plaintiff Opp. at Exhibit 4*), at 34:14-35:3.

[48]   *See id*., at 37:9-37:11.

[49]   *See Morton Bender Dep*. (attached at Exhibit 31), at 77:8-78:8.

[50]   *See Morton Bender Dep*. (*Plaintiff Opp. Exhibit 1*), at 80:18-81:1.

major IFSB shareholder, spoke with Bender immediately after Carver's winning bid was accepted by IFSB and asked Bender if he had bid for IFSB.  According to Ms. Fitzgerald, Bender told her he had not done so simply because "he didn't want to get his ass kicked by Bob Johnson."[51]  Although it is not clear which of these reasons is correct, neither was disclosed.

Despite his expert's evaluation of "$14 to $19 a share" and despite his own Bank's President's advice that $20 per share was too "rich," Mr. Bender continues to maintain that IFSB is worth much more than $21 per share, assuming it were "run right,"[52] and there is no doubt that "right," in this context, means "by Bender."  What Bender has never disclosed in any Schedule 13D filing is his opinion that it will take up to 18 months of his leadership and managerial efforts to achieve such a value.  After that period of time, he "would hope" that IFSB would be worth more than the $21 per share Carver had put "on the table."[53]  Bender's plan therefore implies that shareholders who are forced to participate in it as Bender's unwilling partners may never have the opportunity to receive $21 for their shares of IFSB, because Bender, unlike Carver, does not have sufficient faith in his own managerial talents to shoulder the full risk of his turnaround plan's success.  To the contrary, Bender intends to conscript existing IFSB shareholders as his uninformed "turnaround" partners, who will bear the vast majority of the financial loss should the Bender plan fail.

## IV.    THE IFSB BOARD UNANIMOUSLY ACCEPTS THE CARVER BID

On March 14 and 15, 2004, IFSB's Board met to consider Carver's formal proposal.  After extensive deliberation, the Board unanimously voted in favor of the proposed $21 per share transaction.  Indeed, so compelling was the case for the proposed deal was so compelling that both of the Bender

---

[51]    *See Faustine Fitzgerald Dep*., June 14, 2004 (attached at Exhibit 44), at 24:22-25:11.  Mr. Johnson had, like Carver, submitted a bid for IFSB.

[52]    *See Morton Bender Dep*. (attached  at Exhibit 31), at 76:22-77:5.

[53]    *See Morton Bender Dep*. (*Plaintiff Opp. Exhibit 1*), at 81:15-81:18.

Nominees voted in favor of it.[54]  After reviewing all possible alternatives, Mr. Hall concluded that the Merger Agreement was the "best course" available to shareholders.[55]  Mr. Deckelbaum also concluded that the Carver bid was the "best offer on the table"[56] after the elaborate, year-long process the Board and its advisors had gone through to maximize shareholder value.

Thus, on the evening of March 15, 2004, the Merger Agreement was executed and IFSB and Carver issued a joint press release to announce it.  All of the members of the board of directors of IFSB, again including the Bender Nominees, subsequently entered into agreements to vote their shares in favor of the merger.

## V.   BENDER FALSELY PROCLAIMS THE PURPORTED OPPOSITION OF HIS NOMINEES TO THE CARVER MERGER

On April 7, 2004, Bender and the Bender Nominees jointly filed Schedule 13D Amendment No. 7,[57] stating that the Group intended to use Defendant Bender's substantial current stockholdings, as well as potential additional purchases of IFSB stock, to block shareholder approval of the Merger Agreement.[58]  The Bender Group disclosed that it had acquired an additional 65,000 IFSB shares on March 29, 2004, increasing its percentage of ownership from 13% to over 17% of the outstanding IFSB common shares.  The Group further stated that Bender intended to purchase additional IFSB shares to kill the transaction.  In addition, the Bender Group indicated that if the Merger Agreement did

---

[54]     *See Elliott Hall Dep.* (*Plaintiff Opp. Exhibit 20*), at 14:6-14:10; *Nelson Deckelbaum Dep.* (*Plaintiff Opp. Exhibit 19*), at 48:6-48:12.

[55]     *See Elliott Hall Dep.* (*Plaintiff Opp. Exhibit 20*), at 14:6-14:10.

[56]     *See Nelson Deckelbaum Dep.* (*Plaintiff Opp. Ex. 20*), at 48:6-48:9.

[57]     *See Bender Schedule 13D Amendment No. 7* (*Plaintiff Opp. Exhibit. 7*), at 12.  As Amendment No. 7 indicates, the Bender Nominees provided Mr. Bender with powers of attorney that gave Mr. Bender full authority to sign Schedule 13D amendments on their respective behalf.  Pursuant to this power, Bender signed Amendment No. 7 for each of his nominees' behalf.  *See id.*, at 12.  What was not disclosed in Amendment No. 7 (or in the subsequently filed Amendments Nos. 8 and 9) was that Bender signed these amendments on behalf of the Bender Nominees without ever affording them a chance to read and review these filings, or to correct any inaccuracies in them.

[58]     *See id.*, at 7.  Bender will be able to defeat the Carver transaction if the holder or holders of just one-third of IFSB shares vote against the Merger Agreement or fail to vote.

not obtain the approval by the necessary two-thirds vote of the IFSB shareholders, it was the intention of the Bender Group to take further action to change IFSB's "management" and the "composition" of its board.[59]

Amendment No. 7 to the Bender Schedule 13D placed the two Bender Nominees in an irreconcilable conflict of interest. On March 15, both Mr. Deckelbaum and Mr. Hall had voted for the transaction, and it was publicly announced that they (and the other Board members) supported it. By April 7, 2004,[60] the Bender Group, *including* both Deckelbaum and Hall, had filed a Schedule 13D announcing, not only opposition to the transaction, but a determination to acquire enough IFSB shares to block it. No disclosure was made in Amendment No. 7 regarding (i) Messrs. Deckelbaum and Hall's decision, as directors, to approve the Carver transaction; (ii) the reasons for their decision;[61] and (iii) their agreement to vote, as shareholders, in favor of the transaction, which actually – Amendment No. 7 notwithstanding – remained in full effect.

In the remaining weeks of April, the Bender Group filed two more amendments to their Schedule 13D, Amendment Nos. 8 and 9, which stated the same position as Amendment No. 7 with respect to the Carver transaction, and omitted to state the same matters with respect to the actual positions of the two Bender Nominees. Amendment Nos. 8 and 9 trumpeted the rapidly increasing strength of the Bender Group, to over 18% of the outstanding common shares of IFSB by April 15, 2004,[62] and finally to more than 20% by April 27, 2004.[63]

---

[59]    *See Bender Schedule 13D Amendment No. 7 (Plaintiff Opp. Exhibit. 7)*, at 7.

[60]    Although Messrs. Deckelbaum and Hall were purportedly members of the Bender Group at the time, no amendment was filed to note the action taken by these two Group member with respect to Carver, or their agreement to vote their shares in favor of the transaction.

[61]    Schedule 13D Amendment No. 7 filed by Bender omitted to state that the Bender Nominees had made their decision after a full consideration of (i) materials received from all potential bidders, (ii) the recommendation of IFSB's financial advisor, (iii) the opinion of IFSB's investment banker that the Carver transaction was fair to IFSB shareholders from a financial point of view, and (iv) the advice of IFSB's legal counsel regarding the fiduciary duty owed by directors to shareholders. *See Answer for Nelson Deckelbaum and Elliott Hall*, dated May 25, 2004 (*Plaintiff Off. Exhibit 18*), at 1-2.

[62]    *See Bender Schedule 13D Amendment No. 8 (Plaintiff Opp. Exhibit 8)*, at 8.

[63]    *See Bender Schedule 13D Amendment No. 9 (Plaintiff Opp. Exhibit 9)*, at 8.

## VI.     THE BENDER NOMINEES WITHDRAW FROM THE BENDER GROUP

IFSB filed this suit on May 6, 2004, naming the Benders and the Bender Nominees as defendants.  Mr. Deckelbaum was scheduled to be deposed on May 26, 2003, but two days before that date, Amendment 10 to the Bender Group 13D was filed.[64]  Amendment No. 10 stated that the Bender Nominees had terminated their membership and participation in the Bender Group and terminated their status as Section 13(d) reporting persons.[65]  Mr. Deckelbaum and Mr. Hall also stated that all of the Bender Group's previous Schedule 13D disclosures applied exclusively to Bender, not to the "Bender Group," as previously represented by Bender.  For the first time, the Bender Group Schedule 13D disclosed that the Bender Nominees "voted in favor of the Merger Agreement and have executed voting agreements with Carver [to vote their shares] in favor of the Merger Agreement."[66]

Amendment No. 10 strongly reiterated Bender's intent to vote against the Carver merger and his stated belief that "a change in the management and the composition of the board of directors in [IFSB] is necessary."  It also noted that Bender intended to "take action" to effect such changes.[67]  In addition, Bender no longer indicated, in Amendment No. 10, that he will await the defeat of the Carver transaction to obtain control of the Board.  Instead, he states that he intends to seek to change the composition of the Board at any meeting of IFSB shareholders.[68]  Noticeably absent from Amendment No. 10 was any detail with respect to Bender's plan to do so, continuing to leave IFSB shareholders and the investing public in the dark as to Bender's real scheme to launch a risky "turnaround" scenario that will last up to 18 months or possibly longer, and which may – or may not – ultimately produce value

---

[64]     *See Bender Schedule 13D Amendment No. 10* (attached at Exhibit 32), at 4.

[65]     Amendment No. 10 included as an exhibit signed letters from each of the Bender Nominees revoking the powers of attorney previously given by the Bender Nominees to Bender, which authorized Bender to make Section 13(d) filings on their behalf, and terminating a "Joint Filing Agreement" attached to the Bender Schedule 13D Amendment No. 6.

[66]     *See id.*, at 6.

[67]     *See id.*, at 5.

[68]     *Id*.

16

for shareholders exceeding the $21 per share offered by Carver.  And again, Amendment No. 10 omitted any discussion of the grounds for denial of his preliminary injunction in *Bender v. Parks*.  In that regard, while discussing Bender's plan to change the composition of the board, Amendment No. 10, like Amendment Nos. 7, 8 and 9, fails to state that this effort to acquire control of one third or more of the seats on IFSB's Board is exactly the conduct that this Court said that Bender was *not* permitted to engage in under his current OTS change in control approval.  Thus, heading into a meeting to approve the Carver transaction, IFSB's shareholders and the investing public generally are left with the inaccurate belief that Bender, in fact, has the current capacity to seek to carry out his plan to gain control of IFSB's Board and that there is absolutely no doubt as to the legality of that course of conduct.  In fact, his plan is directly contrary to this Court's earlier opinion.

## VII.   BENDER REVEALS IN HIS DEPOSITION, HIS UNDISCLOSED TRUE PLANS AND INTENTIONS REGARDING IFSB

In addition to the failure to disclose any of the Court's rationale or reasoning for rejecting his preliminary injunction motion, noticeably absent from Bender's Schedule 13D is any mention of various aspects of Bender's concrete plans with regard to IFSB's management and business operations.

First, regarding his change of control methodology, if the Carver deal is voted down, Bender currently believes that he will "probably" propose for election at the annual meeting the same three nominees he previously identified, in response to the Court's prompting in the prior litigation – nominees whose identities and backgrounds have *never* been disclosed by Bender in his Schedule 13D. Subsequently, Bender will – yet again – call for a special shareholders meeting to "throw the rest of [the directors] off the board."[69]  If he is successful in this gambit this time around, Bender will then have his nominees complete the transformation of the Board by appointing Bender nominees to the open seats

---

[69]     *See Morton Bender Dep.* (*Plaintiff Opp. Exhibit 1*), at 49:11-49:22.

created by the removal.[70]   These new directors would not receive any fees for their services as directors, pursuant to Bender's plan to entirely eliminate director's fees, thus eliminating all vestiges of independence on IFSB's Board, since, rather clearly, the only persons who would undertake the onerous duties of a public company director without compensation are individuals whom Bender could simply *instruct* to take those positions.[71]

Next, Bender intends to "change a lot of [management] people in the bank."[72]   Specifically, Bender acknowledges that he is "not a fan of" Thomas Batties, IFSB's Acting President and Chief Executive Officer, and that he has had discussions with Mr. Rial, Colombo Bank's President, about installing Rial as President of IFSB.   Bender also intends to "get rid of" the current Chief Financial Officer, Leroy Morris, and he also plans to fire IFSB's independent auditors, BDO Seidman.[73]   Bender also wants to bring in a whole new management team to handle, and improve, collections from IFSB's contracts with the District of Columbia.[74]

Bender also intends to have his new management implement certain concrete business plans relating to IFSB's operations.   Specifically, he plans to have IFSB avail itself of  "lots of advantages" that supposedly come from "being a minority bank," such as getting government agencies to deposit funds at IFSB on which IFSB would not have to "pay them interest."[75]   Bender also intends to "get [IFSB] more active in the loan business" by hiring loan officers "that would be aggressive and go out and get the business" which, apparently in Bender's view, IFSB is not pursuing "aggressively" enough.[76]

---

[70]      *See, e.g., Bender Schedule 13D Amendment No. 4* (*Plaintiff Opp. Exhibit 10*), at 9.  ("If these five individuals are removed, the remaining three directors would be authorized to fill the resulting vacancies. Two of these remaining directors would be Messrs. Deckelbaum and Hall, who are members of the Group.").

[71]      *See Morton Bender Dep.* (*Plaintiff Opp. Exhibit 1*), at 94:3-94:8.

[72]      *See id.*, at 92:2-92:7.

[73]      *See id.*, at 85:14-85:19.

[74]      *See id.*, at 92:14-92:22.

[75]      *See id.*, at 88:12-89:16.

[76]      *See id.*, at 91:20-92:7.

Bender also intends to change IFSB's information technology systems by getting "another company to handle it,"[77] presumably the same firm to which Bender outsources Colombo's information processing functions.  None of these proposed steps, many of which have serious implications for IFSB's business, have been disclosed in the Bender Schedule 13D.

Finally, and of utmost significance to investors, Bender acknowledges that it will take up to 18 risk-laden months of running IFSB as a "turnaround" situation, in order to achieve at least some of his plan's aims.[78]   After 18 months, Bender "hopes" that the bank will be worth more than the $21 per share that has been offered by Carver to IFSB shareholders.[79]   Bender admits that he has no idea if this goal can be achieved.[80]   And, once again, none of this has been disclosed in the Bender Schedule 13D, even after ten amendments, as Section 13(d) clearly requires.

## ARGUMENT

### I.   PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY AND APPROPRIATE

The law in this Circuit is well settled that a court may issue a preliminary injunction if the moving party establishes that:

> (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction.

*Sea Containers Ltd. v. Stena A.B.*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Federal Deposit Ins. Corp. v. Cafritz*, 762 F. Supp. 1503, 1505 (D.D.C. 1991) (granting an application for a temporary restraining order and citing the *Sea Containers* standard).

---

[77]     *See id.*, at 93:1-93:22.

[78]     *See id.*, at 80:12-81:4.

[79]     *See id*., at 81:15-81:18.

[80]     *See id*., at 117:12-117:15.

Bender has violated, and continues to violate, Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), most notably, by failing to disclose his true intentions and plans for IFSB, but also by concealing other material information to which shareholders and prospective investors are entitled under the law.  Even as repeatedly amended, Bender's Schedule 13D discloses only, in the vaguest terms possible, a generalized desire to "increase shareholder value," change "management and directors" and "oppose" the Carver transaction.  Bender's prior deposition testimony, his previous testimony before this Court and his most recent testimony all leave no doubt that he has given the question of what he would do if he were "in charge" of IFSB long and hard thought, and has developed quite specific plans for IFSB.  Disclosure of such matters is simply required.

In addition, the Bender Schedule 13D fails to disclose the result of Bender's prior litigation before this Court and any potentially negative conclusions as to Bender addressed by this Court in that litigation.  This failure can only be intentional and deliberate.  After the litigation was dismissed, Schedule 13D Amendment No. 7 was filed; it uninformatively stated only that Bender "was unsuccessful in his attempt to hold a special meeting of shareholders of the Issuer to remove certain directors."[81]  In stark contrast, when Bender's suit was filed, Bender clearly believed details of his litigation on were material. Bender's Schedule 13D Amendment No. 6 gave a detailed blow-by-blow account of the litigation, going on at great lengths about certain aspects of the litigation, particularly any that indicated that Bender might be successful in his attempt to get IFSB to hold a special shareholders meeting.  For example, following a hearing on Bender's motion for a TRO on December 8, 2003 – which was, in fact, denied – Bender advised shareholders that ***"[t]he judge indicated*** that Mr. Bender, as the holder of at least 10% of the shares of [IFSB], ***was entitled to a special meeting separate from the annual meeting,*** and advised Mr. Bender to revise his request for a special meeting to indicate his

---

[81]     *See Bender Schedule 13D Amendment No. 7* (*Plaintiff Opp. Ex. 7*), at 7.

recommendation for the new composition of the board if the named directors were to be removed . . . ."[82]

Other than the bare notation, 12 weeks after the fact, that Bender's demand for a special meeting had been "unsuccessful," this was the final word from Bender on his prior litigation.  Bender failed to disclose the dismissal itself and, more importantly, the reasoning of the Court in rejecting his motion for a preliminary injunction – that Bender's ability to call a special meeting to take control was problematic because (1) Bender's "admitted personal interest" in controlling IFSB conflicted with the interests of other shareholders; (2) Bender intended to gain indirect control of the Bank without paying any control premium to shareholders and thus to acquire control as cheaply as possible;[83] and (3) he had not requested, nor had the OTS approved, a change of control via the "removal and replacement of directors."

The reason for Bender's highly selective disclosure practices, of course, is that Bender *intended* to use his Schedule 13D disclosures to influence other shareholders' perception of his purportedly substantial likelihood of success and, in effect, get a head start on his proxy solicitation campaign for the election of directors.  And there is evidence Bender's strategy was effective.  *See, e g., Yahoo IFSB Message Board Posting*, Nov. 21, 2003 (attached at Exhibit 47) (relating to Bender's request for a special meeting that was disclosed four days earlier in Bender Schedule 13D Amendment No. 5 (attached as Exhibit 48), filed on Nov. 17, 2003)*; see also America Online Instant Messenger Transcript*, Nov. 27, 2003 (dated by hand "12/2/03") (attached at Exhibit 49) (discussing Bender's lawsuit and predicting that Bender "will carry the day").

Finally, Bender continues to violate Section 13(d) by his steadfast refusal to disclose his change-in-control purpose and plan to take over IFSB's board and management and run it as a one-man band, in pursuit of his own idiosyncratic "turnaround" scheme.  Bender himself obviously can afford to run the

---

[82]     *See Bender Schedule 13D Amendment No. 6* (attached at Exhibit 39) (emphasis supplied), at 7.

[83]     *See Bender v. Parks, 1/15/04 Mem. Op.* (*Plaintiff Opp. Exhibit. 2*), at 7.

substantial risk of the failure inherent in his plan, but other shareholders, many of whom have been long-term IFSB investors, simply do not have the financial resources to endure such risks with their investment accounts.   If Bender's intentional omissions are not rectified, a majority of IFSB shareholders, who lack Bender's huge resources and appetite for risk, will be (1) forced to make investment and voting decisions based upon an incomplete record; (2) deprived of the benefits of the Carver transaction; and (3) dragged involuntarily into unknown territory, a risky Bender-led turnaround effort.

## II.   BENDER HAS INTENTIONALLY VIOLATED SECTION 13(D) BY OMITTING FROM HIS SCHEDULE 13D MATERIAL INFORMATION ABOUT HIS PLANS AND INTENTIONS

Because Bender has failed to make clearly required disclosures in his Schedule 13D, IFSB is likely to succeed on the merits of its Section 13(d) claim.[84]   The Court's determination as to the likelihood of success "is not a mere prediction of success by a given percentage." *Cafritz*, 762 F. Supp. at 1506.   Rather, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors [in the inquiry]."   *Washington Metropolitan Area Transit Commission*, 559 F.2d 841, 843 (D.C. Cir. 1977).   As demonstrated herein, IFSB is likely to succeed on the merits of its claims because the Benders have violated Section 13(d), and the rules thereunder, by failing to disclose accurately and fully Bender's plans and intentions, and not by mere inadvertence; to the contrary, Bender knowingly withheld and continues to withhold material information from IFSB shareholders while he continues to work to seize control of IFSB as cheaply as possible, disregarding the impact this course will have on other IFSB shareholders.

---

[84]   An issuer of securities pursuant to Section 12, such as IFSB, has standing to sue for relief under Section 13(d).   *See Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1224 (4th Cir. 1980);. *s ee also Sea Containers*, 890 F.2d at 1209 (analyzing issuing company's request for injunctive relief pursuant to Section 13(d)); *Seilon, Inc. v. Lamb*, No. C83-314, 1983 U.S. Dist. LEXIS 15163, at *24 (N.D. Ohio July 27, 1983).

Section 13(d) of the Exchange Act provides that any person (or a group acting together for the purpose of acquiring, holding, or voting securities of a company), who acquires, either directly or indirectly, the beneficial ownership of more than 5% of a class of securities registered under Section 12 of the Exchange Act must, within ten days, file a statement on Schedule 13D.  15 U.S.C. § 78m(d). Section 13(d) was "designed as a broad disclosure provision to give shareholders and the market notice of potential changes in corporate control."  *SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 724 (D.D.C. 1988), *aff'd*, 890 F. 2d 1215 (D.C. Cir. 1989); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975), stating that "[t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party").  *A fortiori*, the qualifications and intentions of a large shareholder who has *not* made a cash tender offer but who seeks to defeat a transaction by one who did, are even more relevant to shareholders and potential investors, since investors will have to live with the results of actions, dictated by the large shareholder, which may effect changes in corporate management, policy or business.

It is elementary that a Schedule 13D must set forth, among other things, the background and identity of the group's members, their businesses, the source of their financing, *their purposes in acquiring the issuer's stock, and their plans and intentions with respect to the issuer.*[85]   In addition, Section 13(d)(2) of the Exchange Act and Rule 13d-2 (17 C.F.R. § 240.13d-2) thereunder require that any person who has filed a Schedule 13D must "promptly" amend its Schedule 13D when any material change occurs in any of the facts set forth in the Schedule 13D.

Rule 13d-101, issued pursuant to Section 13(d), specifically requires that "reporting persons," such as the Benders, must disclose the purpose of their accumulation of stock acquisition and any "plans or proposals" that would result in, *inter alia*, an "extraordinary corporate transaction;" "any change in

---

[85]  Item 2 of Schedule 13D provides for the "identity and background" of the investor and any group members. Item 4 provides for the "purpose of [the] transaction."

the present board of directors or management of the issuer;" or any other material changes in the issuer's business or corporate structure.  17 C.F.R. § 240.13d-101.  A change in control plan need not be "fixed" or definite in order to trigger a disclosure requirement,[86] because a primary purpose of the Rule 13d-101 disclosure requirement is to alert and inform companies, their shareholders, and the investing public generally regarding accumulations of stock which might presage a potential shift in either corporate control or direction and to compel full disclosure of information critical to informed investment decisions.  *See SEC v. First City Fin. Corp., Ltd.,* 688 F. Supp. 705, 724 (D.D.C. 1988), *aff'd*, 890 F. 2d 1215 (D.C. Cir. 1989) ("the disclosure provisions of 13(d) are 'the only way that corporations, their shareholders and others can adequately evaluate . . . the possible effect of a change in substantial shareholdings.'" (citing 113 Cong. Rec. 855 (1967));  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1167 (D.C. Cir. 1978).

A failure to disclose information violates Section 13(d) if a "reasonable investor" would "consider the information to be important . . . ."  *A.P. Green Indus., Inc. v. East Rock Partners, Inc.*, 726 F. Supp. 757, 761 (E.D. Mo. 1989) (quoting *Missouri Portland Cement Co. v. H.K. Porter Co.*, 535 F.2d 388, 393 (8th Cir. 1976));  *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (stating the materiality standard under the federal securities laws).  Disclosure of such facts is necessary to allow a shareholder to determine how to vote and what  "other action might be desirable or essential in order to protect his or her investment in the company."  *Seilon, Inc.*, 1983 U.S.

---

[86]     Because any attempted change of control necessarily, by its nature, involves a "plan," the test for establishing whether a Section 13(d) filing that acknowledges that the filer is seeking control has a "plan" with regard to that intention is less stringent than undisclosed plans in other contexts.  In *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1226 (4th Cir. 1980), the court deemed that the test for presence of a control purpose was whether a purchaser has a "perceptible desire to influence substantially the issuer's operations," and proof of a "fixed plan" was not required.  Likewise, in *Chromalloy American Corp. v. Sun Chemical Corp*, 611 F.2d 240, in rejecting a defendant's argument that it did not have a "fixed plan" and that disclosure of intent to control could "mislead investors by overstating the definiteness of [the Defendant's] plan," the court held that Section 13(d) required explicit disclosure of a control purpose.  The court explained, "[d]isclosures of a purchaser's purpose in acquiring stock is a different matter [than disclosures of plans for specific corporate changes].  Item 4 specifically requires disclosure of a purpose to acquire control, regardless of the definiteness or even the existence of any plans to implement this purpose." *Chromalloy American Corp. v. Sun Chemical Corp*, 611 F.2d 240, 247 (8th Cir. 1979).

Dist. LEXIS 15163, at *51; *see also TSC Indus.,* 426 U.S. at 449. Courts have held that "the fact that information is *required* to be revealed under Section 13(d) is evidence of its materiality." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (emphasis supplied) (citing *SEC v. Levy*, 706 F.Supp. 61, 72-72 (D.D.C. 1989)).

Section 13(d) filings are required to be both complete and truthful. *See, e.g., SEC v. Savoy Ind.,* 587 F.2d 1149, 1165 (D.C. Cir. 1978); *Mason Dixon Bancshares v. Anthony Invs.*, CCB-96-3836, 1997 U.S. Dist. LEXIS 23638, at *17 (D. Md. 1997) (". . . courts have repeatedly read into Schedule 13D filing requirements that obligation to tell the truth."). Nor can a defendant satisfy Section 13(d) by a demonstration of *facial* adequacy, i.e., a mere showing that he has provided *some* statement in response to every item called for by Schedule 13D. *Dan River Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1227 (4th Cir. 1980) ("[a] court is not to take a mechanical approach by refusing further inquiry into the plaintiff's allegations solely because the filing is facially adequate."). Similarly, statements that are grounded in fact, but which nevertheless have a misleading effect, violate Section 13(d). *See Mason Dixon Bancshares v. Anthony Invs.*, CCB-96-3836, 1997 U.S. Dist. LEXIS 23638 (D. Md. 1997) (defendant's Schedule 13D was inadequate because several statements, while factually correct, were misleading as stated).

A.  **Bender's Schedule 13D Is Incomplete and Misleading Due to Its Material Omissions and Misleading Portrayal of Bender's Plans and Intentions with Respect to IFSB**

Here, Bender's Schedule 13D, even after multiple amendments, fails to fully and honestly disclose his true intentions with regard to IFSB, intentions that a reasonable investor would, given IFSB's current situation, undoubtedly find important, if not absolutely essential, in making informed investment and/or voting decisions regarding IFSB. Amendment No. 10 to Bender's Schedule 13D outlined only Bender's intent to vote against the Carver merger, his belief that "a change in the management and the composition of the board of directors in [IFSB] is necessary" and his intent to "take action to effect such a change." These spare and indefinite statements paint for other IFSB shareholders and the investing public generally an utterly misleading and inaccurate picture of Bender's

25

current plans and intentions regarding IFSB.  It is simply impossible to deduce, from Bender's Schedule 13D, his actual, undisclosed plans and intentions and the detailed blueprints Bender has in mind for IFSB that will lead, if he is successful, to Bender gaining control of IFSB and bringing a majority of shareholders along for a "turnaround" ride of up to 18 months, by Bender's unsubstantiated guess, and quite possibly much longer, with wholly uncertain results.

As evidenced by his own words, Bender has a definitive plan of action to effect a change of control at IFSB, none of which has been properly disclosed in his Schedule 13D.[87]  The Bender Schedule 13D omits Bender's change of control plans, directorial, managerial and operational planned changes, as well of the effects of those plans on shareholders and prospective investors, who have only the Schedule 13D on file with which to educate themselves about Bender's true intent.

The materiality of this information is plain.  IFSB shareholders are currently attempting to judge the merits of the Carver bid, which would deliver cash per share to them, against the alternative offered to them by Bender.  But they have no idea that if the Carver merger is defeated, Bender intends to employ a turnaround strategy that, by his own admission, will take up to 18 risk-laden months, and perhaps well beyond that, with absolutely no guarantee of any improvement on the Carver offer.[88]

First, Bender's Schedule 13D fails to disclose Bender's plan to obtain control of IFSB or the methodology to be used in achieving Bender's intended effect.  This information is critical.  Investors need to know that Bender seeks to gain effective control of IFSB as cheaply as possible, by electing three of his nominees at the next annual meeting to replace the independent board members up for

---

[87]    Even when one considers the application of Section 13(d) to specific corporate changes rather than a change of control, the Bender's statements go well beyond "vaguely formed thoughts for the future," the standard used to determine required Schedule 13D disclosure in *Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15, 16 (2d Cir. 1995).  Bender's specific and significant plans, described *supra*, are not "vague daydreams" and clearly must be disclosed in a Schedule 13D.  *Id.* (quoting *Todd Shipyards Corp. v. Madison Fund, Inc.*, 547 F. Supp. 1383, 1387 (S.D.N.Y. 1982)).

[88]    *See Morton Bender Dep.* (*Plaintiff Opp. Exhibit 1*), at 81:5-81:9.

election and giving him majority control of the Board, Bender's long-sought goal.[89]   Bender will then call a special meeting to "throw the rest of [the directors] off the board,"[90] thus removing the last remnants of independent representation of shareholders from the IFSB Board.

In these circumstances, shareholders must be able to compare the quality and integrity of the leadership Bender offers to that provided by the Bank's slate of nominees.   Moreover, they need to consider the implications of the fact that the transformation Bender fully intends to implement entails the complete elimination of any vestige of independent thought or action on the Board, as outside directors are replaced by more individuals who will occupy their seat in the boardroom solely by the grace of Bender.   Shareholders and the investing public generally must be able to judge for themselves the direction in which the loyalty of such a Board is likely to lie.

Second, Bender's Schedule 13D fails to disclose the management changes Bender anticipates making, namely, his intent to replace Thomas Batties, IFSB's Acting President and Chief Executive Officer, to "get rid of" IFSB's Chief Financial Officer, Leroy Morris, and to discharge IFSB's independent auditors, BDO Seidman.[91]   IFSB shareholders and prospective investors should be able to consider the rather ominous implications of the fact that, once Bender has removed any vestige of independence on the Board, he will also replace such key management positions as CEO and CFO with personnel beholden only to him.   Shareholders might well find particularly disturbing Bender's plan to replace the current independent auditing firm selected by the current independent board with auditors handpicked by Bender, and rubberstamped by "his" Board, particularly in light of the fact that in running the affairs of Colombo, Bender had no need to exercise care with respect to fiduciary duties owed to minority shareholders, because at Colombo he has none.

---

[89]     As noted, Bender has not disclosed in his Schedule 13D the names of the three nominees he intends to put forward, names which he has known since at least December 9, 2003.

[90]     *See Morton Bender Dep.* (*Plaintiff Opp. Exhibit 1*), at 49:11-49:22.

[91]     *See id.*, at 84:22-85:19.

Third, Bender has omitted, from his Schedule 13D any disclosure relating to his numerous concrete operational plans for IFSB.  Other IFSB shareholders have no ability to judge the desirability and implications of Bender's plans to cause IFSB to avail itself of  "lots of advantages" that come from "being a minority bank," such as opportunities to obtain non-interest paying government agency deposit funds.[92]  Shareholders are likewise unfamiliar with Bender's intent to "get [IFSB] more active in the loan business" by hiring loan officers "that would be aggressive and go out and get the business."[93] They have no idea of the risk level involved in the new loan business Bender would direct IFSB into, because Bender has not even not told them.  IFSB shareholders considering their votes at IFSB's annual meeting are not aware that Bender intends to change IFSB's computer systems by getting "another company to handle it."[94]  Given that this is exactly what Bender did at his bank, Colombo, Bender certainly has information he could share as to how this option might work out in practice, including data on the potential risks of outsourcing and information as to how soon IFSB could expect to see any increased return attributable to this new approach.

Bender has shared nothing on this subject with shareholders or potential investors and they have a right to know.  No one could possibly suggest that such matters are not of vital concern to investors. If Bender published his plans, they would be discussed, analyzed and – most importantly – better understood.  That is, after all, the goal of the federal securities laws.

Under the current circumstances, IFSB shareholders or potential investors attempting to judge the merits of the Carver bid that would deliver cash in hand to them have no idea that if it is defeated, Bender intends to employ a turnaround strategy that, by his own admission, will take up to 18 months,

---

[92]        *See id.*, at 88:12-89:16.

[93]        *See id.*, at 92:2-92:7.

[94]        *See id.*, at 93:1-93:22.

and perhaps several years beyond that, with absolutely no guarantee of improvement or an ultimate share price equal to, let alone greater than, the Carver bid.[95]

Ominously, if Bender is successful in preventing the Carver transaction, it would appear virtually certain that the price of an IFSB share will fall to the same historical levels at which it traded prior to the time the IFSB board hired KBW, potentially to as low as $10.00 to $12.00 per share. Bender asserts (although not yet publicly) that, to the contrary, he believes that the mere "presence of Morton Bender involved in [IFSB] will support the stock price at current levels (just below $21) or even above."[96] Bender seems to believe that he himself is the most influential force acting on IFSB's stock price,[97] ignoring the rather obvious correlation between the Carver bid price and the current trading level of the stock just below that price, as well as the fact that the price of IFSB stock only began its rise after the company indicated it was for sale. The views of those who should be knowledgeable on this subject – including those who were willing to commit their funds, to back up their talk – are to the contrary.[98] However, the point is not really whether Bender is right or wrong. The point is that Bender has not told investors what he thinks IFSB stock will do after he defeats the Carver transaction, and why, so that shareholders and potential investors can judge the reasonableness of Bender's beliefs, and the persuasiveness of any facts or data he may be able to cite in support of those beliefs. If the public chooses to believe that Bender can elevate the price of IFSB stock simply by scratching in the right places,[99] they surely have every right to do so.

---

[95]     *See id.*, at 81:5-81:9.

[96]     *See id.*, at 121:7-121:11.

[97]     *See Morton Bender Dep.* (*Plaintiff Opp. Exhibit 1*), at 19:10-19:17; 121:7-121:11.

[98]     *Deborah Wright Dep.*, June 23, 2004, (attached at Exhibit 45), at 243:12-244:1. ("Q: And in your experience, what would be your expectations as to what would happen to the IFSB stock price if the Carver deal were [defeated] and there was no other immediate prospect of a takeover? [Objections to the form of the question] THE WITNESS: Our assumption would be that the stock would drop to where it was previously traded, which is 10 to 12.").

[99]     *See Morton Bender Dep. (Plaintiffs Opp. Exhibit 1)*, at 19:10-19:17.

Bender's arrogant refusal to disclose the body of information that a reasonable shareholder would want to have in order to manage his or her investment violates Section 13(d) and makes clear the likelihood of IFSB's success on the merits.  For example, in *A.P. Green*, *supra*, at 25, the defendants failed to disclose in their Schedule 13D that they planned to finance their purchase of a company either by enforcing a lien on substantially all of the company's assets or by a pre-acquisition deal with a potential buyer of one of the plaintiff's businesses, to be consummated after the defendants gained control of the company.  726 F. Supp. at 759.  The court found that information about these plans was material, and that non-disclosure of it demonstrated the incomplete nature of the Schedule 13D filing and, consequently, the plaintiff's likely success on the merits of their Section 13(d) claim.  *Id*. at 761. Similarly, in *Marshall Field & Co. v. Icahn*, 537 F. Supp. 413, 415-416 (S.D.N.Y. 1982), the court found that the defendant's plans to engage in material changes in the plaintiff's business should have been disclosed in the defendants' Schedule 13D filing.  The Court consequently ruled that the plaintiffs demonstrated that they were likely to succeed on the merits and granted injunctive relief.  *Id.* at 416. *See also Financial Gen. Bankshares v. Lance,* No. 78-0276, 1978 U.S. Dist. LEXIS 18098, at *25 (D.D.C. 1978).

Bender's failure to fully disclose his true intentions, purposes and plans in acquiring IFSB shares is precisely the type of violation of Section 13(d)'s reporting requirements that warrants injunctive relief. Just like the defendants in *A.P. Green* and *Marshall Field*, Bender admits (but not publicly) that he has specific, but secret plans here, a plan to lead IFSB into a risky turnaround strategy.  In the present case, the information withheld is particularly significant because this strategy could endanger the future of the company and a pending cash transaction.  Unlike Carver's plan, Bender's plan puts the risk of Bender's failure on the majority of shareholders, not Bender, who can effectively "kill" the Carver deal with the votes of just one-third of IFSB's shares.   This makes full disclosure regarding the anticipated consequences of Bender's actions absolutely essential to shareholders in assisting them to determine what action might be desirable to protect their investment in the company.

**B.**      **Bender Has Not Disclosed in His Schedule 13D the Results of the Prior Litigation with IFSB**

In Amendment No. 6 of the Bender Group Schedule 13D, filed December 22, 2003, the Bender Group provided IFSB shareholders and potential investors with certain details of Bender's litigation effort, emphasizing that this Court had indicated that he was entitled to a special shareholders meeting and noting that the Court had set a date for a preliminary injunction hearing in January 2004. On April 7, 2004 – long, long after the Court's Memorandum Opinion was issued in that action on January 15, 2004 – the Bender Group filed another Schedule 13D amendment, Amendment No. 7, which stated only, in truly minimalist fashion, that Bender had been "unsuccessful" in this attempt. The contrast between Bender's fulsome description of the unproven allegations in his Complaint, and the determination and rulings actually entered by this Court, is surely no accident.

Bender's Schedule 13D omits to state that "Mr. Bender has not obtained OTS approval for a change in control effected by the removal and replacement of directors, which is necessary for the special meeting to proceed."[100]  Bender entirely omits to state that the litigation he filed against IFSB and its independent directors with great fanfare ended, ingloriously, with this Court's conclusion that Bender "wants to acquire the Bank for the least amount possible" and that the focus of his request for a special meeting was "to remove all but two of the Board members, replace those persons with others of his choosing and gain indirect control of the Bank without spending a *sou* for it."[101]

---

[100]    *See Bender v. Parks, 1/15/04 Mem. Op.* (*Plaintiff Opp. Exhibit 2*), at 5, 7. Bender's admission, through his counsel at the oral argument held on June 28, 2004, that he has been working hard behind the scenes to convince OTS personnel that the Court reached this conclusion in error only proves the materiality of this point. If it is important enough to provoke this activity on Bender's part, the high level of doubt which this Court's conclusion raises regarding the legality of Bender's course of action is surely information shareholders are entitled to have.

[101]    *See Bender v. Parks, Memo. Op.*, at 9. The Court's phrasing is, of course, not the important thing. The important thing is that Bender should let IFSB shareholders know that "My goal is to take this company over without paying shareholders the substantial control premium Carver has offered" – because that *is*, in fact, his goal.

C.   **The Economic Logic and Rationale of Bender's Actions Prove That He Has Plans Other Than Those Stated in His Schedule 13D**

In the context of Section 13(d), courts have consistently found evidence of economic advantage to a course of action contrary to a defendant's stated intentions to be indicative of undisclosed plans. *See, e.g., Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1225 (4th Cir. 1980) ("[Defendants would only receive] dividends which would amount to only a fraction of what the defendants would be paying in interest in order to carry these purchases."); *Chromalloy Am. Corp. v. Sun Chem. Corp.*, 611 F.2d 240, 246 (8th Cir. 1979) ("[Defendant's stated plan] would be a wise business  decision only if [defendant] is attempting to gain control."); *Standard Fin. Inc. v. LaSalle/Kross Partners, L.P.,* No. 96 C 8037, 1997 U.S. Dist. LEXIS 1916, at *9 (N.D. Ill. 1997) ("[D]efendants could only realize a significant profit if the company was acquired."); *Kaufman & Broad v. Belzberg,* 522 F. Supp. 35, 44 (S.D.N.Y. 1981) ("[Defendant's] claim regarding increased investment in accordance with such tax advantages is untruthful because the tax advantage is more than offset by the interest payments on funds borrowed to purchase the additional [issuers] stock.").

Here, Bender has developed plans to acquire IFSB for their own benefit, without having to match or beat the $21 per share Carver has agreed to pay and without paying a control premium to IFSB shareholders.  If Bender had agreed to tender his IFSB shareholdings (203,700 shares) at the Carver transaction price of $21.00, Bender would stand to make a profit, minus transaction costs, of approximately $1,649,174, a total return on investment of more than 60%.  Yet, even after the Carver bid was announced, Bender continued to buy additional IFSB shares at just below the $21 level, at a rate of return of barely 1% on the additional investment of funds.[102]   Bender acknowledges in his deposition that he hopes to gain an even greater profit from his true alternate course of action,[103] but

---

[102]    Indeed, even though the Bender Nominees are no longer in the Bender Group, Bender used them to deceive the public into believing that the Bender Nominees supported him; no other conclusion can be reached from reading, in Amendment Nos. 7, 8 & 9, of the purported opposition by the "Bender Group" to a merger the Bender Nominees had actually voted for and supported as the best deal available to shareholders.

[103]    *See Morton Bender Dep*. (*Plaintiff Opp. Ex. 1*), at 92:2-92:7.

32

what he has disclosed is only that he hopes to defeat the Carver transaction and that "changes" in IFSB's board and management are "necessary." That cannot be Bender's ultimate goal; there is no financial return in defeating a transaction (particularly where such action will likely have a detrimental short-term effect), and likewise no financial return in merely effecting personnel changes. Bender must reveal that his true intention is to put into effect the risky turnaround scenario that he, in his sole wisdom, has developed in the hope of ultimately reaping a large gain. The self-inflicted reduction in Bender's rate of return is only rational if Bender intends to take control of IFSB and push on with his "turnaround" plan.

If Bender truly thought IFSB was worth more than the $21 "on the table," Bender could have made his own bid to purchase the bank above Carver's $21 bid. Bender's failure to follow through on his own indication of interest as well as his continued pursuit of the acquisition of control, both evidence that he truly cannot believe the Carver transaction is undervalued. To the contrary, he believes it represents real value that he wants to appropriate for himself. He must disclose this.

    **D.**    **Bender's Pattern of Evolving Interest in IFSB Demonstrates That He Has Plans Other Than Those Stated in His Schedule 13D**

A *pattern* of evolving interest in a target company has been viewed as convincing evidence of an undisclosed intent to gain control. *See*, *e.g.*, *General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir. 1977) (stating that defendant's Schedule 13D failed to state a control intent, where the plaintiffs demonstrated, *inter alia*, an escalating conflict with the issuer's board); *Egghead.com, Inc., v. Brookhaven Capital Mgmt.*, 194 F. Supp. 2d 232 (S.D.N.Y. 2002) (finding that defendant's increasing interest in influencing the company and meetings with the issuer's management evidenced intent to control.).

Here, Bender's actions over the past couple of years are clearly indicative of a growing and evolving interest in IFSB, which is simply not reflected in Bender's bland statements in his Section 13(d) filings. Since October 2002, Bender has continuously purchased more and more IFSB shares and, in other ways, sought to increase his influence over IFSB. In March 2003, Bender used this growing influence (and an investment of more than $400,000) to elect two nominees to the Board. As time

33

passed, Bender continued to acquire shares and sought to influence IFSB in other ways, including his November 2003 attempt to eliminate, first through Mr. Hall, then via his own request for a shareholder meeting, and finally through litigation, all of the IFSB board members that were not members of the Bender Group.

Based on this history of a growing involvement in IFSB and the documented previous attempts to seize control, it is inconceivable that Bender's current Schedule 13D, in which Bender fails to detail any concrete plan to take control of IFSB in the event that Bender successfully defeats the Carver transaction, fairly represents his ultimate plan for IFSB.

## III.   BENDER SHOULD BE ENJOINED FROM SEEKING TO ACQUIRE CONTROL OF IFSB THROUGH THE ELECTION OF DIRECTORS OR APPOINTMENT OF DIRECTORS IN VIOLATION OF OTS REGULATIONS

IFSB requests that the Court issue a preliminary injunction prohibiting Bender from taking any action to seek to elect additional nominees to the IFSB Board or to remove members of the IFSB Board and replace them with nominees of Bender's choosing.  The Court, in its prior opinion in *Bender v. Parks*, stated that it was unlikely that Bender had obtained approval from the OTS such as would allow him to obtain control of IFSB's Board through the removal and replacement of IFSB board members at a special meeting:  Bender purports to acknowledge the Court's ruling in *Bender v. Parks;*[104] however, his actions and statements are completely to the contrary.  In fact, Bender has not even acknowledged, much less respected, the Court's ruling.  In Amendment Nos. 7, 8 and 9, Bender discussed his intention to seek to defeat the Carver transaction and, if successful, his intention to take action to change the composition of the Board.  In Amendment No. 10, Bender increased the level of his rhetoric, indicating that he will no longer wait until after the defeat of the Carver transaction to pursue

---

[104]   See *Memorandum of Points and Authorities in Support of Benders' Application For Preliminary Injunctive Relief* at 4 n. 4 ("Notwithstanding their disappointment in it, the Benders certainly acknowledge this Court's decision in the <u>Parks</u> case denying their request for temporary and preliminary injunctive relief.").  They have *not*, however, acknowledged it in the Schedule 13D.

control of the Board.  Instead, he intends to seek to change the composition of the Board at the very next meeting of IFSB shareholders, and he has again turned to this Court for assistance, asking the Court to order IFSB to schedule meetings and set agenda for those meetings that would best further his goal of control.  He makes no secret (except in his Schedule 13D) that he intends to run three nominees for the Board of Directors, Messrs. Mark Brodsky, Terry Hart Lee and John Silvanus Wilson, Jr. Following their election, Bender would have control of a majority of the Board, but he acknowledges that, even then, he won't be satisfied.  He will convene a special meeting to remove *all* remaining directors other than his nominees, and appoint more Bender designees to fill the seats of any removed directors.

This Court will, of course, recognize the scenario Bender lays out.  The removal and replacement strategy is exactly what was before the Court in *Bender v. Parks.*  There, the Court stated that the OTS Order approving his application did not authorize Bender to take any action to acquire control in this manner, recognizing that the OTS Acquisition of Control Regulations ("Control Regulations") treated any effort by a party to place nominees on a board of directors in a number equal to or exceeding one-third of the board as a presumptive acquisition of control.[105]  Since Bender currently has two nominees on the eight-person Board, the addition of a single Bender nominee to the

---

[105]    Bender's plan to elect additional nominees to the Board as well as to remove other directors and replace them with his nominees reflect actions that would require approval under the Control Regulations.  Under those regulations, an acquiror is presumed to have acquired control of a savings association if the acquiror, among other things, holds any combination of voting stock and proxies of a savings association, which would enable the acquiror to: "(i) Elect one-third or more of the savings association's board of directors, including nominees, or representatives of the acquiror currently serving on such board."  12 C.F.R. § 574.4(a)(2)(i).  Moreover, Bender's plan to gain control of the Board through the combination of the election of directors and the removal and replacement of directors also implicates the provision of the regulations that provides that an acquiror will be deemed to have acquired control of a savings association if the acquiror, among other, things, "Controls in any manner the election of a majority of the directors of the savings association."  12 C.F.R. § 574.4(a)(1)(iv).  In his application to acquire IFSB, Bender did not seek approval to acquire control by means of obtaining control of the Board and the OTS Order approving the application expressly provided that: "The proposed acquisition contemplated by the Application must be consummated within one year from the date of this order, *in accordance with the terms and representations in the Application.*"  *OTS Approval Order No. 2003-51*, Oct. 14, 2003 at 5 (attached at Exhibit 33) (emphasis supplied).

Board would cause Bender to cross this threshold.   Thus, Bender cannot proceed with either component of the strategy that he described in his deposition.

Certainly the Court's statement in *Bender v. Parks* affirms the likelihood of IFSB's success on the merits on this particular issue and clearly no persons other than Bender would be harmed by the requested relief.   In the absence of the requested relief, however, Bender will cause irreparable harm to IFSB shareholders and potential investors by acquiring control in contravention of *both* OTS regulations and this Court's statement, both of which reflect the public interest.   Bender's unwillingness to acknowledge the restrictions applicable to him the under the Control Regulations and his intention to act in a manner which this Court's Order indicated would be illegal strongly support the need for a preliminary injunction preventing Bender from seeking to take any further steps with respect to either the election or appointment of Bender nominees to the IFSB Board, unless and until Bender obtains the necessary OTS approval.

## IV.    IFSB WILL SUFFER IRREPARABLE INJURY IF THE REQUESTED RELIEF IS NOT GRANTED BY THE COURT

If the Court does not grant IFSB's request for preliminary injunctive relief, IFSB and its shareholders will suffer permanent and irreparable harm.   In the context of Section 13(d), irreparable harm justifying injunctive relief exists wherever the "informed exercise of the franchise and other methods of control and redress by the shareholders" would be threatened by a failure to make the disclosures required under Section 13(d).   *Seilon, Inc. v. Lamb*, No. C 83-314, 1983 U.S. Dist. LEXIS 15163, at *33 (N.D. Ohio July 27, 1983); *Ludlow Corp. v. Tyco Labs, Inc.*, No. 81-1640-Z, 1981 U.S. Dist. LEXIS 16760, at *6 (D. Mass. July 2, 1981); *see also General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977).   Because these interests can be satisfied *only* by providing shareholders "the information required to be filed," *ICN Pharmaceuticals, Inc. v. Khan*, 2 F.3d 484, 489 (2d Cir. 1993), the failure to provide such information demonstrates irreparable harm.   *General Aircraft*, 556 F.2d at 96-97; *Clarostat Mfg. Co., Inc. v. Ostrau*, No. C82-299-L, 1983 U.S. Dist. LEXIS 16675, at *3-4 (D.N.H. May 26, 1983).

36

In *Seilon*, 1983 U.S. Dist. LEXIS 15163, at *50, the court found that the failure of a Section 13(d) group to provide specific statements about "present intentions of the members of the group," as mandated by Schedule 13D, would result in irreparable harm if the requested injunctive relief were not granted. *Id*. Similarly, in *Ludlow*, the court decided that because "the very *raison d'etre* of Section 13(d) would be thwarted by a continued failure to disclose information required by the statute," irreparable harm existed where the defendant failed to satisfy Section 13(d)'s disclosure requirements. 1981 U.S. Dist. LEXIS 16760, at *5 (quoting *General Aircraft Corp.*, 556 F.2d at 97).

Here, as in *Seilon*, the Benders have failed to disclose their current plans and intentions and other material information, as required by Section 13(d). Such violations necessarily injure IFSB and its shareholders, permanently and irreparably. Like the *Seilon* defendants, Bender has failed to state, in his amended Schedule 13D filings, his current plans or proposals that would cause IFSB to embark, to the detriment of a valuable merger opportunity, on a risky "turnaround" venture. Nor does Bender's Schedule 13D mention Bender's intent to cause IFSB to be taken over in a manner not approved by the OTS, a manner that serves only Bender's interests and is contrary to the interests of IFSB and its shareholders. By withholding this crucial and material information, the Benders have denied shareholders the ability to make an "informed exercise of the franchise" at any meeting addressing the merger, *see Seilon,* 1993 U.S. Dist. LEXIS 15263, at *33, or any informed decision as to whether to purchase, sell or hold IFSB shares.

As noted above, Section 13(d) requires the disclosure of Bender's intent, precisely the type of information that a reasonable investor would consider significant and therefore material, and the non-disclosure of which demonstrates a threat of irreparable injury. By virtue of the Defendants' unlawful actions, IFSB shareholders are being denied their right to make investment and voting decisions concerning IFSB securities on the basis of full and fair disclosure, the basic goal and requirement of the federal securities laws. If not enjoined, Bender's violations will cause irreparable harm, as the voting process will be corrupted by the his violations of the federal securities laws.

For all these reasons, the Court should require the Benders immediately to disclose all of the information required by Section 13(d). The Court should neutralize the shares Bender acquired while

he was in violation of that Section. Finally, the Court should enjoin Bender from nominating any new directors or taking any other actions to effect a change of control in a manner not approved by OTS.

## V.   OTHER PERSONS WILL NOT SUFFER SUBSTANTIAL HARM IF THE REQUESTED INJUNCTIVE RELIEF IS GRANTED

A preliminary injunction will not cause substantial harm to other persons. Indeed, the only persons whose interests arguably might be impaired by a preliminary injunction are the Benders, because the injunction sought here is designed to halt the violations that they have used for their own benefit and to the detriment of IFSB and the other IFSB shareholders. *See, e.g.*, *A.P. Green*, 726 F. Supp. at 760 ("the brief delay contemplated by [plaintiff's] motion will cause far less harm to [defendant] than would befall [plaintiff's] shareholders if [defendant] continues to purchase [plaintiff's] stock without the full disclosure of material information"). Shareholders other than the Benders will suffer no adverse effects by the issuance of a preliminary injunction.

In addition, IFSB seeks an injunction of relatively brief duration, limited to the period needed to conduct a fair shareholder vote in which all materially relevant information, including that which should have been disclosed in the Bender Schedule 13D, is available to IFSB shareholders. The grant of injunctive relief will result in the release of such information to the investing public and will prevent the Benders from unfairly benefiting from their past violations of Section 13(d). Such an injunction will not harm, and will substantially aid, other persons, especially the majority of shareholders of IFSB, and is well within the power and authority of this Court.

## VI.   INJUNCTIVE RELIEF WOULD SERVE THE PUBLIC INTEREST

The Court's issuance of a preliminary injunction would serve the public interest. Only through injunctive relief can the Court  give effect to the purpose of the securities laws at issue here:  the disclosure of relevant information necessary for shareholder and potential investor decision-making. As the Fourth Circuit has said with respect to Section 13(d), because "a false filing may be more detrimental to the informed operation of the securities markets than no filing at all . . . a court simply cannot turn a blind eye to a potentially inaccurate filing when it possesses the injunctive power to have

the filing corrected before irreparable harm occurs to the investing public." *Dan River, Inc.*, 624 F.2d at 1227 (citation and quotation omitted). Here, only injunctive relief can ensure that IFSB shareholders will be able to freely exercise their voting rights, because without such immediate relief, they will have to act in the absence of vital information extremely relevant to their vote at the next IFSB meeting. In this instance, injunctive relief will serve the public interest by allowing access to that information. *See A.P. Green*, 726 F. Supp. at 760 ("the public interest is served by requiring [defendant] to comply with securities regulations"). Indeed, as this Court has explained, broad injunctive relief may be appropriate in situations in which "defendants [have] obtained effective control of [the plaintiff corporation] as a result of purchases made while not complying with Section 13(d)." *Financial Gen. Bankshares*, 1978 U.S. Dist. LEXIS 18098, at *33. Bender's accumulation of 21% of the company, coupled with the fact that he may be able to influence other shareholders, indicates that he may already have acquired such "effective control." Granting such immediate relief also serves the public interest by exposing falsehoods, by uncovering and punishing wrongdoing, and by precluding individuals from benefiting from that wrongdoing.

In addition, without such relief, the exercise of the shareholder franchise at the next IFSB shareholder meeting will be irredeemably corrupted, which may well allow Bender to fulfill his threat to derail the Carver merger and then move forward to gain control of IFSB in a manner not permitted by OTS. Granting immediate injunctive relief, therefore, will serve the public interest by assuring informed shareholder democracy.

IFSB requests relief that is not extraordinary in cases involving violations of the sort involved here. Courts have the power to ensure that individuals comply with the federal securities laws, and issue injunctive relief requiring that defendants satisfy the disclosure and reporting requirements of Section 13(d). *See J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) ("it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done") (quotation omitted); *Financial Gen. Bankshares*, 1978 U.S. Dist. LEXIS 18098, at *34 (issuing injunctive relief due to Section 13(d) violation); *Lewis v. General Employment Enters., Inc.*, No. 90C0291, 1991 U.S.

Dist. LEXIS 950 (N.D.Ill. Jan. 21, 1991), at *12-13 (issuing injunctive relief because "full disclosure [is necessary] to ensure that a shareholder vote be based upon complete, accurate and comprehensible information").   Indeed, the requested relief in the instant case is especially necessary because of the scope of and duration of Bender's longstanding and repeated intentional violations of Section 13(d).

This Court's power extends, it is clear, both to IFSB's request that the Court require full compliance with Section 13(d), and to its request that the Court neutralize the Tainted Shares at any shareholder meeting of IFSB, deeming them present for purposes of a quorum and similar matters, but directing that Tainted Shares be voted in a manner proportionate to the actual votes cast by non-Bender shares.   Indeed, the U.S. District Court for the Southern District of California prescribed precisely this remedy in *Medical Imaging Centers of America, Inc. v. Lichtenstein*, Civil No. 96-0039-B (AJB) (S.D. Cal. 1996).[106]   Faced with the defendant's violation of Section 13(d), the court ruled that neutralization based on proportional voting was the **minimal** remedy capable of addressing the violations.   *Id*. at 10.   Looking to the Northern District of Illinois' decision in *Champion Parts Rebuilders v. Cormier Corp.*, 661 F.Supp. 825, 851-853 (N.D.Ill. 1987) (neutralizing shares as a remedy for a violation of Section 13(d)), the *Medical Imaging Centers of America* court found that proportional voting was "the most minimal equitable relief that is consistent with the culpable conduct and the irreparable injury to be prevented."   *Id*. at *10-11. *See also Spencer Co. v. Agency Rent-A-Car Inc.*, 542 F. Supp 237, 238 (D. Mass. 1982) (permitting sterilization where defendant had a "fixed purpose" contrary to its Schedule 13D that stated it was considering a number of options.).

The same is true of the case at hand.   Only by neutralizing the Bender's Tainted Shares in the same manner can this Court guarantee that Bender will not benefit from his own blatant misconduct and that IFSB and its shareholders will not be irreparably harmed by Bender's serial violations of law. Indeed, the Delaware Supreme Court has ruled, in analogous situations, that courts in equity must

---

[106]   *See Medical Imaging Centers of America, Inc. v. Lichtenstein, Order Granting Plaintiff's Application for Preliminary Injunction* (attached at Exhibit 46).

endeavor to prevent a director who breaches his fiduciary duties from benefiting from that breach. *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). "Once disloyalty has been established, [Delaware legal standards] require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Id*. *See also Phillips v. Insituform of N. Am., Inc.*, C.A. No. 9173, 1987 WL 16285, at *11 (Del. Ch. Aug. 27, 1987) (director's shares neutralized to prevent circumvention of fiduciary duty). Only by granting the specific injunctive relief requested by IFSB can this Court assure that Bender will not profit from his wholesale disregard the requirements of the law.

## CONCLUSION

For the foregoing reasons, IFSB requests that a preliminary injunction be issued

(a)      requiring the Benders to comply fully with Section 13(d), by filing a Schedule 13D amendment fully disclosing Bender's plans and intentions concerning IFSB and all other undisclosed material information;

(b)      enjoining Mr. Bender from taking any steps to implement his plan to nominate or elect additional IFSB directors to effect a change of control in a manner not approved by the OTS; and

(c)      neutralizing all Tainted Shares by directing that (i) the Tainted Shares be deemed to be present at the  next meeting of IFSB shareholders in regard to the Carver acquisition, and any adjournment thereof, for all purposes; and (ii) the Tainted Shares shall be voted in the same proportion as the votes cast by shares that are not Tainted Shares on all matters considered at the meeting.

Respectfully submitted,

_____
James H. Schropp (D.C. Bar No. 185538)
Thomas P. Vartanian (D.C. Bar No. 952671)
Robert H. Ledig (D.C. Bar No. 370987)
FRIED, FRANK, HARRIS, SHRIVER

41

& JACOBSON LLP

1001 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C.  20004
Telephone:   (202) 639-7000
Facsimile:    (202) 639-7008

Counsel to Plaintiff
Independence Federal Savings Bank

DATED:  June 30, 2004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                )
INDEPENDENCE FEDERAL SAVINGS BANK     )
                                                                )
                                        Plaintiff,              )
                                                                )
                        v.                                      )
                                                                )     Civil Action No. 1:04CV 00736 (RMC)
MORTON A. BENDER, et al.,                       )
                                                                )
                                                                )
                                        Defendants.     )
_____)

## [PROPOSED] PRELIMINARY INJUNCTION ORDER

Upon consideration of Independence Federal Savings Bank's ("IFSB") Complaint and its Motion for Preliminary Injunctive Relief and Memorandum Of Points and Authorities in support thereof, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and for good cause shown, it is, this ____ day of _____, 2004, hereby

ORDERED, that the Defendants, Morton A. Bender ("Bender") and Grace M. Bender (collectively, "the Benders") shall comply with Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), by filing a complete and accurate Schedule 13D amendment fully disclosing all material information in Bender's possession regarding, *inter alia*, (i) the reasons Bender's opposition to IFSB's proposed merger, including any material economic analyses and other data in Bender's possession; (ii) Bender's plans and intentions concerning the composition of the Board, the management and the operations of IFSB; and (iii) the findings, conclusions and results of Bender's prior litigation in

1

this Court involving IFSB, including the reasons for this Court's denial of Bender's request for preliminary injunctive relief; and it is further

ORDERED, that Mr. Bender is enjoined from taking any steps to implement his plan to nominate or elect additional IFSB directors in order to effect a change of control of IFSB in a manner not approved by the Office of Thrift Supervision ("OTS"); and it is further

ORDERED, that all IFSB shares acquired by the Benders during the period the Benders were in violation of the federal securities laws (the "Tainted Shares") shall be deemed present for all purposes at any meeting of shareholders called in regard to the Carver merger transaction, and any postponement or adjournment thereof, and that the Tainted Shares shall be voted proportionately to the votes actually cast by shares that are not Tainted Shares on all matters considered at that meeting; and it is further

ORDERED that this ORDER shall be filed forthwith in the Clerk's Office and entered of record.

_____
UNITED STATES DISTRICT JUDGE

Dated: _____

545516.12