## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**INDEPENDENCE FEDERAL SAVINGS BANK**  )
                                           )

             **Plaintiff,**              )

                                           )

      **v.**                        )      **Case No. 1:04CV00736**

                                           )      **(RMC)**

**MORTON A. BENDER, et al.,**          )

                                         )

            **Defendants.**         )

_____)

### MORTON A. BENDER AND GRACE M. BENDER'S BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION ON THE POISON PILL

Defendants Morton A. Bender and Grace M. Bender (the "Benders"), by and through their undersigned counsel, hereby file this Brief in further support of their Motion for Preliminary Injunctive Relief on the Poison Pill:

### INTRODUCTION

The Benders sought an expedited hearing on a portion of their pending Application for Preliminary Injunction. That request was granted and a hearing held on June 28, 2004. On the morning of the hearing, the Plaintiff Independence Federal Savings Bank (IFSB") filed a Memorandum of Points and Authorities in Opposition to the Benders' Request for Injunctive Relief. This Brief is filed by the Benders further support of their Application, and in reply to IFSB's Brief.[1]

---

[1] References in this Brief to Benders' Exhibits 1 through 24, are to the exhibits which were admitted at the June 28th hearing, and are included in the Blue Binder which was submitted to the Court.

The limited issue before the Court at this stage is the efficacy of the Poison Pill Rights Plan, which was discussed and acted upon during a Special Meeting of IFSB's Board of Directors which was held on May 4 and May 5, 2004.  While IFSB's Brief purports to address the reasons advanced by the Benders that the Poison Pill is ineffective, the vast majority of the Brief is irrelevant to a determination that the Court must make on the present efficacy of the Pill.[2]  IFSB's "over the top" mischaracterization of the Benders' motivations is consistent with IFSB's full frontal attack on Mr. Bender by any and all means possible.  While IFSB characterizes its recent activity as "defensive," the reality is that the Board and its counsel have devised a Bender strategy, which is both aggressive and offensive.  IFSB's attempt to portray its Board as quintessential "good guys" in this dispute, seemingly placed on the moral high ground by the Court's earlier Order in Bender v. Parks, is disingenuous.  When the facts are fully developed, we believe the Court and, if necessary a jury, will easily conclude that the instant case initiated by IFSB is mean spirited, reckless and devoid of any evidentiary support.

The first real argument put forward by IFSB in its Brief begins on page 14 where it outlines an analysis of the Pill based on the two-pronged test of Unocal Corp. v. Mesa Petroleum Co., 493 A.2d

---

[2]        There is an obvious undercurrent running through all IFSB's pleadings in this case. Seizing on the tone of the Court's earlier Opinion in the case of Bender v. Parks while ignoring its logic, IFSB's Brief is yet one more attempt to convince the Court that Mr. Bender is somehow a bad person and, therefore, not entitled to relief.  IFSB's transparent attempt in that regard is demonstrated by language such as "without paying a sou for it," "abusive and coercive actions and threatened actions of the Benders," "an individual worth millions and, literally with his own bank" who would "not back up his talk with his money" and "acquiring control without having to pay for it".  Those allegations while colorful are both untrue and irrelevant to the issues presently under consideration by the Court.  In the Bender v. Parks case, IFSB was adamant that all shareholders were to be treated equally.  Having been successful in the earlier case in achieving that result, IFSB now is equally vocal that the Benders alone should be treated differently (and worse than) all the other shareholders, including IFSB's proposed merger partner, Carver Bankshares.  Of course, the Benders' Application for Preliminary Injunctive Relief should be decided on the law and evidence, free from the taint of character assassination.

946, 955 (Del. 1985).  While the Benders concede that, in some cases, a <u>Unocal</u> analysis might well

validate a Poison Pill, such an analysis is now at best premature, and for the other reasons advanced by

the Benders, probably unnecessary in this case.  Therefore, we do not intend to engage in an argument

about <u>Unocal</u> and Poison Pill validity.  We do not, by our silence in this regard, concede the propriety

of IFSB's position in that respect and if the Court deems it necessary later, we will respond

substantively to the <u>Unocal</u> argument.[3]  The specific issues (which the Benders believe are presently

dispositive) are as set forth below.

## ARGUMENT

In considering a request for preliminary injunctive relief, a district court must examine whether

"(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably

injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4)

the public interest will be furthered by an injunction." <u>Atlantic Coast Airlines Holdings, Inc. v. Mesa Air</u>

<u>Group, Inc.</u>, 295 F.Supp.2d 75, 81 (D.D.C. 2003) (citing <u>Davenport v. Int'l Bhd. of Teamsters</u>, 166

F.3d 356, 360 (D.C. Cir. 1999); <u>Serono Lab v. Shalala</u>, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)).

It is well-established that these factors "interrelate on a sliding scale" and a particularly strong showing

on one may compensate for a weak showing on another.  295 F. Supp. 2d at 81 (citing <u>Vencor</u>

---

[3]  A <u>Unocal</u> analysis is necessarily fact driven, and includes an analysis of a board's motivation in adopting a poison pill.  Although the IFSB Brief goes on for pages to justify its decision to adopt the Pill as an attempt to preserve shareholder value, there is in reality another motivation which drives the Board's actions as to the Benders.  It has been, and continues to be a motivation of the Board to prevail in its dispute with Mr. Bender because Mr. Bender is white.  An excerpt of a portion of Mr. Parks' deposition on this issue is attached as Exhibit 25 (pages 59-61).  With discovery ongoing, the development of a complete factual record as to the Board's motivation is not yet complete, and therefore, a full <u>Unocal</u> analysis is not possible.

Nursing Ctrs., L.P. v. Shalala, 63 F.Supp.2d 1, 7 (D.D.C. 1999)).

**I.      THERE IS SUBSTANTIAL LIKELIHOOD THAT THE BENDERS WILL SUCCEED ON THEIR CLAIM THAT THE POISON PILL IS NOT VALID AND SHOULD BE RESCINDED**

**A.      The OTS Has Taken the Position That the Pill Is Not Effective**

It is clear that the Pill has not been approved by the OTS.[4]  On June 16, 2004, counsel for the

OTS wrote to counsel for IFSB on several matters, including the Pill.  Benders' Exhibit 14.   As to the

Pill, the OTS letter states:

> [W]e remind you that with respect to the Bank's Shareholders rights Plan (Plan), the Bank has
> to date failed to perform all steps necessary to comply with OTS regulations to implement the
> Plan.  Specifically, OTS staff advised the Bank and its counsel that the Plan would **NOT** be
> effective until all necessary prerequisites, including the Bank's filing of an offering circular under
> 12 C.F.R. Pat 563g, and OTS declaring the offering circular effective, are completed.  It is
> clear that the public is unaware that the Plan is not yet effective, and accordingly again, because
> we share your concerns regarding misperceptions on the part of the public, the Bank must
> immediately issue a press release stating that the Plan is not in effect until all necessary steps are
> taken to comply with OTS regulations.

---

[4] On April 28, 2004, a week prior to the adoption of the Pill and IFSB's filing of this action,
Mr. Vartanian, counsel for IFSB, wrote a letter to the OTS describing various actions IFSB wished to
take to thwart Bender, including the adoption of the Pill.  In his letter, Mr. Vartanian tried to take the
position with the OTS that if "we do not hear from you to the contrary [within the next five days,
including a weekend], IFSB will assume you have no objection and will proceed with the actions set
forth herein."  The described actions included the Pill.  The OTS promptly responded on April 29,
2004 that the OTS's inability to respond within the time frame suggested in Mr. Vartanian's letter "may
not be interpreted as OTS approval, acquiescence, or non objection to any of the proposals outlined in
your letter."  These letters were admitted as Benders' Exhibits 8 and 9 at the June 28th hearing.

Despite a massive document production on May 21-26 by both parties, these April 28th and
April 29th letters were not produced until June 14, 2004 – three weeks after the bulk of the
production, and after several depositions of critical IFSB witnesses had already occurred.  These letters
were the first indication of the OTS position on the Pill.

Exhibit 14 (emphasis in original).[5]  Thus, it is clear that the OTS has taken the position that the Pill is

not effective until effective *until all necessary prerequisites*, including – but not limited to -- the Bank's

filing of an offering circular.  The position of the OTS is understandable: as set forth below, OTS

regulations (Exhibits 17 and 18) and its handbook (Exhibit 16) manifest OTS policy that any maneuver

by the board of a federally chartered bank to implement an anti-takeover policy must first be submitted

to, *and approved by*, the OTS.  12 C.F.R. §552.5(b)(1)(i)(A); 12 C.F.R. §552.4(a)(2).

On June 22, 2004, IFSB issued a press release (Exhibit 15) which stated that: "[T]he OTS has

advised the Bank of its view that the Rights Agreement will not be effective until the offering circular has

been declared effective."  Notwithstanding the OTS's view of the present status of the Pill, IFSB takes

the position in the same press release that "the Rights Agreement is a contract that was effective upon

its execution on May 5, 2004 ... ."  At the hearing on June 28th, counsel for IFSB took the position that

the press release had been approved by the OTS.  There is no "evidence" of this approval, and the

depositions of the relevant OTS personnel have not been taken.[6]  Given IFSB's public statement, as

---

[5]  This June 16th letter was not delivered to undersigned counsel until 2:30 on Friday afternoon, June 25th, in advance of the June 28 hearing.  Although all counsel have been working diligently to provide documents and conduct depositions, it is troubling that this letter – which is so critical to the OTS position on the efficacy of the Pill – was not produced until the Friday before the preliminary injunction hearing.  It was produced only after the Benders complained (in their Brief seeking the expedited hearing which was filed at 9 am on June 25th) that no OTS document had been produced, despite the fact that IFSB counsel had indicated that such a document may exist.  It is hard to believe that this was an oversight, given the massive team of attorneys and paralegals working on this matter for IFSB.  If it was, the "oversight" bought IFSB an additional three weeks of keeping the Benders out of the market.

[6]  Additional documents including various drafts of the press release were provided to undersigned counsel on late Friday afternoon, June 25th.  Those documents do not clearly establish what draft versions of the press release were reviewed or considered or purportedly "approved" by the OTS, and what the comments of the OTS may have been.

well as the positions taken in this action, the Court is correct when it observed that Mr. Bender is a risk

taker, but not so much of a risk taker that he would take the chance that the Pill would be triggered by

any additional purchases of stock.

      **B.**      **The Poison Pill was Adopted in Violation of the OTS's November 4, 2003**
              **Express Directive to Submit all Third Party Contracts to the OTS for <u>Approval</u>**

As noted in the Benders' opening Brief (p. 23), IFSB failed to submit the Poison Pill to the

OTS for its prior review, in blatant disregard of the OTS directive in its November 4, 2003 letter

designating the IFSB to be a "problem association" and in "troubled condition." <u>See</u> 11/4/03 letter

from John E. Ryan to Board of Directors (Benders Ex. 5). By that letter, the OTS imposed a condition

on the Bank's board of directors requiring "[p]rior OTS review of third party contracts." <u>Id</u>. at p. 3,

item 4. Not only is the Poison Pill a third party contract, IFSB concedes that the Poison Pill is a

*material contract*. Transcript of Deposition of Thomas Batties ("Batties Tr.") (Benders' Exhibit 22)

at 92 (testifying that the Poison Pill is a material contract of IFSB and that prior OTS approval was not

sought). Perhaps attempting to mitigate the effect of this unequivocal testimony by IFSB's president,

IFSB now writes in its brief that the Poison Pill is "merely . . . further agreement with its existing stock

transfer agent to provide purely ministerial services, raising no threat that IFSB will waste scarce

resources on payment to the right agent." IFSB Br. at 30.[7] Notably, the condition for prior contract

review imposed by the OTS in its November 4, 2003 letter does not restrict the condition to certain

types of contracts; it does not even carve out contracts that are "ministerial" and not material. The

---

[7] One wonders about the scarce resources IFSB is paying to its lawyers to litigate about this "ministerial" contract.

letter simply states "Prior OTS review of third party contracts." Thus, no matter how IFSB's lawyers choose to characterize the Poison Pill in the Bank's Brief, it was subject to the prior review condition by the express terms of the letter. In any case, that particular characterization is directly contracted by Batties' testimony that, indeed, the Poison Pill is a material contract.

Moreover, in its attempt to minimize the significance of the Poison Pill in the context of the OTS designation of the Bank as a problem association in troubled condition,[8] IFSB states the rights agent will charge fee of only $200 per month for its services. Plaintiff's Brief at 30 (referencing 6/28/04 Hrg IFSB Ex.29). IFSB has wholly ignored the Benders' contention in their opening Brief (pp. 23-24) that Section 19 of the Rights Agreement potentially subjects IFSB to great financial risk. Under Section 19, the Bank's financial exposure is not to the monthly service fee alone - it is also to "on demand of the Rights Agent, its reasonable expenses and counsel fees and disbursements and other disbursements incurred in the administration and execution of this Agreement and the exercise and performance of its duties hereunder. [Independence] shall indemnify the Rights Agent for, and hold it harmless against, any loss, liability, claim or expense ("Loss") arising out of or in connection with its duties under this Agreement, including the costs and expenses of defending itself against any Loss . . . ." Poison Pill at §19 (Benders' Exhibit 11).

IFSB cannot escape the fact that the OTS November 4, 2003 letter requires IFSB to submit

---

[8] Minimizing the magnitude of the Poison Pill is indicative of IFSB's *modus operandi* -- skirting the regulatory framework where it suits IFSB's purpose. Another example is its filing of a what it characterized as a "routine" application for the reorganization of the Bank into a holding company structure. In its June 16, 2004 letter to Thomas Vartanian (6/28/04 Hrg Benders Ex. 14), the OTS wrote "[a]s the controversy surrounding the Reorganization indicates, it is clear that the transaction is anything but 'routine.'"

third-party contracts to OTS for prior review; that the Poison Pill is subject to that requirement; and that IFSB failed to comply with this condition.  It if fundamentally unfair for IFSB to simply take all manner of unauthorized actions resulting in barring the Benders from the marketplace.  The Court should return the parties to the positions they were in *before* these actions were taken and order IFSB to obtain the necessary regulatory approvals for their actions.

### C.        There is No Legal Authority for the Pill

The Benders contended in their opening Brief and at the June 28, 2004 oral argument that no statutory authority exists for the Poison Pill.  IFSB offered no defense to this argument (at the hearing or in its Brief), nor pointed to any statutory authority.  Thus, the only issue left for the Court to resolve is whether such statutory authority is necessary, as argued by the Benders in their opening Brief (at pp. 24-28).  IFSB has also ignored this argument, both in its Brief and in oral argument.[9]

There is no question that as a general legal proposition, the notion of a poison pill has been judicially approved.  Moran v. Household International, Inc., 500 A.2d 1346 (Del. Supr. 1985). Moran involved a Delaware corporation and, therefore, once the Moran Court found statutory authority for a certain poison pill under the Delaware corporation statute, it was not an issue which needed to be revisited for other Delaware corporations adopting similar poison pills.  Thus, in the cases involving Delaware corporations (or corporations incorporated in states whose codes are modeled

---

[9] It is not clear to undersigned counsel whether or not IFSB's counsel actually conceded this argument at the hearing.  It is clear, however, that, for whatever reason, IFSB has not addressed the argument.

after Delaware's) adopting the kind of pill adopted by Household International, Inc.,[10] the court skips

this first part of the <u>Moran</u> analysis and proceeds directly to the <u>Unocal</u>[11] analysis which evaluates the

reasonableness of the poison pill under the facts of the particular case.  However, the <u>Moran</u> Court's

holding that certain poison pills are statutorily authorized under the Delaware corporate code in no way

automatically validates the particular Poison Pill adopted by this particular federally regulated thrift and

does not automatically vindicate the actions of IFSB.

The Benders submit that <u>Moran</u> dictates that statutory authorization for a poison pill must first

be found before the court even undertakes a <u>Unocal</u> analysis.  Significant to the instant case is the

following language of the <u>Moran</u> decision which precedes its <u>Unocal</u>/business judgment analysis of the

poison pill:

Of course, the business judgment rule can only sustain corporate decision making or

---

[10]  The poison pill in <u>Moran</u> was a "flip-over" pill which grants to the Rights holder the ability to exercise rights to purchase stock of the tender offeror. 500 A.2d 1346. A flip-in provision - such as adopted by IFSB in its poison pill - "dilutes the voting rights and equity position of an Acquiring Person seeking to gain control of the corporation." <u>West Point-Pepperell, Inc. v. Farley Inc.</u>, 711 F. Supp. 1088, 1094-95 (N.D. Ga. 1988). The poison pill in <u>Moran</u> did not contain a flip-in provision. Thus, as some commentators have noted, there is "lingering doubt" as to whether "flip-in" provisions of rights plans even of Delaware corporations are validated by <u>Moran</u>. <u>See</u> HAROLD S. BLOOMENTHAL and SAMUEL WOLF, 3E SECURITIES AND FEDERAL CORPORATE LAW, §25:88 (2nd Ed.(updated through 2004).

[11]  <u>Unocal Corp. v. Mesa Petroleum Co.</u>, 493 A.2d 946 (Del. 1985). <u>Unocal</u>, which was decided about six months before <u>Moran</u>, did not involve a poison pill; it involved a self-tender offer by a corporation for its own shares as a way to defeat a hostile tender offer by a minority shareholder. In analyzing that particular defensive measure the Supreme Court set out its two part analysis for evaluating defensive measures: (1) whether the Board "had reasonable grounds for believing that ta danger to corporate policy and effectiveness exists;" and (2) whether the defensive measure adopted is reasonable in relation to the take-over threat. 493 A.2d at 955. It was not until the <u>Moran</u> decision that the Delaware Supreme Court was first faced with the particular defensive measure of a poison pill and the particular argument that the corporation had no statutory authority to adopt the poison pill.

transactions *that are within the power or authority of the Board* . Therefore, before
the business judgment rule can be applied *it must be determined whether the
Directors were authorized to adopt the Rights Plan* .

Moran, 500 A.2d at 1350 (emphasis added).[12]  Thus, the Moran court clearly found that in evaluating

the propriety of an anti-takeover measure, the court must first determine - *ab initio* - whether the

directors are authorized to take the action in the first place.  Therefore, there can be no question in the

instant case that this Court must determine whether the IFSB Board's adoption of the Poison Pill was

within its power or authority.  The Benders submit that it was not.

The appellants in Moran "vehemently contend[ed] that the Board of Directors was

unauthorized to adopt the Rights Plan.  First, appellants contend[ed] that no provision of the Delaware

General Corporation law authorizes the issuance of such rights."  Id. at 1351.  In response to this

argument, the defendant argued that the Rights Plan "was issued pursuant to 8 Del. C. §§151(g) and

157.  It explain[ed] that the Rights are authorized by §157 and the issue of preferred stock underlying

the Rights is authorized by §151."  500 A.2d at 1351.  Section 151 of the Delaware Code authorizes

the corporation to adopt a resolution assigning rights to classes of stock *where the certificate of

incorporation expressly authorizes it to do so* .  Section 157 authorizes a corporation to create and

issue rights entitling the holders thereof to purchase shares of stock, the rights being evidenced by such

---

[12] The Unocal Court began with a similar premise:

We begin with the basic issue of the power of a board of directors of a Delaware
corporation to adopt a defensive measure of this type.  Absent such authority, all other
questions are moot.  Neither issues of fairness nor business judgment are pertinent
without the basic underpinning of a board's legal power to act.

493 A.2d 946, 953 (Del. Supr. 1985).

instrument as may be approved by the corporation's board of directors.  Thus, the <u>Moran</u> Court

agreed that the rights plan was statutorily authorized by Sections 151 and 157. <u>Id</u>. at 1351-1353.[13]

Having found statutory authority within the Delaware Code for poison pills generally, the <u>Moran</u>

court went on to analyze whether the adoption of the pill in that case was sustainable under the two-pronged

<u>Unocal</u> test.

        In <u>Amalgamated Sugar Co. v. NL Industries</u>, 644 F. Supp.1229 (S.D. N. Y. 1986), the court

found that the poison pill adopted by the board of directors of a New Jersey corporation was *ultra*

*vires*.  That court commented that "[t]he <u>Moran</u> court dealt at some length with the business judgment

exercised by the directors, *but it first addressed the question of whether the directors could adopt*

*the plan, whether they had the power to adopt the plan*   ."  644 F. Supp. at 1237 (emphasis added).

While the <u>Moran</u> court concluded that the board of the Delaware corporation did have the power to

adopt the plan under Delaware statutory law, the <u>Amalgated Sugar</u> Court reached a contrary decision

under New Jersey statutory law about the rights plan adopted by the board of directors of the New

Jersey corporation.  644 F. Supp. at 1234.

        The Delaware courts continue to emphasize the importance of finding statutory authorization for

a particular anti-takeover measure.  For example, in <u>Carmody v. Toll Bros.</u>, 723 A.2d 1180, 1193

(Del. Ch. 1998), the plaintiff claimed that a poison pill containing a dead hand provision[14] was invalid.

---

        [13] The statutory power under Sections 151 and 157 was buttressed by the additional general
powers granted to a corporation's board to manage the affairs of a corporation. 500 A.2d at 1353.

        [14] A dead hand provision restricts the ability of a new board to redeem a poison pill - its
purpose is to disable an acquirer from waging a proxy contest to seat a new board to redeem the pill.
<u>Carmody</u>, 723 A.2d 1184.  Under a dead hand provision, only continuing directors (or their designated
successors) can redeem a pill before its expiration date.  <u>Id</u>.

11

In moving to dismiss the plaintiff's complaint, the defendants argued that the dead hand provision did

not violate any duty imposed by either statute or corporate fiduciary principles.  Id. at 1187.  The court

denied the motion to dismiss, finding that the dead hand provision was not statutorily authorized and,

specifically, that it violated 8 Del. C. §§141(a) and (d).  Id. at 1190-1192.  There were three reasons

why the provision was not authorized by the Delaware corporate code.  First, Section 141(d) of the

Delaware corporate code provides that the power to distinguish voting rights among directors exists

only where there is a classified board and where "those voting power distinctions are expressed in the

certificate of incorporation."  723 A.2d at 1190-91.  The corporate charter for the defendant Toll

Brothers, Inc. did not provide that certain classes of directors would have distinctive voting rights.  Id.

at 1191.  Second, Section 141(d) further provides that only the shareholders – not the directors – have

the right to elect directors with superior voting powers.  Id. at 1191.  The court explained that given

Toll Brothers' charter, this statutory provision was also violated:

> Absent express language in the charter, nothing in Delaware law suggests that some
> directors of a public corporation may be created less equal than other directors, and
> certainly not by unilateral board action [footnote omitted].  Vesting the pill redemption
> power exclusively in the Continuing Directors transgresses the statutorily protected
> shareholder right to elect the directors who would be so empowered.  For that reason,
> and because it is claimed that the Rights Plan's allocation of voting power to redeem the
> Rights is nowhere found in the Toll Brothers certificate of incorporation, the complaint
> states a claim that the "dead hand" feature of the Rights Plan is *ultra vires* , and hence,
> statutorily invalid under Delaware law.

723 A.2d at 1191.  The third statutory basis on which the Court found that the plaintiff had stated a

claim that should not be dismissed was that the dead hand provision would impermissibly interfere with

the directors' statutory power, granted under Section 141(a) of the Delaware corporate code, to

manage corporation's business and affairs.  723 A.2d at 1191.  If the shareholders voted in new

12

directors, their ability to manage the corporation's business and affairs would be curtailed by the dead hand provision prohibiting them from redeeming the poison pill.  Id.  Thus, for all these reasons, the court held that the statutory invalidity claims survived the defendants' motion to dismiss.[15]

In West Point-Pepperell, Inc. v. Farley Inc., 711 F. Supp. 1088 (N.D. Ga. 1988), the tender offeror (Farley) moved for a preliminary injunction declaring invalid the flip-in and exchange provisions[16] of a poison pill.  The court found no authority for these provisions under either state law or the target West Point's article of incorporation.  Id. at 1095.  Thus, Farley was likely to succeed on the merits of its claim that the provisions were "contrary to present law and therefore an *ultra vires* act which is null and void."  Id.  Moreover, on the issue of the balance of harms between the parties, the court found that "West Point is not entitled to the benefit of illegal defensive mechanisms and that the injunction acts only to remove that illegal barrier."  Id. at 1095.  The court enjoined West Point from implementing or enforcing the plan.  Id.

The clear principle espoused by each of these cases is that any defensive takeover provision adopted by a board of directors – to include a poison pill – must be evaluated to determine whether

---

[15]  Another interesting aspect of the Carmody decision is the fact that the court rejected the defendants' reliance on an opinion from the United States District Court for the Northern District of Georgia (Invacare Corp. v. Healthdyne Technologies, Inc., 968 F. Supp. 1578 (N.D. Ga. 1997) which upheld a dead hand provision.  The Carmody Court distinguished the Georgia case because Invacare involved a Georgia corporation, not a Delaware corporation and the dead hand provision was upheld under Georgia corporate law which differed from Delaware law in that the Georgia Business Corporation Code had no provision mandating that limitations on directors' power be set forth in the corporate charter.  Carmody, 723 A.2d at 1192 n.38.

[16]  The exchange provision provided that the board could exchange the outstanding shares and rights (other than those held by the acquiring person) for common stock at the rate of one share per right.  Id. at 1095.

13

there is legal authority for the measure and two sources of legal authority must be examined: statutory

authorization and the corporation's particular charter.  In the unique circumstances present in this case,

unlike in <u>Moran</u>, there is no applicable statute which authorized IFSB's adoption of the Poison Pill.

Independence is a federally chartered stock savings association.  As explained by the Benders in their

opening Brief (at p.25), although it is common for such associations to be wholly-owned by bank

holding companies which are themselves incorporated pursuant to state laws, Independence is not so

owned - there is no holding company of Independence.  Thus, there is no state corporate law which

governs Independence and IFSB failed to elect in its bylaws to be governed by any state's corporate

code.[11]  In the absence of a applicable state corporate code, there are only two other places for IFSB

to look for authorization for its rights plan: IFSB's charter and the Federal Home Loan Act (and any

applicable regulations).  IFSB's purpose is to "pursue any and all lawful objectives of a Federal savings

bank chartered under Section 5 of the Home Owners' Loan Act and to exercise all of the express,

implied, and incidental powers conferred thereby and aby all acts amendatory thereof and supplemental

thereto . . . subject to all lawful and applicable rules, regulations, and orders of the Federal Home Loan

Bank Board ("Board")."  Federal Stock Charter Independence Federal Savings Bank (Benders Ex. 1)

---

[11]  12 C.F.R. §552.5(b)(3) ( Benders Ex.18) expressly states a thrift may elect to be governed by the laws of the state where its principal office exists, Delaware corporation law or the Model Business Corporation Act, but to make such an election, the thrift "**shall** designate in its bylaws the provision or provisions from the body or bodies of law selected for its corporate governance procedures." (Emphasis added.)  Does this indicate an acceptance of Delaware corporate law generally by the OTS? Yes.  Did IFSB make an election to be governed by Delaware corporate law? No.  Moreover, even if a thrift does make a proper election, the provisions of corporate law adopted cannot include anti-takeover measures ***without prior OTS approval after the conclusion of the application process*** .  12 C.F.R. §552.5(b)(1), (3).

at §4.  There is nothing in Section 5 of the Home Owners' Loan Act ("HOLA") (12 U.S.C. §1464)

which empowers a board of directors to adopt such a plan.  HOLA instead delegates to the director of

the Federal Home Loan Bank Board the authority to adopt regulations for the "organization,

incorporation, examination, operation, and regulation of associations to be knows as Federal savings

associations" and "to issue charters therefor[.]" 12 U.S.C. §1464.  Those regulations clearly provide

that anti-takeover measures are subject to prior review and approval by the OTS.  See Applications

Handbook §410, p. 410.8; 12 C.F.R. §552.5(b)(3).

As explained by the Moran Court, the statutory analysis goes hand in hand with a review of the

corporation's charter.   In Moran, the reason the Court found statutory authorization for the poison pill

it was examining was that Section 151 of the Delaware Code permits a corporation to adopt a

resolution issuing preferred stock underlying the Rights contemplated by a poison pill rights plan *so long

as the corporate charter expressly vests such authority in the board*.  500 A.2d  at 1351 n.8.  The

charter in Moran gave such authority; IFSB's charter does not. IFSB's charter expressly provides that

the terms of any preferred stock (the relative rights and preferences thereof) "shall be set forth ***in a

supplementary section to the charter***."  Charter §5.B (emphasis added).  IFSB's charter has no

"supplementary sections" and IFSB cannot establish by resolution or fiat the relative rights and

preferences of any preferred shares necessary to implement to the Poison Pill - it would have do so by

a charter amendment approved by the shareholders.  Such a charter amendment would not only have

to be approved by the shareholders - it would have to be approved by the OTS.  12 C.F.R. §552.4

(a)(2)(I).

There is an additional section of the IFSB Charter which renders the Board's adoption of the

Poison Pill invalid.  Section 5A. states: "Each holder of shares of common stock shall be entitled to one vote for each share held by such holder, except as to the cumulation of votes for the election of directors."  Essentially, this is a non-discrimination clause.  If the Poison Pill is triggered, however, the Benders' voting rights per share will be significantly diluted.  See Amalgamated Sugar, 644 F. Supp. at 1233 (explaining that upon a triggering event, the common shareholders, other than the acquiring shareholder, would be allowed to have nine votes for each common share previously owned while the acquiring shareholder would have the same number of shares and the same number of votes as he had before, resulting in substantial dilution of his voting rights) .  The result is that, in violation of Section 5A, they will be treated differently than other holders of common stock.  Because IFSB has not elected in its bylaws to be governed by a state corporation statute which permits discrimination among shareholders within a class (of course, because any such election relates to the adoption of an antitakeover statute, application to adopt the provision would first have to be made to, and approved by the OTS) and has not amended its charter to conform therewith,  IFSB is left with the provisions of its Charter as they exist today.  The "flip-in" provision of the poison pill clearly violates the anti-discrimination clause in Section 5A.

Thus, even beyond its lack of approval of the Pill by the OTS, there are three reasons why the Poison Pill adopted by IFSB is invalid: (1) IFSB failed to elect in its bylaws to be governed by the laws of Delaware and therefore there IFSB cannot look to the Delaware corporate code to validate its adoption of the Poison Pill; (2) even if IFSB had made an election in its bylaws to be governed by the corporate law of Delaware, that election could not have included  - without prior application to, and approval by, the OTS – of those provisions of the Delaware corporate code which allow a board to

adopt a poison pill, an antitakeover measure; and (3) IFSB's charter does not allow a poison pill which discriminates amongst common shareholders (Charter §5A) and has not been supplemented to set out the rights of preferred stock which the Poison Pill contemplates (Charter §5B).

> ### D.     The Procedural Irregularities at the Board Meeting Approving the Pill Render the Pill Ineffective

The Pill was adopted at a Special Meeting of the IFSB Board which was held on May 5, 2004. On June 30, 2004 (two days *after* the Preliminary Injunction hearing of June 28th) undersigned counsel for the first time received the following documents: draft minutes of the May 4th and 5th Board Meetings; an Agenda for the May 4th Meeting; and a Notice, dated April 30, 2004, for the May 4th Meeting.  These documents are attached hereto as Exhibit 26 (Notice of May 4th Meeting); Exhibit 27 (May 4th draft minutes); Exhibit 28 (May 4th Agenda); and Exhibit 29 (May 5th draft minutes). Until these documents were produced, the only document related to this meeting that had been produced by IFSB was the Agenda for the May 5th Special Meeting.[12]

Not only were Deckelbaum and Hall not present at either of those meetings for discussion and voting on the Poison Pill, they were affirmatively misled by the Bank's other directors as to the purpose of those meetings so that they would not be present.  Neither the Agenda, nor the Notice give any hint of the subject matter of the meetings.  The Notice simply states the purpose of the meeting is to "receive an update on the Merger and related matters," and the Agenda only refers to the "Report" and "Recommendation" of the "Transaction Committee." Neither the Notice or the Agenda refer to a two-

---

[12]     The May 5th Agenda was admitted at the June 28th hearing as the Benders' Exhibit 10.  The May 5th Agenda (Exhibit 10) and the May 4th Agenda (Exhibit 28) are exactly the same, except for the date of the meeting.

day meeting.  Jeanus Parks, IFSB's Board Chairman, testified that he spoke with Mr. Deckelbaum

prior to the first day of the meeting, which these newly tendered exhibits establish as May 4th.  Parks

Tr. at 191.  (Exhibit 23).  Mr. Parks testified that during that conversation, Mr. Deckelbaum told Mr.

Parks that he had a scheduling conflict, and would not be able to participate in the meeting.  Id. at 191-

92.  Mr. Parks testified that he recalled a subsequent conversation in which Mr. Deckelbaum told him

that he could attend the meeting for about a half hour, if it would be "meaningful" for him to attend.  Id.

at 192-93.  Mr. Parks testified:

> Q:     In response to his comment that he was available for half and hour what if anything did
>        you say?
>
> A:     Well, I told him that it was his decision. ... He asked me if I thought there would be
>        anything to be gained by his participation for a half an hour.
>
> Q:     What did you say?
>
> A:     I said no, I doubt it.
>
> Q:     At the time that you talked to Mr. Deckelbaum did you consider this meeting to be an
>        important one?
>
> A:      Yes.

Id. at 193.  Nevertheless, Mr. Parks did not convey the importance of the meeting to Mr. Deckelbaum,

because Mr. Parks considered "every meeting to be important." Id. at 193.  The "important purpose"

of the meeting was to receive counsel's report on how to deal with Bender.  Id. at 194-95.

Mr. Hall attended the May 4th meeting by telephone, and when it came time to receive

counsel's report, Mr. Hall was asked to leave the meeting,  Id. at 199, on the theory that Deckelbaum

and Hall "were allied with interests contrary to the best interests" of the bank.  Id. at 201. According to

the Minutes just provided to counsel, Mr. Hall left the May 4th Meeting at 6:45 p.m.  The remainder of the minutes are "redacted," containing only the statement that one of the directors commented that the Board should act "expeditiously" with regard to the Pill and the litigation.  The meeting was recessed 35 minutes after Mr. Hall left, at 7:20, and set to resume the next evening.[13]  The May 5th Minutes indicate that Mr. Deckelbaum and Mr. Hall were "Absent-Excused."  The other Board members simply "uninvited" Deckelbaum and Hall from the continuation of the meeting based on their own perception (or the advice of counsel) that Deckelbaum and Hall were in conflict because of their affiliation with Bender, despite Hall and Deckelbaum's agreement to vote in favor of the Carver Merger.  The Pill was approved during the May 5th continuation of the Special Meeting.  Exhibit 29.  Incredibly, the Minutes of that Meeting reflect the following:

> Mr. Parks reported that he received a follow-up call from Mr. Deckelbaum on this date, inquiring about yesterday's meeting, to which the Chairman gave him an update and informed him that Mr. E. Hall had excused himself from the meeting upon learning that the Board believed that both his and Mr. Deckelbaum's participation presented a "conflict" for the Board.

> The Chairman further stated that he had explained to Mr. Deckelbaum that the Board had a duty to protect the deal and could be liable to the Bank's shareholders if it failed to do so.  <u>He also informed Mr. Deckelbaum that the Board had not yet taken any formal action but to recess the meeting.  Mr. Parks stated that Mr. Deckelbaum did not inquire of him as to when the Board would reconvene the meeting.</u>

---

[13] This reason for the abbreviated time frame is not apparent from the minutes.  On the day these Minutes were received by undersigned counsel (June 30, 2004), Sheila Finlayson, the IFSB corporate secretary, was deposed.  Although her transcript is not yet available, Ms. Finlayson testified that two hours prior to the scheduled board meeting on May 4th, the other board members (other than Hall and Deckelbaum) met with counsel to discuss the Pill and the litigation.  Thus, after Mr. Hall left the actually-scheduled meeting, there was only a brief discussion prior to the recess, because the real meeting had taken place three hours earlier.  Further discussion and the vote took place the next day, when neither Mr. Deckelbaum nor Mr. Hall were invited.

Exhibit 29 (emphasis added).[14]  The foregoing passage from the Minutes of May 5th leaves the unmistakable impression that Mr. Deckelbaum was once again misled by an intentional omission.  Mr. Parks clearly knew the meeting was convening again the evening of May 5th,  yet he conveniently failed to advise Mr. Deckelbaum, and left him with the impression that nothing substantive transpired, because "no formal action [had been taken] but to recess the meeting."  Procuring a director's absence from a meeting by deception or omission is something this Court should not countenance. [15]

Despite the other Board members' misperceived views with regard to Messrs. Deckelbaum and Hall, Deckelbaum and Hall had a right to be informed about the purpose of the meetings, attend the meetings, voice their views on the Pill and the litigation, question Fried Frank about the propriety of the Pill given lack of OTS approval and statutory authorization,[16] and attempt to persuade the other directors to vote against either or both of these defensive measures.  Without regard to the impact of these measures on Messrs. Deckelbaum, Hall or Bender, the other Board members were entitled to hear Deckelbaum and Hall's views on the escalating cost of these defensive measures given the rapidly depleting cash reserves of the Bank.[17]

---

[14]  Mr. Parks was deposed on June 15, 2004; this document was just produced on June 30th, so there was no opportunity to question Mr. Parks on these Minutes.

[15]  For example, a quorum is invalid if it is obtained by misleading the director to believe the meeting was postponed.  See Schroder v. Scotten, Dillon, Co., 299 A.2d 431, 436 (Del.Ch. 1972).

[16]  Messrs. Deckelbaum and Hall are both practicing attorneys.

[17]  The magnitude of the legal fees being expended by this Bank (of which the Benders are 20% shareholders) is astounding.  At the May 4th Board meeting, *five* Fried Frank attorneys and one attorney from Muldoon & Murphy were in attendance; the next day, four Fried Frank attorneys and one Muldoon & Murphy attorney were in attendance at the Board meeting.

## II.    THE EXISTENCE OF THE PILL IS CAUSING THE BENDERS TO SUFFER IRREPARABLE HARM

At the hearing on June 28th, the Court raised the issue of whether the Benders' loss was solely a monetary loss, and if so, whether they could establish irreparable injury. As set forth below, the Benders are being deprived of their right to impact the affairs of IFSB by acquiring enough shares to vote down the Carver merger, and by acquiring enough shares to replace directors. The Benders' loss of their right to acquire additional shares in the market, and what that ultimately means to the Benders, cannot be readily calculated in monetary terms. When a loss is solely monetary, and a successful plaintiff can be adequately compensated at the conclusion of the litigation, injunctive relief is not appropriate because there is no irreparable injury. But the monetary injury concept is not without its exceptions. As this Court (Urbina, J.) pointed out in Lee v. Christian Coalition of America, Inc., 160 F.Supp.2d 14 (D.D.C. 2001), there are several exceptions to this rule, including, as here, where the nature of the loss may make damages very difficult to calculate. Id. at 31 (citing Hamlyn v. Rock Island County Metro. Mass Transit District, 960 F. Supp. 160, 162 (C.D. Il. 1997)).

The D.C. Circuit and this Court have, in numerous cases, found irreparable harm where the loss is essentially economic. For example, in Hoffmann-Laroch, Inc. v. Califano, 453 F.Supp. 900, 901-03 (D. D.C. 1978) this Court (Gesell, J.) enjoined enforcement of an order which established a ceiling price for cost reimbursements for certain drugs under various federal programs. The Court found that if the order went into effect, the plaintiff would lose sales and good will, and although the loss was "admittedly economic," because no "adequate compensatory or other corrective relief will be available at a later date" plaintiff would suffer irreparable harm. 453 F. Supp. at 903 (internal quotation

marks omitted). <u>See also,</u> <u>Washington Metropolitan Area, Etc. v. Holiday Tours</u>, 559 F.2d 841,

843-44 (D.C. Cir. 1977) (destruction of a business constitutes irreparable harm); <u>Merrill Lynch,</u>

<u>Pierce, Fenner & Smith Incorporated v. Wertz</u>, 298 F.Supp.2d 27, 34 (D.D.C. 2002) ( despite the

defendants' contention that the lost commission income from customer could easily be determined, the

Court found that the injury was not confined to lost commissions; rather Merrill Lynch had suffered

"irreparable non-compensable harm in the loss of its customers" and it was "impossible to calculate the

investments that would have flowed from the customers' accounts"); <u>Olympic Fed. S&L v. Office of</u>

<u>Thrift Supervision</u>, 732 F.Supp. 1883, 1200-01 (D.D.C. 1990)(Court found that thrift established

irreparable harm because if a receiver or conservator was appointed, there was a reasonable

probability that Olympic would be destroyed or fundamentally altered); <u>American Federation of Labor</u>

<u>and Congress of Industrial Organizations v. Chao</u>, 297 F.Supp.2d 155, 164 (D.D.C. 2003)( labor

unions established that they would suffer irreparable harm if it was forced to start complying with the

requirements of a new financial reporting rule, and if the rule was subsequently invalidated, nothing

could be done to restore the unions to their previous position).[18]

    In <u>O'Donnell Construction Company v. District of Columbia, et al.</u>, 963 F.2d 420 (D.C. Cir.

1992), Plaintiff O'Donnell, a road construction company, sought an injunction to prevent enforcement

of a set-aside provision of the District of Columbia Minority Contracting Act. Id. at 421. The D.C.

Circuit reversed the District Court's refusal to grant an injunction. Id. at 429. As to irreparable injury,

---

[18] The D.C. Circuit case law on this issue is consistent with the Supreme Court opinion in <u>Youngstown Sheet & Tube Company et al v. Sawyer</u>, 343 US 579, 96 L. Ed 1153, 72 S Ct 863, (1951)("seizure and governmental operation of these going businesses were bound to result in many present and future damages of such nature as to be difficult, if not incapable, of measurement").

the D.C. Circuit found that the plaintiff had little hope of obtaining "adequate compensatory or other corrective relief at a later date" if the injunction did not issue.  (citing Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)).  The Court stated:

> [T]o recoup its losses, O'Donnell would have to show which prime contracts and subcontracts it would have received in the absence of the sheltered markets and 50 percent set-aside provisions and how much profit it would have made on each of those contracts.  The difficulty of such an inherently speculative showing weighs heavily in favor of granting the injunction, especially since O'Donnell's likelihood of success is so high.  In this respect, O'Donnell is much like an unsuccessful bidder for a government contract who is seeking judicial review because the contract was awarded to another under illegal procedure.  In that context, courts do not determine who should have obtained the disputed contract.  Rather, agencies are routinely enjoined to redo the bidding process, in order to vindicate the disappointed bidder's right to a legally valid procurement process. Because damages cannot adequately compensate for the loss of that right, relief must be equitable.

963 F. 2d at 428-29.  Similarly here, the Benders should be entitled to a *legally valid process* to exercise their rights as shareholders to acquire more stock without the risk of the Pill, which was adopted under an illegal procedure.  As in O'Donnell, damages cannot adequately compensate for the loss of that right.  Since the adoption of the Pill on May 5th, the Benders have been prevented from acquiring additional stock even though the OTS has authorized them to do so, and the Court anticipated that they would do so in its January 2004 Order in the Bender v. Parks case.  The harm to the Benders from not being able to buy stock is exacerbated by the fact that others are not so restricted.  Bender is the only shareholder at the 20% threshold.  Thus, any other shareholder, group of shareholders, or potential shareholders who are in favor of the Carver merger can purchase stock (under the 20% level) without triggering the Pill, at the same time that Bender is restricted.  Indeed, Carver recently acknowledged that it had purchased shares without prior approval from the OTS to exceed its then holdings of 5% of the outstanding shares of Independence stock, resulting in the

placement of the balance of the shares (constituting 4.7% of the total outstanding shares of Independence) in a trust. (Exhibit 13). Pursuant to the trust agreement establishing that trust, the shares may not be voted by Carver until it receives OTS permission to retain more than 5% of Independence's outstanding voting stock. Id. at Item 6, p. 4. As presently situated, the game has been rigged in favor of Carver: not only can shareholders in favor of the transaction (including insiders) continue to purchase shares, but the OTS could approve Carver's application to exceed 5%, virtually assuring approval of the Carver Merger when it is ultimately put to a vote of the IFSB shareholders.

If the Benders are barred from purchasing more shares, and Carver's application to exceed 5% is approved, it is likely that the Merger will be approved. If that occurs, the Benders' claim for damages, as in O'Donnell, results in an "inherently speculative" exercise, because they would have to establish how many shares they would have purchased, what the price of those shares would be, what would have happened if they were allowed to purchase shares, and how IFSB (and hence the value of their shares) would have fared absent the Merger.

The Benders will also be irreparably harmed in suffering the loss of the benefit of the OTS approval of their acquisition of stock. In Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998), the District Court, in granting Mova's motion for preliminary injunction, found that Mova "would be harmed by the loss of its 'officially sanctioned head start,' and that Mova's small size put it at a particular disadvantage." 140 F.3d at 1066 n.6. In Atlantic Coast Airlines Holdings., this Court recognized that a party (who was opposing an injunction) would suffer harm as a shareholder if it

was prevented from taking steps to change a corporate board.  295 F. Supp.2d at 87.[19]  Here, the

denial of the injunctive relief sought by the Benders will prevent them from acquiring more stock, which

in turn prevents them from effectively competing with the pro-Carver shareholders, and limits the impact

the Benders can have on the composition of the IFSB Board.  See International Banknote Co., Inc. v.

Muller, 713 F. Supp. 612, 623 (S.D.N.Y. 1989) ("[c]ourts have consistently found that corporate

management subjects shareholders to irreparable harm by denying them the right to vote their shares or

unnecessarily frustrating them in their attempt to obtain representation on the board of directors").

In its Brief filed the morning of the June 28th hearing, IFSB argues (at page 32) that the Benders

will not be harmed because "they are free to vote against the Carver transaction *and, if enough other*

*shareholders decide to do likewise, it will be sufficient to defeat the Carver transaction."*          What

IFSB ignores however, is that the game is rigged in favor of Carver if the Benders are illegally restricted

from acquiring more shares.  The Benders are entitled to an untainted process where they are entitled to

buy enough shares on the open market – assuming willing sellers – to vote those shares to ensure the

transaction is defeated.  Under the IFSB scenario, given the Pill, although Bender can vote against the

transaction, the ability to vote it down is completely dependent on the votes of other shareholders.

IFSB also argues that "if the Benders believe that the OTS has the power to invalidate IFSB's

Rights Plan" they can advocate that position with the agency "and attempt to achieve the result that they

seek."  The issue is what is happening today.  The Benders have illegally been kept out of the public

market for IFSB stock since May 5, 2004.  As counsel for IFSB stated at the hearing on June 28th, it

---

[19]  The Court granted the injunction on different grounds. 295 F. Supp. 2d at 96.

might take four weeks for the OTS to approve the offering circular alone.  OTS's letter dated June 16th (Benders' Exhibit 14) states: "the Plan would not be effective until ***all necessary prerequisites***, including the Bank's filing of an offering circular ... and OTS' declaring the offering circular effective, are completed."  No one knows when "all necessary prerequisites" will be completed, yet the Benders are kept out of the market by the Bank's insistence that the Pill is currently effective and the Rights will be triggered if the Benders exceed 20%.  The Benders are suffering, and continue to suffer, irreparable harm.

**III.     GRANTING AN INJUNCTION WILL NOT SUBSTANTIALLY
          INJURE IFSB OR ITS SHAREHOLDERS**

IFSB argues (at page 31-32) of its Brief that IFSB will suffer harm because if the injunction is granted, the Benders will be able to purchase stock and block the Carver transaction.  The Bank however, really should have no dog in this fight.  The Bank's business is not impacted (or should not be impacted) by what is going on at the shareholder level.  The issue here is whether the shareholders will be harmed by the issuance of the injunction.  What IFSB ignores is that it has illegally instituted a Pill to block the Benders' lawful exercise of their rights as IFSB shareholders to block a transaction that the Benders do not believe is in the best interests of the Bank and its shareholders.  Morton Bender has been vocal for some time that the Carver transaction is not in the best interest of the shareholders, and that it is his intention to vote against the transaction, and then change management of the Bank.  <u>See, e.g.,</u> Benders' Exhibit 19 at 5.  It has been his position that if management is changed, and the Bank performance is improved, the value of IFSB will increase for all shareholders.  IFSB Exhibit 1 (Bender transcript), at 84-94; Benders' Exhibit 19 (Bender Transcript) at 114-119; 75-81.

26

To implement the measures adopted by the Board on May 5th, the bank is bleeding money. In response to inquiry by the OTS, Fried Frank provided information that its legal fees "through April 30, 2004" were approximately $1 million. Benders' Exhibit 30. The Fried Frank fees for May were expected to be approximately $450,000. Id. This does not include amounts spent with Muldoon & Murphy, IFSB's regulatory counsel. The Bank is being directly harmed right now by this all-out assault on the Benders. Prohibiting enforcement of the Pill, while allowing the Benders to exercise their rights as shareholders may in fact ameliorate the cash drain on the Bank by narrowing the issues for litigation.

In O'Donnell, 963 F.2d 420 (discussed above in Section II), the Court found that the "balance of hardships" favored granting the injunction, because the plaintiff asked only for prospective enforcement of the Court's order invalidating the set-aside provision. The Court stated:

> [A] forward-looking injunction would not upset any contractual relations already in place, thus minimizing the adverse impact on third parties. For this reason, the balance of hardships also cuts in favor of granting the injunction. Given the high probability of O'Donnell's eventual success in this litigation, interested third parties will eventually experience the effects of dismantling the Act.

963 A. 2d at 429. Here, the Benders now ask for only prospective injunctive relief, so that they may purchase shares in the market. They do not now seek an injunction which would "undo" any IFSB stock purchases which occurred since the adoption of the Pill.[20] Thus, there is no harm to other shareholders who may have been trading during the pendency of the Pill.

The Benders do not seek disruption of the status quo. The status quo was disrupted on May

---

[20] To the extent Carver has made illegal purchases of shares at the time the Benders' were restricted, that is another issue for another day.

27

5th when the Pill was illegally adopted; the Benders merely seek return to the status quo. IFSB and its counsel cannot embark on an illegal course of action and then deem it to be the status quo. See, e.g., McGregor Printing Corporation v. Kemp, et al., 1992 WL 188794 (D.D.C. 1992) (implementation of a final rule changing government procurement rules was enjoined to preserve the status quo until this Court can rule on the merits of the cross-motions for summary judgment).

IV.     **THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING THE RELIEF REQUESTED**

If the Benders are in the market, there will be more competition (and potentially a higher price) for the individual shareholders who want to sell their IFSB stock now. Attached hereto as Exhibit 31 is a chart printed from the internet on July 1, 2004. Prior to the announcement of the Carver Merger (March 15, 2004), the price of the stock ranged from $22.50 - 23.50 per share. After the announcement, the stock price fell to just under $21.00 per share, which is the offering price from Carver. During the April, the Benders purchased stock at the market price. See Benders' Exhibit 10 (13D Amendment 10). On May 5, 2004, the Benders made an additional acquisition, at the market price. Id. After the May 6th announcement of the Pill and the litigation, and the Benders removal from the market, the stock price has fallen to below $20.50 per share. Additional competition in the market for the purchase of shares is in the public interest.

Moreover, as a troubled institution, the public interest is best served by IFSB complying with OTS regulations and directives (see, e.g., Benders' Exhibit 5) that required the Pill to be approved [21]

---

[21] Of course, as set forth above, it is the Benders' position that the Pill lacks statutory and shareholder authorization, so it is incapable of being valid.

by the OTS *prior* to being adopted.  The purpose of these regulations and directives is to protect the public interest, and to ensure that the bank is operated in a safe and sound manner.  The financial cost to IFSB of this assault on the Benders threatens the not only the financial institutions insurance fund, but the Bank's depositors, its shareholders, and its vendors.  The Benders' purchases of shares on the open market constitutes no such threat, and an injunction is proper.

## **CONCLUSION**

The Benders are entitled to prompt relief.  The likelihood on success of the merits (the present invalidity of the Poison Pill) is overwhelming. [22]  In addition, the evidence of irreparable injury is also high.  All the Benders' seek is the unfettered ability to act in a market for IFSB stock which is not skewed by the *ultra vires* activities of IFSB's Board.  If the Court were to deny relief in this circumstance it would amount to a judicial ratification of improper activities of the Bank's Board and give the Court's imprimatur to the Bank's audacious approach to its own regulators.  It is respectfully submitted that the Application for Injunctive Relief should be granted.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & WAYSON, L.L.P.

---

[22]While not directly involved in the Court's resolution of the instant Motion, it is significant that the Bank recently filed a voluntary dismissal of all claims against Messrs. Deckelbaum and Hall.  The Bank's Complaint centers around this notion that Messrs. Bender, Deckelbaum and Hall are acting in concert and that Bender is somehow improperly benefitting from an alleged breach of fiduciary duty by Hall and Deckelbaum as directors.  The dismissal reflects the reality that there is no evidence, and never was any evidence, to support the existence of this alleged cabal.  In that context, it appears that the likely that the Benders will succeed in their defense of the Bank's Complaint.

_____/s/_____
Dale A. Cooter, Bar #277454
Donna S. Mangold, Bar #358851
James E. Tompert, Bar #358952
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Defendants*
 *Morton A. Bender and Grace M. Bende*  r

1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Benders' Brief in Further Support of Their

Motion for Preliminary Injunctive Relief on the Poison Pill was served electronically on the 2nd day of

July 2004, on:

        James H. Schropp, Esquire
        Fried, Frank, Harris, Shriver
         & Jacobsen, LLP
        1001 Pennsylvania Avenue, N.W.
        Washington, D.C. 20004-2505
        schroja@ffhsj.com

                                          /s/
                              Dale A. Cooter